## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

BROCK FREDIN,

          Plaintiff,

--against--

GRACE ELIZABETH MILLER,
CATHERINE MARIE SCHAEFER

          Defendants.

Case No. 18-cv-466 DWF/KMM

**COMPLAINT**
Jury Trial Demanded

RECEIVED

FEB 16 2018

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

Plaintiff Brock Fredin ("Plaintiff"), proceeding pro se, hereby alleges the following

against Defendant Grace Elizabeth Miller ("Defendant Miller") and Catherine Marie Schaefer

("Defendant Schaefer") (collectively, "Defendants").

## NATURE OF THE CASE

1.    Plaintiff asserts claims for defamation *per se*, abuse of process, non-consensual

sexual solicitation, invasion of privacy, negligence, false arrest, malicious prosecution, civil

fraud, conspiracy intentional infliction of emotional distress, and *prima facie* tort under

Minnesota state common law.  The events that give rise to the claims in this action began in

March 2014 when Defendant Schaefer began stalking the Plaintiff after he stood her up for a

blind date.  Prior to Defendant Schaefer initiating and arranging the unprompted date, Plaintiff

had very brief email conversation through an anonymous dating website where he was unable to

see her photo.  Furthermore, Plaintiff had very brief additional text-message interaction in

connection with this meeting with Defendant Schaefer and did not even know who she was.

Since that time, Defendant Schaefer began stalking the Plaintiff by making bogus and knowingly

false police reports with several law enforcement departments spanning multiple states

SCANNED
FEB 16 2018
U.S. DISTRICT COURT ST. PAUL

1

3.      Plaintiff's defamation claims arise from Defendant's posting patently false and sordid statements and allegations concerning Plaintiff on the anonymous revenge porn Twitter account @CardsAgstHrsmt, providing knowingly false statements to the Minnesota Judicial Branch, and *The City Pages*. Specifically, Defendant Schaefer claimed, endorsed, and published multiple statements within *the City Pages* that she received unwanted phone and/or text messages from Plaintiff – messages and calls that do not even exist and were contrived by Defendants. This bogus and outrageous allegation is categorically untrue and defamatory, which was proven irrefutably false after an exhaustive investigation by the Saint Paul Police department in May 2017.[1] After proper subpoena practice, every single allegation provided by Defendants originated from telemarketers – easily identified by routine Google searches – despite claims to the contrary by Defendants. The publication of which, however, on the @CardsAgstHrsmt Twitter account and *The City Pages* has inflicted substantial emotional distress on Plaintiff.

4.      Defendants did not stop with posting or providing the false text message and phone call allegations to various organizations and the *City Pages*, unfortunately. Instead, Defendants continued subsequently for years to harass Plaintiff by repeatedly coaching and encouraging women to abuse process through collateral pile-on harassment restraining orders ("HRO"). This included repeatedly posting Plaintiff's photographs and derogatory statements soliciting contact with Plaintiff from third-parties on seedy adult websites that violated the newly enacted revenge porn law in Minnesota. Defendants persisted even after Plaintiff conducted an independent investigation and skip-traced Defendant Schaefer's number to ascertain the identity of the

---

[1] After Defendant Schaefer filed upwards of twenty (20) knowingly false police reports, The Saint Paul Police department initiated subpoenas and/or search warrants for every single phone call and/or text message claim. Each subpoena indicated the numbers were owned by telemarketers or local companies selling products or services. Virtually all of the claims were obviously dubious on their face.

3

retaliating against Plaintiff by commencing a baseless state court proceeding against Plaintiff seeking a Harassment Restraining Order ("HRO") in Ramsey County District Court.  Defendant commenced the proceeding not because Plaintiff was in any way harassing her.  Rather, she has acknowledged both in *The City Pages* article and throughout the HRO proceeding that she was "coached" by Defendant Miller and has sought the HRO because Plaintiff has compromised her anonymity with respect to her maintaining and posting unlawful advertisements impersonating his identity on the Internet and that she needed to "conceal" her actions with respect to her relentless stalking and false police reports originating from telemarketers.[3]  In other words, Defendants abused process by bringing the HRO proceeding against Plaintiff for the collateral purpose of manufacturing a knowingly false coordinated smear campaign, retaliating against Plaintiff, attempting to silence his legitimate First Amendment free speech to request that they cease posting about him, prevent him from seeking legal redress, and to conceal their unlawful activities including relentless false police reports with respect to their invasion into his personal life.

7.      As a result of Defendant's repeated tortious acts, Plaintiff has suffered significant damages and harm.  This includes, but is not limited to, harm to Plaintiff's personal and professional reputation, frivolous litigation expenses and severe emotional harm inflicted at the harms of Defendant through their orchestrated @CardsAgstHrsmt Twitter and *The City Pages* smear campaign.  Plaintiff seeks actual and punitive damages in addition to injunctive relief.

## JURISDICTION AND VENUE

---

[3] Defendant Miller admitted that she "then she coached [Defendant Schaefer] through getting her own [HRO]" during the release of the February 22nd, 2017 *The City Pages* article.

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. The Court also has federal question jurisdiction under 28 U.S.C. § 1331.

9.     Venue is proper pursuant to 28 U.S.C. § 1332(b)(1) and (b)(2) because the events that gave rise to this action occurred in this Judicial District.

## THE PARTIES

10.     Plaintiff Brock Fredin is a citizen of the State of Wisconsin and resides at an address of 1905 Iris Bay, Hudson, WI 54016.

11.     Upon information and belief, Defendant Grace Elizabeth Miller is a citizen of the State of Minnesota and resides at an address of 1656 Dayton Ave S., Saint Paul, MN 55104.

12.     Upon information and belief, Defendant Catherine Marie Schaefer is a citizen of the State of Pennsylvania and resides at an address of 120 W Cherry Ln., State College, PA 16803.

## FACTUAL ALLEGATIONS

### Background

13.     Defendant Miller is a Major in the United States Air Force and commands the Aircraft Maintenance Squadron at the 934th Airlift Wing for the Minneapolis-St. Paul Air Reserve Station. In addition, she just finished her PhD in English Literature at the University of Minnesota. Her only job prior was working at the United States Air Force Academy as an English instructor where she mentored Rhode Scholar students including Rebecca Esselstein. In doing so, Defendant Miller attempted to date Ms. Esselstein's brother only to mock him relentlessly – as she has done to virtually any man she comes into contact with - for traveling from Ohio for a date. The genesis of the instant matter stems from Plaintiff's breakup with Defendant Miller in January 2016.

6

Plaintiff and Defendant Miller dated for the latter half of 2015. In October 2015, Defendant Miller learned false allegations deliberately manufactured to harm Plaintiff from Defendant Schaefer. Finding these (now known to be false) allegations credible, Defendant Miller eventually exited the relationship in January 2016.

14.     Within hours after this petty breakup argument, Plaintiff made an extremely brief public social media post claiming "To a lost love. Incredibly sorry Grace." Defendant Miller then conducted a series of revenge acts to mischaracterize this post as "threatening" and labeled him a "stalker" for doing so. Although this post did not notify her directly or even indirectly, Defendant Miller petitioned for an HRO and then began repeatedly clicking on his social media profile to imitate a message within a "recent views" section of her profile dashboard. Exhibiting all the signs of a petty and cruel military officer, Defendant Miller then mischaracterized a police report alleging that this was an HRO violation. Indeed, this was the start of her abuse of process to restrict the Plaintiff's legitimate First Amendment protected free speech. Even after she obtained her HRO, she continued bullying him by emailing him claiming that she was "one hundred percent [expletive] serious". Rather than simply emailing once, she instead repeatedly emailed him with aggressive tones in an effort to goad him into violating the HRO. Instead, the Plaintiff took reasonable and appropriate action by ignoring her and did not respond.

15.     Shortly following the rubber-stamped HRO proceeding, in which Plaintiff was subjected to the start of some of the most outrageous, inflammatory, and outright gender-bias available anywhere in a civilized nation, Defendant Miller sought to bring criminal charges for this social media post in which she deliberately and falsely characterized as "threatening". Of course, Defendant Miller never specified what the "concerns" over Plaintiff's behavior were as it

7

was simply another conclusory attack on Plaintiff and an effort to justify what would become her two-and-a-half years of malicious harassment without affording Plaintiff relief.

16.     As an initial matter, following the contested hearing, the Saint Paul City Attorney's Office ("SPCA") immediately declined criminal charges, which is a common pattern when the Defendants seek false and bogus criminal charges over Facebook posts multiple times, only to see them summarily declined.  Defendant Miller then took the incredibly inappropriate step of alerting the SPCA by letter alleging that Plaintiff's social media posts were "harassment" and unlawful before begging them to bring criminal charges.  Specifically, Defendant Miller stated that she herself was making deliberate adverse inferences to the meaning and/or content behind innocent Facebook posts that very clearly were not directed at her, notifying her, or even indirectly communicating.  Nonetheless, it was clear that Defendant Miller once again intended to publicly retaliate against and stigmatize Plaintiff by insinuating to the public that Plaintiff was at fault and needed to be criminalized without Plaintiff ever having a chance to contest it or a meaningful opportunity to be heard on the issue. For example, Defendant Miller claimed that an innocent Facebook post about the highly popular book *To Kill a Mockingbird* amounted to "stalking" and that the post violated her HRO since it contained text that read "Justice will always prevail.  Bullies never win." and a photo of the trial depicted in the book.  Likewise, Defendant Miller began reporting this and other innocent posts to the Saint Paul Police and the Ramsey County District Court.

17.     After an absurd trial, in which the Ramsey County Referee James Street openly bullied and harassed the Plaintiff, where the Plaintiff presented evidence that Defendant Miller instead was the one sending repeated messages following the breakup indicated by her multiple

8

emails even after obtaining her ex-parte HRO, Plaintiff appealed the Order to the Minnesota Court of Appeals.

18.     On September 20th, 2016, Defendant Miller attempted to both initiate and cancel multiple show cause hearings over Facebook posts which did not violate any known state statute, federal law, and posed no opportunity for violating her HRO.   Plaintiff's attorney responded with "Eric looked through Brock's fb and didn't see anything that mentioned."

19.     On June 27th, 2016, four (4) days before a calendared appellate brief deadline, Defendant Miller demanded a hearing to require her HRO be modified to bar the Plaintiff from making any Facebook posts or speaking about her publicly.  In doing so, Defendant Miller radically changed and expanded her allegations of harassment.  In this petition, she falsely alleged that virtually any Facebook or social media post or profile somehow was directed at her (despite the fact they were not direct messages and did not tag or notify her) and therefore violated the HRO.   Defendant Miller's allegations not only necessarily conflicted with her prior sworn allegations without any explanation or reasoning but were substantially embellished and added-to from her two prior sworn statements.  As a result of Defendant Miller's filing of a new petition for a Temporary Harassment Restraining Order requesting that his speech be censored in the Family Justice Center of the Ramsey County District Court just days prior to the commencement of a *Miller v. Fredin* appellate brief deadline before the Minnesota Court of Appeals, the range of harassment allegations were being expanded to include any known speech ever uttered by the Plaintiff – including private text messages exchanged during his routine relationship with Defendant Miller well before the temporary harassment restraining order. Indeed, Defendant Miller's tactical filing that radically changed her allegations of harassment just days before the calendared *appellate brief deadline* on July 1st, 2016 left Plaintiff

9

fundamentally unprepared to defend himself against her allegations. On advice of counsel, Plaintiff agreed to enter into a verbal agreement with Ms. McQuitty providing for a limited period of social media profile removal, where Defendant Miller demanded that he stop posting while she was deployed to Kuwait as part of the agreement. Plaintiff's counsel believed that without the additional time to gather evidence and witnesses to defend against Defendant Miller's radically changed and new allegations of harassment dropped on him two hours before the emergency *TRO* filing on June 27th, 2016, the Minnesota Court of Appeals would make a summary finding against Plaintiff and the presumption of harassment (while subject to an HRO) – that any social media post was not harassment - would be forever rebutted under the law in Minnesota.

20. In reading the Appellate Decision ("Decision"), it is simply astonishing that Judge Kevin G. Ross – an elected judicial officer – would write a decision designed with the sole intent to negatively portray a litigant and inflict unnecessarily (and irreparable) harm on him. In releasing his tabloid style opinion, he failed to cite any case law whatsoever in contravention of state law and failed to identify any facts within the actual timeline of the breakup. Instead, he chose to extract wholly unrelated comments weeks before any breakup to destroy his career for the remainder of his life. In failing to cite context, Judge Ross was fully unaware these comments were made in jest as a sarcastic response to Defendant Miller's vicious behavior where she relentlessly mocked the Plaintiff to be more "confident" based on his general passive behavior in line with his role as a computer programmer. Even worse, non-party Ms. Middlecamp had litigated previously before Judge Kevin Ross and even released a Tweet regarding his decision before it was publicly released.

10

21.     Apart and aside from her military career, Defendant Miller is also a militant feminist bent on pressing forward a radical sexist agenda and desperate for attention. She admittedly reached out to a patently offensive, abusive and bigoted Minneapolis Assistant Attorney Lindsey Middlecamp ("Ms. Middlecamp") who maintains the Twitter account entitled "Cards Against Harassment" that has a handle of @CardsAgstHrsmt, to retaliate against her ex-boyfriend/Plaintiff following their failed relationship.     Defendant Miller coached and manufactured an HRO from Ms. Middlecamp's personal friend - Defendant Schaefer - to serve one purpose:  conduct all-out warfare and destroy Plaintiff through a coordinated media attack. She used the Twitter account – which is run anonymously by Ms. Middlecamp – to post abusive and vulgar feminist screeds and propaganda about her ex-boyfriend who she claimed is a "stalker" for making the social media posting explained in greater detail above and that she was stealing his private photos to "keep women safe".  As a part of the offensive content on the Twitter account, Defendant Miller targeted Plaintiff by knowingly publishing and/or providing false and defamatory information about him in an attempt to shame and stigmatize him.  Defendants stole his private photos and published them to hundreds of thousands of people not in an effort to "warn" women.  Instead, Defendants invaded his privacy to fully manufacture all-out warfare for trivial and petty grievances and to retaliate for past criticism.  Their only goal throughout was to criminalize Plaintiff for exercising his rights to legitimate free speech to criticize public officials and to seek legal redress for their past wrongful and unlawful conduct.  Moreover, Ms. Middlecamp was a convenient conduit for bringing criminal charges due to her role as an Assistant Minneapolis City Attorney and her connection to law enforcement.  As Plaintiff would later find, Ms. Middlecamp used these connections to bring extraordinary abuse of process and malicious

11

prosecution in conjunction with her media smear campaign. As a result, this violates Professional Responsibility Rule 3.6 (Trial Publicity).

22.    Illustrative of Defendant Miller's connection to @CardsAgstHrsmt, on January 24th, 2017, Defendant Miller's sister, Emma Miller began retweeting the defamation of Plaintiff from her Twitter account @EmmaMil87.[4]



23.    In addition to providing the *Miller v. Fredin* and *Schaefer v. Fredin* decisions to @CardsAgstHrsmt, Defendants also provided it to the *City Pages* tabloid. Specifically, Defendants provided the Decisions and invaded Plaintiff's privacy by giving his confidential photos to Michael Mullen at the *City Pages* and Jenavieve Hatch at the *Huffington Post*. Mr. Mullen wrote disparaging articles concerning the Decisions entitled "Accused stalker Brock Fredin is writing a horror story, and he's the main character." Both of Plaintiff's prior attorneys confirmed that Defendants and Ms. Middlecamp sent the Decisions to Mr. Mullen directly and that Ms. Middlecamp was additionally connected to Mr. Mullen as a "friend" on Facebook.

24.    By way of example of their abusive conduct, Defendants have started and actively promoted the Twitter and the *City Pages* phony content to bring prejudicial media coverage before unlawfully using Ms. Middlecamp's public position as an Assistant Minneapolis City Attorney to

---

[4] See e.g., https://twitter.com/emmamil87

coordinate frivolous criminal charges over the social media post explained above. After being subjected to the relentless false and disparaging coverage, Plaintiff was fired from his job as a software developer and ridiculed by his co-workers after Ms. Middlecamp and Defendants sought to terminate each and every one of his employment opportunities.

25.     Perhaps the most troubling aspect of the fraudulent collateral pile-on HRO's is what Defendants did with it. They were not content with simply sanctioning Plaintiff. Rather, they wanted to publicly humiliate him, cause him to be fired from his job and irreparably destroy his reputation and ability to practice his career. They did this by unlawfully publishing the manufactured Decisions and disseminating it to the tabloid media to incite negative publicity against Plaintiff.

26.     As an initial matter, Minnesota Law § 609.748 ("MN 609.748") defines harassment trials as special proceedings. Despite the fact that the two fifteen (15) minute trials were subject to due process deprivations under Minn. Civ. R. P 81.01, Defendants manipulated the statute and published the Decisions in the *City Pages* and attempted to publish it in the *Huffington Post*. In doing so, Defendants manipulated the statute and engaged in conduct illustrating that they were illegitimately abusing the orders to bring extraordinarily negative media coverage. This is particularly so in light of the sensitive and prejudicial allegations protected by MN 609.748 that they deliberately chose to include in their phony allegations and Decisions, which they personally disseminated to the media and the public. The publication of the Decisions was a clear act of bad faith, harassing behavior designed to retaliate against Plaintiff for the filing of the Court of Appeals case against Defendant Miller.

13

Facebook User

unlawfu

fraudule

06/18/2016 11:53PM

I ask that you remove my name from the internet. You have posted my name, contact information, and false accusations to a nefarious based website.

You and or your parties therein made several false accusations which are punishable via a libel/slander suit. Your parties have also harassed me through veiled threats, unwanted communication, and signing my email up to various online sits to receive email in mass.    This is harassment.

If my name isn't removed within 1-2 hours after receipt of the message I will file a restraining order against all parties involved to harass me.

Please do take this seriously.   I do not want you to have any sort of reputation loss or stress from any sort of restraining order.

Do not contact me under any situation.   Your serious unending harassment is against the law.

32.    (See June 18th, 2016 BF to CS Msg.)  Plaintiff was denied a full and fair opportunity to be heard during *Schaefer v. Fredin*.  Referee Elizabeth Clysdale presided over the hearing where she had previously rubber-stamped Defendant Miller's HRO petition.   As there was no legal basis to grant an HRO to Defendant Schaefer who had never met, spoken to, or had any meaningful communication with the Plaintiff beyond being told to remove ads on the internet she published, the inescapable conclusion is that Referee Clysdale intentionally engaged in deceitful conduct to enhance Defendant Schaefer's testimony because she knew that it would be favorable to the Court, it would allow the county to score a new grant from the Federal government for handing out Harassment Restraining Order(s).  During this hearing, in which Defendant Schaefer would be granted a free attorney from her personal friend Ms. Middlecamp – the only person to testify was Defendant Schaefer.  Indeed, Referee Clysdale rubber-stamped the HRO after a brief fifteen (15) or twenty (20) minute hearing.  The one valid email from Plaintiff clearly read, however, that he was requesting that Defendant Schaefer cease publishing ads to victimize him, yet egregiously Referee Clysdale incompetently failed to

16

read the email. Referee Clysdale's behavior and decision was all the more prejudicial because of the fact she relied on out-of-court hearsay statements allegedly made by Defendant Miller and granted the HRO with merely verbal allegations and one woman's testimony.

33.    Rather than seek reasonable mediation, Defendant Schaefer brought a bad-faith HRO to abuse legal process and manufacture a false smear campaign in retaliation for both appealing Defendant Miller's order and for past grievances explained above.

<u>Prejudicial Effect of Negative Media Coverage</u>

34.    Defendants publication and dissemination of the Decision to the media was the single most prejudicial and abusive act they committed in *Miller v. Fredin*. In fact, it was probably the single most abusive and prejudicial act ever directed at a litigant by an Assistant City Attorney in modern jurisprudence. It precluded Plaintiff from having any meaningful trial, much less a full and fair trial in *Miller v. Fredin, Schaefer v. Fredin, Middlecamp v. Fredin, or State of Minnesota v. Fredin*. It fundamentally crippled Plaintiff's ability to try the case, gave license to Defendant's counsel and Karmen McQuitty, Peter Mayer, and/or Michael P. Boulette to further engage in inappropriate conduct during the trial(s), incited continuous negative publicity over the presumptively confidential case and deprived Plaintiff of an unbiased and conflict-free factfinder.

35.    Perhaps most important, Defendant's publication and dissemination of the Decision to the media resulted in Plaintiff being terminated from his job at *Trane*. Plaintiff was terminated on January 26th, 2017 – less than two months prior to the commencement of the Middlecamp and/or the frivolous criminal trial – solely as a result of Defendant's dissemination of the Decisions. Given the nature of the Plaintiff's firing, the negative publicity incited by

Defendants and Defendant's horrific and fabricated statements about Plaintiff in the Decisions,

it was impossible for Plaintiff to find new employment prior to the commencement of either

trial. Thus, Plaintiff was left without the financial means to defend himself – which Defendants

were well-aware of and seemed to be their desired intent in publishing the Decisions. This

included paying fees for legal representation, retaining experts, copying expenses, fees incurred

for transcripts, etc. Most importantly, it precluded Plaintiff from hiring experienced trial

counsel as he intended to do prior to the Decision.[5]

36.     Defendants publication and dissemination of the Decisions was further

prejudicial because it attracted negative pretrial media attention to the case. Indeed,

Defendants not only attracted this attention, but they affirmatively went out and aggressively

sought it out in an effort to paint Plaintiff in a negative light to inflict harm on Plaintiff and

further their campaign of retaliation and harassment. This was highly prejudicial and

inconsistent with Due Process. Indeed, it is fundamental that "in the case

of pretrial proceedings, publicity has a far greater potential for prejudicing defendants."

*Minneapolis Star & Tribune Co. v. Kammeyer,* 341 N.W.2d 550, 560 (Minn. 1983). in order "to

maintain public trust and confidence in the judiciary, judges ... should act to assure that parties

have no reason to think their case is not being fairly judged." *Pederson v. State,* 649 N.W.2d 161,

163-65 (Minn.2002). Here, Defendants did everything in their power to maximize pretrial

---

[5] Plaintiff intended to hire trial counsel in the Winter of 2017. Nathan Hansen was retained by Plaintiff in July 2016 in order to help Plaintiff until future counsel was retained. After Plaintiff was fired from *Trane* as a result of the Decision, Plaintiff no longer had the means to retain experienced trial counsel and the Ramsey County District Court refused to appoint counsel for him. Thus, he was left to try the case himself. At that time, Plaintiff cashed out his 401k to retain Barry S. Edwards. Defendants, seemingly aware of the problem they created, repeatedly referred to Mr. Hansen as "scandalous, without merit" in order to deflect any challenge by Plaintiff and retaliate against his legal counsel.

18

publicity negative to Plaintiff denying him any meaningful opportunity to be heard and only further harass and inflict harm on Plaintiff.

37.     Given the fact that in the Decision Defendants publicly made numerous negative statements against Plaintiff, attacked Plaintiff's ability to practice his career, tacitly gave credence to Defendant Miller's allegations of domestic harassment and repeatedly suggested that Plaintiff was a harm to local women without having seen a single document in evidence, there was absolutely no way that Plaintiff could receive a fair trial from the Ramsey County District Court and/or Referee Elizabeth Clysdale ("Referee Clysdale") as the fact-finder.  This is particularly so in light of the fact that Plaintiff lost his job as a result of the Decision leaving him without the financial means to defend himself.  In order for Referee Clysdale to rule in Plaintiff's favor, it would have required her to wash over her previous negligent Decision and admit fault in making improper Orders based on highly suspect judgement.  This was never going to happen.  Referee Clysdale pinned herself into a box when her prior Decision was published and disseminated in which she was essentially forced to rule against Plaintiff in order to try to corroborate her poor judgement against Plaintiff and to justify causing Plaintiff to lose his job less than two months prior to the commencement of the *Middlecamp* v. *Fredin* and frivolous criminal trial as well as his ouster from the software profession in Minnesota stemming from the Decision.  As a result, Defendants publication and dissemination of the Decision to the media was prejudicial and deprived Plaintiff of an unbiased fact-finder rendering the *Middlecamp v. Fredin* and frivolous criminal proceeding inconsistent with Due Process.

38.     Without question, Referee Clysdale's conduct surrounding the Decisions was improper, unethical and highly prejudicial to Plaintiff in *Middlecamp v. Fredin* and Schaefer v.

19

*Fredin*, most specifically Referee Clysdale personally rubber-stamping HRO's from women he had never met in order to manufacture media campaigns. In the weeks that followed, Referee Clysdale refused to recuse herself from the proceeding despite her appalling judgement and misconduct. She went on to preside over the *Middlecamp v. Fredin* trials where she further engaged in abysmal and prejudicial behavior discussed *infra*.

39.     Throughout the whole ordeal, Plaintiff tried to reach out to state court officials in an effort to put a stop to Defendants and Referee Clysdale's behavior. Indeed, Defendants conduct was harmful not only to Plaintiff, but was destructive to his family and, most importantly, the the integrity of the Judicial system. What Plaintiff found was that the various departments and agencies in the Minnesota Judicial Branch were actively complicit in Defendants, Ms. Middlecamp, and Referee Clysdale's behavior and were engaged in a full-fledged cover-up of this behavior by attacking Plaintiff. Indeed, as Plaintiff found out, this scheme went all the way up to the Minneapolis and Saint Paul City Attorney's Office and the Minnesota Court of Appeals.

40.     As mentioned above, Plaintiff reached out to both Ramsey County Chief Judge Guthmann and Nykee Younghans in the Office of Court Administration inquiring as to why Referee Clysdale was singled out to take over the three *Fredin* matters. Both Judge Guthmann and Ms. Younghans refused to provide any explanation or justification for the deviation in the court rules and policy, with both Ms. Younghans and Judge Guthmann even refusing to investigate. Moreover, throughout the litigation, Plaintiff wrote to both Judge Guthmann and Ms. Younghans with concerns about Defendants and Referee Clysdale's misconduct in *Miller v. Fredin, Schaefer v. Fredin, and Middlecamp v. Fredin*. This included concerns about Referee

20

Clysdale's outrageous and hostile behavior, her prejudicial disposition towards Defendants, her use of excessive court officers to threaten and intimidate Plaintiff, Defendant's extrajudicial conduct with the tabloid media and the fact that Referee Clysdale was fabricating rulings and findings in an effort to harm Plaintiff. Judge Guthmann's and Ms. Younghans willfully refusal to intervene to stop Defendants and Referee Clysdale's retaliatory behavior and extrajudicial misconduct directed at Plaintiff was improper.

41.     Moreover, the cover-up of Defendants misconduct has gone well-beyond merely Court Administration. Indeed, on July 18, 2017, Plaintiff filed an action against Ms. Middlecamp in the United States District Court for Minnesota alleging inter alia that Defendants and Ms. Middlecamp had defamed Plaintiff and denied Plaintiff the right to a fair trial by engaging in the extrajudicial acts of publishing and personally disseminating the Decisions to the media and making outrageous irrefutably false claims. See *Fredin v. Middlecamp*, Case No. 0:17-cv-03058 ("Fredin v. Middlecamp"). In the complaint, Plaintiff detailed numerous acts of misconduct by Defendants and Ms. Middlecamp that went well beyond personally disseminating the Decisions to the media.

<u>Defendants Defamation of Plaintiff</u>

42.     On February 22nd, 2017, Defendants perfected their phony smear operation to the *City Pages*. Virtually every statement Defendants provided in the *City Pages* article is false and mischaracterized. Accordingly, the allegations below are therefore patently false and defamatory *per se*. Defendants provided the above statements knowing that the statements were false and with reckless disregard for the truth. Moreover, to the extent they did fabricate the above statements, both Defendants clearly adopted the defamatory

21

statements by providing the statements to the *City Pages* and reporter Michael Mullen. In it, Defendants set forth numerous irrefutably false statements, which included:

| | |
|---|---|
| FALSE: | "Before they met in person, Fredin sent a series of "very odd" and intense texts. Schaefer decided a meeting was "not in her best interests." (*See* City Pages Art. Feb 22nd, 2017.) |
| TRUTH: | Plaintiff had minimal communication with Defendant Schaefer and stood her up after Defendant Schaefer sent erratic messages. |

22



**Flaireolas**
*Minneapolis, Minnesota*

Tues, 3/11. at 9.

**Flaireolas**
*Minneapolis, Minnesota*

I'm Catherine. What's your name?

*Minneapolis, Minnesota*

My name is

See you at the Republic at 9.

Can't wait. :)

**Flaireolas**
*Minneapolis, Minnesota*

Actually I just found out I'm scheduled for an 11 hour day both today and tomorrow, would it be ok to do Wednesday instead? My number is

**Flaireolas**
*Minneapolis, Minnesota*

Ungh. Parent just rescheduled. Let's stick to Tuesday.

**Flaireolas**
*Minneapolis, Minnesota*

So how am I going to know who I'm meeting if I don't have a picture? Remember, also, that I am a woman meeting a stranger and for safety's sake, I'd like to at least have a phone number for you. Personally, I don't really understand the hesitance to share a picture and it's making me a little hesitant. Even if it was for the sake of keeping your privacy with regard to        prettymuch anyone could take any picture of you and claim to have any sort of conversation regardless of it being true or not, so that seems like a less solid reason...

**Flaireolas**
*Minneapolis, Minnesota*

Going to need an answer from you here before I go, buddy...

| | |
|---|---|
| **FALSE:** | "[Defendant Schaefer] canceled and told Fredin to stop contacting her." (*See id.*) |
| **TRUTH:** | Plaintiff stood her up.  Defendant Schaefer authenticated this through the text message "Yea well I sent you those messages several days ago and when I didn't hear from you I went anyway last night.  I sent |

23

you one to keep Tuesday literally hours after the one asking to change."



**FALSE:**   "Over the next two years, she was contacted dozens of times by unfamiliar cell phone numbers and online dating profiles. In longer communiques, Schaefer recognized Fredin's "unique" writing style, she wrote in the affidavit. Other messages just said, "Hi Cat." No one else called her that." *(See Id.)*

**TRUTH:**   After an exhaustive investigation by the Saint Paul Police department, each and every allegation originated from telemarketers. In fact, many were easily identified via routine Google search. In one report, the Saint Paul Police claimed, "An internet search revealed this number as a possible telemarketer."

24

## Saint Paul Police Department
# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

Complaint Number    Reference CN                                              Date and Time of Re

**16122823**                                                                 03/30/2017 08:

Primary offense

## HARASSMENT-STALKING LAW VIOLATION

Primary Reporting Officer   Mccabe, David D          Name of Victim/business

Primary email,                                       Location of Incident   1100 GRAND AV Apt 2
Secondary reporting officer                                                 ST PAUL, MN 55104

Approver

District  Central                                    Date & time of occurrence   01/01/2014 11:48:00 to
Site.                                                                             06/20/2016 11:48:00

Arrest made

Secondary offense

Police Officer Assaulted or Injured.              Police Officer Assisted Suicide.
Crime Scene Processed.

## NARRATIVE

On 07/01/2016, the victim of this incident reported that she had two "odd" calls in the same night. The following are the reported numbers and what was found on them.

619-300-7004; Lists to a Patrick Oshea, as a utility (through cingular wireless), out of San Diego CA (and has since 2011). An internet search also revealed this number as a possible telemarketer.

209-201-1847; Lists to a business (Pac West Telecom, INC), out of Stockton CA, an internet search also revealed this number as a possible telemarketer.

25



Saint Paul Police Department

# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

04/18/2017 08:20

Complaint Number    Reference CN

16253015

Primary offense

## HARASSMENT-STALKING LAW VIOLATION

Primary Reporting Officer:  Mccabe, David E

Name of location/business

Location of incident: 1180 GRAND AV Apt 2
ST PAUL, MN 55105

District: Western

Date & time of occurrence: 11/15/2016 00:23:00 to
12/10/2016 10:21:00

Police Officer Assaulted or Injured
Crime Scene Processed:

Police Officer Assisted Suicide

## NARRATIVE

On 03/31/2017, I received a response to an administrative subpoena served to Onvoy, LLC (via Email), that provided the Whole saler information to [763-515-4376] as: Text Plus, INC.

On 4/6/2017, I served an administrative subpoena on TextPlus, INC. (via email), for subscriber information for [763-515-4376], and on 04/13/2017 received data back from that request. That data was added to the SPPD Media Vault.

That data showed, that on 01/02/2017 @ 1428 (GMT), the [IP Address 74.44.215.189] (which shows that it is owned and operated from Frontier Communications), was being used at that time.

On 04/17/2017, I served an administrative subpoena on Frontier (via Corporation Service Company, Christine Olund), for subscriber information and address of [IP Address 74.44.215.189]. On 04/18/2017, I received a response from Frontier with the following subscriber information: Twin City Steel Erectors INC (13065 132nd ST W, Apple Valley, MN, 952-423-6101).

At this time there is no known connection between Brock FREDIN and that company.

List of Files for CN 16253015:

1. 16253015-04162017_234616-STALKING(1111550_NextPlus_Activity).csv  -  TextPlus Activity
2. 16253015-04132017_105934-STALKING(prov1xbc@gmail.com_VoiceCalls).csv  -  TextPlus Calls

The labeled photos were TRANSFERRED to the Media Vault.

List of Photos for CN 16253015:

1. 16253015-04182017_113714-STALKING(Frontier AS Return).pdf  -  Frontier AS Return

26

## Saint Paul Police Department
# SUPPLEMENTAL OFFENSE / INCIDENT REPORT

Complaint Number    Reference CN                                    Date and Time of Re

16122823                                                           05/02/2017 18:

Primary offense:

## HARASSMENT-STALKING LAW VIOLATION

Primary Reporting Officer:  Mccabe, David E          Name of location business:

Primary squad:                                        Location of incident: 1180 GRAND AV Apt 2

Secondary reporting officer:                                      ST PAUL, MN 55104

Approver:

District  Central                        Date & time of occurrence: 01/01/2014 11:48:00 to

Site:                                                             05/20/2016 11:48:00

Arrest made:

Secondary offense:

Police Officer Assaulted or Injured:          Police Officer Assisted Suicide:
Crime Scene Processed:

**NARRATIVE**

On 05/02/02017, I (Sgt McCabe, SPPD), received the following information from a subpoena served on Google Voice at the request of the SPCA.

List of Files for CN 16122823:

1. 16122823-05012017_053154-STALKING(6125640343.Golfflow4@gmail.com.Voice).txt  -  Google Voice Return for 6125640343
2. 16122823-05012017_053154-STALKING(6125640343.VHarma@mypanthers.org.Voice).txt  -  Google Voice Return for 6125640343
3. 16122823-05012017_053154-STALKING(9522228094.Golfflow4@gmail.com.Voice).txt  -  Google Voice Return for 9522228094
4. 16122823-05012017_053154-STALKING(Letter 991052).pdf  -  Google Voice Letter

The labeled photos were TRANSFERRED to the Media Vault.

None of the results obviously directly connect to FREDIN.

**PUBLIC NARRATIVE**

Last page of the report

FALSE:            "Exasperated, Schaefer took to Facebook, detailing
                  how a guy she'd never met was haunting her. A friend
                  shared her post. Another Twin Cities woman soon
                  reached out. Schaefer wasn't Fredin's only victim."
                  (See Id.)

TRUTH:            Defendant Schaefer had initiated unprompted contact to

                  Plaintiff's then-girlfriend Defendant Miller in October 2015.

27

In doing so, Defendant Schaefer stalked him through non-party Joshua Pose Lee.

FALSE:          "The messages, some sexually suggestive, continued for weeks." (*See Id.*)

TRUTH:          This statement is patently false and defamation *per se* and simply never occurred.

FALSE:          "Hansen filed to make Schaefer undergo a deposition, something her attorney said was "unheard of."" (*See Id.*)

TRUTH:          This statement is patently false. Depositions happen as a matter of course in most legal matters including special proceedings.

FALSE:          "Schaefer's evidence of unwanted contact through the years was overwhelming." (*See Id.*)

TRUTH:          This statement is patently false and defamation *per se* as described above via proper subpoena practice. Defendant Schaefer made verbal accusations that she received "Hi Cat" text messages from unknown parties which turned out to be telemarketers or local companies selling products and/or services. Additionally, she offered evidence of random dating profile messages from anonymous profiles which were not ultimately connected to Plaintiff. (*See* November 2016. Schaefer v. Fredin Trial Tran.)

43.     Moreover, by Defendant Miller's own admission, she personally directed and coached Defendant Schaefer's false allegations. In fact, Defendant Miller admitted that "That she coached Schaefer through getting her own". (See Feb. 22, 2017 City Pages Article.) Furthermore, representatives for The City Pages confirmed that Ms. Middlecamp, Peter Mayer, and Defendant Schaefer also sent it directly to the reporter from The City Pages in an apparent attempt to generate publicly for the various Decision(s). Michael Mullen for The City Pages wrote in an e-mail to Plaintiff:

> Brock - Hi this is Mike Mullen with City Pages. I am writing a column for our next issue that involves you. I tried reaching out through your attorney, Nathan Hansen, who said he would get in touch with you. Since I haven't heard from either him or you, I thought I'd try this email, which I'd seen listed for you somewhere, though I'm not sure you still use it.
>
> Please get back in touch with me as soon as possible. I understand if you (or Nathan) choose not to comment for this story, but I need to confirm that is your wish. Thank you.

The reporter, Michael Mullen, went on to write an article on the front page of The City Pages entitled "Accused Stalker Brock Fredin is Writing a Horror Story, and He's the Main Character." To further corroborate the fact that Defendants, Ms. Middlecamp and Peter Mayer disseminated the various Decision(s) to the media to generate publicly, in connection with Mr. Mullen's article, Ms. Middlecamp began eagerly re-posting it to her 30k Twitter followers and even went so far as planning and posting a baseless irrefutably false rape claim the very same day. As a result, the Defendants gave Plaintiff only a few days to respond while he was on his way to a European vacation.

29

<u>Defendants Coordinated Malicious Prosecution</u>

44.    What became clear with the Ramsey County District Court's rubber-stamped HRO's was that the Defendants could engage in a full-fledged assault with knowingly false and malicious claims using law enforcement resources, no doubt in an attempt to shield them from liability in *Miller v. Fredin, Schaefer v. Fredin, and Middlecamp v. Fredin*. On July 20th, 2016, Defendants began maliciously prosecuting Plaintiff using the Saint Paul Police. That day, Defendants falsely alleged that virtually any Facebook post was an HRO violation and began reporting any telemarketer call as knowingly false evidence of Plaintiff's alleged contact. Defendant's statements were unequivocally lies.

45.    On July 22nd, 2016 Defendant Miller's lawyer began requesting the SPPD pull subpoenas on her personal behest. Karmen McQuitty used improper and unethical *quid pro quo* relationship's forged over several years in the Ramsey County Public Defender's office. A cruel and sinister aspect of this quid pro quo relationship, however, is that Ms. McQuitty and Defendant Miller used the SPCA to "prosecutor shop" her bogus claims and to improperly publicly "shame" litigants she personally disliked. She alone choosing which litigants to publicly ridicule.



46.    The emails above show clear indication of Ms. McQuitty taking screenshots of

Facebook posts and immediately forwarding to her pre-picked SPCA prosecutor Michael Seasley

and her pre-arranged detective SPPD Sgt. David McCabe.  Although the posts were both totally

innocent and protected through legitimate First Amendent protections, Ms. McQuitty, instead chose to characterize the posts falsely as HRO violations given that they contained memes of trials as explained above in paragraph 37.

47.     Given the Defendants all-out media war on Plaintiff, it remains ironic that Ms. McQuitty and Defendants would abuse process by collaterally using their HRO as a weapon to limit the Plaintiff's legitimate First Amendment protected speech on his own Facebook.  In a shocking twist, Ms. McQuitty would later direct her own mother to taunt Plaintiff as shown below.  True to her intent, Ms. McQuitty used the "printable" tabloid article to personally direct her mother to taunt Plaintiff using her *quid pro quo* relationship with the SPCA, Sgt. David McCabe, and Michael Seasley as the vehicle to do so.



48.     Similarly, on July 21st, 2016, Defendant Schaefer was given an interrogatory by the SPPD. In this, she was asked "Do you think he/she will seriously injure you?" She answered very clearly "Right now, no." She further stated "No. But I am under treatment for depression and it has triggered a recent episode." Indeed, as mentioned above, Defendants were bringing malicious claims knowing they were false and/or mischaracterized in an effort to retaliate against the Plaintiff. Defendant Schaefer confirmed she had no valid fear with her answer. (See July 21st, 2016 SPPD Complaint No: 16122823.)

49.     After nearly twenty (20) bogus reports alleging that Facebook posts were somehow criminal to the Saint Paul Police, the SPCA office yet again refused to press any

charges as shown below. And, when Defendants could not manufacture convincing claims, they instead moved towards escalating their malicious pattern of reporting by alleging that Plaintiff "raped" a woman that likely did not even exist through Ms. Middlecamp's Twitter smear campaign. (*See* @CardsAgstHrsmt February 22nd, 2017.) During a brief conversation with SPPD Sgt. David McCabe in April 2017, he claimed that "someone" likely Ms. Middlecamp reported the false rape claim to him but that it was totally false. Upon information and belief, Defendants were both aware of this knowingly false rape claim and had knowledge that Ms. Middlecamp had reported it to the police in a malicious effort to bring charges.



| CITY OF SAINT PAUL Mayor Christopher B. Coleman | Criminal Division 500 City Hall 15 West Kellog Blvd Saint Paul, MN 55102 | Telephone: (651) 266-8740 Facsimile: (651) 298-5532 |
| --- | --- | --- |

December 21, 2017

Ms. Catherine Shafer
P.O. Box 693
State College, PA 16804

RE:    State vs. Brock William Fredin
       Date of Incident: 12/04/2017 (on or about)
       Police Case No.: 17-280176

Dear Ms. Shafer:

I have reviewed the above-referenced police reports outlining Brock Fredin's recent internet websites, postings, and YouTube videos. While these postings are understandably upsetting, the nature of the postings do not constitute a violation of your order because there is no evidence that he contacted (or attempted to contact) you to draw your attention to these public postings. Additionally, there is not sufficient evidence to prove beyond a reasonable doubt that Brock Fredin was the author of that text. The decision to initiate criminal charges or decline to prosecute is never a determination taken lightly by any prosecutor. Prosecutors must follow certain legal and ethical principles, which prohibit pursuing criminal charges unless we believe there is a reasonable likelihood of success at trial. We must be able to convince all six jurors beyond a reasonable doubt that a crime has been committed and the accused committed it. This does not necessarily mean that I believe he isn't the author of these postings and that they weren't made with the hope that you would see them, but because of the burden of proof in criminal cases, we would be unlikely to prove a violation of your order beyond a reasonable doubt in court. Therefore, we are declining to pursue criminal charges for <u>this</u> incident. We will continue to independently review new reports regarding Brock Fredin's conduct.

Sincerely,

/s/

Tara Patet
Supervising Attorney, Domestic Violence Prosecution Unit

34

50.     On February 28th, 2017 Defendants presented evidence that Plaintiff initiated a whistle blower complaint to prevent Defendant Schaefer from continuing to violate the revenge porn law with ads she published impersonating his identity on seedy adult websites.  First and foremost, it was apparent that the SPPD and SPCA investigated the complaint against Defendant Schaefer.  The SPPD and SPCA never interviewed Plaintiff or any other witnesses, requested documents or otherwise performed any sort of investigation.  The reason for this was clear:  The SPPD and SCPA was tacitly involved in Defendants misconduct.  Sgt. David McCabe wrote "this case was turned over to the SPCA for charging consideration." (*See* SPPD Feb. 28, 2017 Complaint No: 16122823.)  Yet, again, for the umpteenth time, charges were immediately declined.  Each time the charge was terminated in Plaintiff's favor.



51.     Put simply, Defendants had a vested interest in insulating their public smear campaign by generating fundamentally false police reports and criminal investigations.  On February 27th, 2017, Defendants claimed that a Datingpsychos.com post violated the law.  Even worse, the Defendants offered no credible evidence connecting this to Plaintiff or even that this speech violated any known state or federal statute.

**NARRATIVE**

It should be noted that on 7/8/2016, I received a report from _____ regarding a dating Pyschos website post that Fredin had made about her. When this post was made an HRO was in place (62-HRCV16411), however that HRO did not preclude the respondent from posting on the internet of social media about the petitioner. This was the issue brought forth with SPPD CN 16-026382, which was declined. Therefor this specific incident was not further investigated at that time.

The posts refer to Schaefer were added to the secure SPPD Media Vault.

List of Photos for CN 16122823

1   16122823-07082016_202342-STALKING(DSPost18Jul16).png  -  DS Post, Schaefer 1
2   16122823-07082016_202342-STALKING(DSPost28Jul16).png  -  DS Post, Schaefer 2
3   16122823-07082016_202342-STALKING(FrontPageDS8Jul16).png  -  DS Post, Schaefer 3

The labeled photos were TRANSFERRED to the Media Vault.

52.     Indeed, as mentioned above, Defendants continued to report telemarketer calls.

For example, on March 20th, 2017, Defendants reported yet another false number.

**NARRATIVE**

At the request of SPCA Vang, On 3/20/2017, I (Sgt McCabe, SPPD Sex Crimes) conducted a search into the phone numbers listed on Schaefer's original statement. The following is what I found,

53.     On March 30th, 2017, Defendants reported another telemarketer call. As

described above, each of these claims originated from telemarketers.

4.  Lists to a Patrick Oshea, as a utility (through cingular wireless), out of St

An internet search also revealed this number as a possible telemarketer

54.     In another true act of disregard for the well-being of the Plaintiff, Defendant

Schaefer also brought a Show Cause hearing for contempt on April 5th, 2017.  Indeed,

Defendant Schaefer and her lawyer, Peter Mayer, made outrageous and highly disrespectful

claims that recommended "prison" for filing a whistle blower complaint and creating a public

Facebook post connecting Defendant Schaefer to the unlawful ads she posted impersonating

the Plaintiff and manufacturing malicious claims.  Again, the hearing was dismissed *nearly* with

prejudice, when the judicial officer claimed "I would dismiss this with prejudice but want to

keep the evidence ..." (*See* May 2nd, 2017 Schaefer v. Fredin Show Cause Tran.)

55.    Defendant Miller alleged that in addition to her February 9th, 10th, 2016 messages to the Plaintiff, she continued reviewing his Facebook profile daily to ensure "that nothing nefarious was posted about her".   As will be explained in greater detail below, Defendant Miller continued her relentless pursuit of Plaintiff by directing additional women to send unwanted messages and bring bogus collateral proceedings.  This type of language is not indicative of a "victim".  Instead, it is the language of a U.S. Air Force Major who was bullying her ex-boyfriend.

56.    On February 12, 2016, Defendant Miller again created an additional knowingly bogus police report by directly sending an email to Sergeant David McCabe of the Saint Paul Police department falsely claiming that Plaintiff had somehow hacked into both her computer and smart phone.  Moreover, Plaintiff had likely never touched either her computer and/or smart phone during the entire length of the relationship nor did he possess any known skill or expertise to break 128-bit AES encryption.  Further, he had no desire to invade her personal privacy in any unlawful manner nor any record that would indicate such a pattern.  This included an admission by Defendant Miller in the midst of her reports that she has "clinical anxiety and depression (which [she is] on medical for – Brock knows this)" Indeed, Defendant Miller concedes that Plaintiff correctly suspected that she was suffering from post-traumatic stress disorder as it relates to her past military deployments to the Middle East.

## Re: test e-mail

Grace Miller <grace.e.miller@gmail.com>

Fri 2/12/2016 9:23 AM

To McCabe, David (CI-StPaul) <david.mccabe@ci.stpaul.mn.us>;

Hi Sgt McCabe,

I did install Norton on my computer and my smart phone and scan both of them frequently - I didn't have them before because I have a mac. I always put tape over the video camera as well in case he's watching. I had to get a separate program for my phone plan (which was free) in order to block his phone numbers.

I've been a little paranoid since this started. I freak out a bit when a car pulls up on front of my house and have to check and make sure it's not his car. I have been having trouble concentrating at work and school when I get these messages, which has made my life pretty hard - I'm working on a PhD and am supposed to take exams this semester, and I'm deploying with the Air Force Reserves this summer.

I also have clinical anxiety and depression (which I'm on medication for - Brock knows this) and this has exacerbated that a lot.

Thanks again,

Grace

On Fri, Feb 12, 2016 at 9:06 AM McCabe, David (CI-StPaul) <david.mccabe@ci.stpaul.mn.us> wrote:

57.     Following a contested hearing on March 21st, 2016, Defendant Miller began a campaign of knowingly false police reports where she verbatim falsely claimed any Facebook post was indeed another HRO violation despite the fact that the posts – did not tag, notify, name her, and were not directed at her – and were simply legitimate innocent First Amendment posts containing Frank Sinatra YouTube.com Videos and/or posts about major historical fictions e.g., *To Kill a Mockingbird* and/or *Count of Monte Cristo*. Nonetheless, Defendant Miller and Plaintiff had a first date at the Guthrie Theatre where they watched the play *To Kill a Mockingbird* – but the post was simply about a metaphor about false claims depicting structural discrimination in society.

### Defendants Unlawful No-Knock Swat Raid

58.     In order to provide process service for their pile-on collateral abusive legal proceedings, Defendants reached out to the Saint Croix County Sheriff's office in Hudson,

38

Wisconsin to personally serve their papers. In mid-April 2017, after apparently directly reaching out to the St. Croix County Sheriff's office, deputy Scott Gostovich began stalking the Plaintiff's personal residence by loudly knocking on his door after dark, using his spot light to shine into his windows, and generally attempting to intimidate and/or terrorize Plaintiff and his fiancé. In his growing desperation to serve the illegitimate ex-parte order from Ms. Middlecamp and contempt motion from Defendant Schaefer, Deputy Gostovich attempted service upwards of four (4) separate times without success by loudly knocking on his door, ringing his door bell multiple times, calling his personal cell phone three (3) times and leaving aggressive patronizing voicemails.[6] Defendants and Ms. Middlecamp deliberately and intentionally directed these improper orders to be served after dark in spite of Minnesota law requiring daylight service. After a week of unsuccessful process service, Defendants and Ms. Middlecamp deliberately reached out to Sergeant David McCabe requesting that her HRO be properly served.

59.     On April 28th, 2017, Defendants and Ms. Middlecamp directed a no-knock swat style raid on Plaintiff's home in Hudson, Wisconsin to unlawfully serve her ex-parte HRO and Defendant Schaefer's constructive contempt motion. Using her role as Minneapolis Assistant City Attorney, she reached out to her boss, Susan Segal, and other Saint Paul/Minneapolis law enforcement officials to carry out the unlawful raid. As a result, Sergeant David McCabe seized virtually all of Plaintiff's digital assets - over sixty (60) items - including twenty items that were never accounted for. In total, about $40,000 worth of computers and servers were seized despite the fact that Plaintiff had already spent his life savings, been bankrupted, and already had his career destroyed through negative press coverage over the Defendants fraudulent actions. In

---

[6] Indeed, this April 25th, 2017 voicemail from Deputy Scott Gostovich verifies this series of events and the Defendants aggressive harassment. *See* https://drive.google.com/file/d/1A9n1LUllc3oezLMgMdaXqXTYM1lyaJXT/view?usp=sharing

other words, Defendants and Ms. Middlecamp abused process by attempting to silence Plaintiff by unlawfully seizing all of his computers and retaliating against him for exposing her as the author of the @CardsAgstHrsmt platform. Moreover, the seizure of all his assets would cause undue burden and limit his ability to gain competent legal representation in further collateral matters fraudulently perpetuated by the Defendants. Defendants and Ms. Middlecamp and Sergeant McCabe abused process further by using long arm statutes designed for hardened violent felons or national security concerns. In spite of this injustice, Plaintiff has never been accused of being violent, creating any sort of known scene, or engaging in any pattern of conduct that would rise to this level. In fact, Plaintiff has never used any drugs, does not smoke, or drink. Plaintiff has a graduate level engineering education and has tried to reasonably apply himself as a productive citizen. Plaintiff and his fiancé (a trauma nurse) were subjected to inhumane treatment/false arrest and effectively held stationary/handcuffed for many hours without food, water, or even a toilet.

60. As Plaintiff would later find, Referee Clysdale also maintained a relationship with the Saint Croix County Sheriff's office due to her residency in Saint Croix County in the City of Somerset. In other words, just about everyone conspired together collaterally to abuse process to bring a search warrant in an effort to silence whistleblower websites that exposed their misconduct.

61. At first confrontation, Plaintiff was lying naked in bed when suddenly a Hudson Wisconsin police officer pointed a semi-automatic AR-15 with an attached laser scope directly at his head. Plaintiff's fiancé began to frantically scream before SPPD Sgt. David McCabe aggressively pulled him naked out of bed and held him down on the floor standing over him – to mimic the sarcastic imaginary response memorialized by Judge Ross's Appellate opinion. After

40

requesting information on why his house was raided by a swat team, Sergeant David McCabe outrageously claimed that the innocent Match.com profile edit (days or hours after a petty argument) that happened nearly two years ago was the legal basis and that he was being criminally charged for an HRO violation as it relates to this nonsense. Furthermore, Sergeant McCabe claimed that Plaintiff should "stop posting about City Officials and/or judges on Facebook or the Internet" in an effort to indicate his **true reason** for raiding his home. At this point, Plaintiff became increasingly irritated and told his fiancé to remain silent while Plaintiff questioned Sergeant McCabe about his communication with Defendants and Ms. Middlecamp. During this exchange, Sgt. McCabe knowingly lied to the Plaintiff by claiming "I don't know Lindsey Middlecamp." As will be explained in greater detail below, Defendants and Ms. Middlecamp not only communicated with Sgt. McCabe prior to the raid, she knowingly provided information to direct the raid to serve her HRO. Furthermore, Plaintiff had no interaction with her whatsoever prior to her state court action. This was made clear when SPCA Assistant City Attorney Stephen Christie claimed that Ms. Middlecamp "[Plaintiff] may have been wronged by Middlecamp." In an email on August 2nd, 2017 to his then-counsel Barry S. Edwards.

> Your client may have been wronged by the aggressive actions of Middlecamp; I
> complainants/investigations have not influenced my decision-making in this case. I

62.    (*See* August 2nd, 2017 Christie Email to Edwards.) Lastly, Sergeant McCabe pulled steel patio furniture into the main living room thereby significantly scratching the surface and causing upwards of $5000 in damages, stepped on and spilled various items throughout the house costing additional carpet cleanup monies, and shattered the frame of the main door costing $1500 in supplies and installation. As a result, Plaintiff was left penniless, bankrupt, and without

any money beyond bitcoins to pay for competent legal representation to defend against Defendant malicious actions.

63.    Following a contested Middlecamp v. Fredin hearing, City Attorney Susan Segal, testified to tacit knowledge of the Raid prior to it occurring.  Plaintiff cross examined Ms. Segal to find that she had communicated with Ms. Middlecamp and two Minneapolis police officers in an effort to convince the Saint Paul Police department to contact Hudson, Wisconsin authorities to bring the raid forward through abuse of long arm statutes.

64.    Even more concerning than Defendants behavior towards Plaintiff was the lengths they went to in order to cover-up their own misconduct after the fact.  During this raid, Defendants and Ms. Middlecamp clearly were aware prior to the fact and knew that Ms. Middlecamp had directly used her public position to help initiate an illegal swat raid. Specifically, there is no fourth (4th) amendment exception to "serving harassment restraining orders or contempt motions."

65.    Moreover, as Plaintiff found the search warrant affidavit, it was revealed to him that Defendants had yet again reported that his April 4th, 2017 Facebook post which mapped their identies as it relates to @CardsAgstHrsmt was used as the leading basis for obtaining the search warrant.  As a result, Defendants retaliated against Plaintiff by attempting to silence his free speech with a terrorizing no-knock swat style raid.  Likely, in an attempt to cut-off any future civil litigation where Plaintiff sought redress for the harm they cuased.

42



**Brock Fredin** updated his status.
September 13, 2016 · 🔒 ▾

Due to the egregious and misleading smear campaign, I have lost a job and have so far been unable to secure re-employment over the past 4 months. It is my hope that Catherine Schaefer, Lindsey Middlecamp, and Grace Miller will acknowledge their wrongful actions.

It goes without saying, this is a very serious matter and their public campaign has trashed my career and likely cost me hundreds of thousands of dollars. Additionally, Catherine Schaefer and Twitter Defamation => (Lindsey Middlecamp) repeatedly retaliated against me for either reporting Schaefer's criminal conduct or demanding removal of content that violated the law. (Schaefer created fake sex ads that violate the revenge porn law).

I've made special consideration to avoid any public postings and bare no responsibility for the vicious public retaliation. During this difficult time, I conducted myself with the utmost integrity.

I am aware my mother had a stroke during the week of the egregious and misleading #fakenews City Pages article and now has deficits walking. It goes without saying, stress from this crazy nonsense contributed.

At this point, however, I implore responsible decision makers to take action and prevent Lindsey Middlecamp, Catherine Schaefer, or Grace Miller from engaging in any further misconduct. Sadly, I've raised these concerns repeatedly but now face the desperate and hopeless endeavor of going bankrupt and inability to make housing payments. During this short period of unemployment, I've lost out on 50-60K of income. Again - this avoidable experience is the result of their retaliation over petty and lawful arguments. Catherine Schaefer published content that violates the Minnesota Revenge Porn Law (fake sex ads) and sadly has so far been celebrated for ruining others by a reporter from the City Pages. She was peacefully told via a single email to remove the content and claimed this single email was 'stalking'. This was a slanderous solicitation to pursue vindictive measures against me.

Referee Elizabeth Clysdale's shameful ruling to Mr. Fredin makes clear that the Ramsey County and Minnesota Judicial branch, Referee James Street, Referee Rebecca Rossow, and Referee Colia Ceisel not only turn a blind eye to Catherine Schaefer and Lindsey Middlecamp's egregious misconduct, but that they endorse their behavior that is embarrassing to the judiciary and threatens the well-being of litigants. More importantly, it raises a serious question how someone like Brock Fredin who reports misconduct of witnesses and legal officers only to be personally insulted by Referee James Street and police officials could ever possibly get a fair trial in any proceeding in the Minnesota Judicial Branch.

I have exhausted most peaceful lawful options. At this point, I am left with describing how these parties and their supporters have sadly abused or endorsed abuse of the legal system and viciously harmed

## Defendants Unlawful Efforts to Intimidate, Tamper, and Retaliate Against Plaintiff's

## Lawyers

66.     Illustrative of the whole scheme by Defendants to intimidate was Defendants commencement of a scheme to retaliate against each one of his lawyers, denying Plaintiff the ability to defend himself, and bankrupting his life savings when he had to retain new lawyers. The genesis of retaliation centered around statements published adverse to Plaintiff's first lawyer, Nathan Hansen, claiming that he was "scandalous, without merit" and using a footnote he placed in the Appellate brief regarding Edgar Allen Poe by generating a tabloid story entitled

"Brock Fredin is writing a horror story…" as an apparent "play" off this content. Although, the Plaintiff had objected to this content being placed in the brief, Mr. Hansen did so anyways.

67.     After this, Plaintiff hired Barry S. Edwards in late April 2017. Mr. Edwards rigorously defended Plaintiff until Saint Paul Assistant City Attorney Steven Christie purportedly offered help on Mr. Edwards "twenty or so other cases in Ramsey County" if he would withdrawal from Plaintiff's case on the eve of the *Middlecamp v. Fredin* and/or *State of MN v. Fredin* trial.

68.     In July 2017, Plaintiff attempted to request that Mr. Edwards not withdraw just days before the *Middlecamp v. Fredin* HRO hearing. Instead, Mr. Edwards cited fear that Ms. Middlecamp and/or the Saint Paul City Attorney's Office would retaliate against him. Furthermore, as discussed infra, an independent audio confirms that Mr. Edwards said "It will make future cases with the Saint Paul City Attorney's Office More Difficult." Clearly, Ms. Middlecamp, Defendants, and the Saint Paul City Attorney's Office were all complicit in intimidating Mr. Edwards.

69.     In order to withdraw, Mr. Edwards attempted to generate fictitious clients that do not exist by saying "my zealous representation of [Plaintiff] will likely interfere with other clients" before claiming that it would "cost his other clients and that if he had this battle with Steve Christie" he may lose all his clients.[7]

70.     Additionally, in approximately October 2017, Plaintiff received an independent audio recording of the September 27, 2017 meeting with Mr. Edwards. An excerpt of the recording has been published:

>     Mr. Edwards admits to withdrawing and taking all legal fee(s). (*See* https://drive.google.com/open?id=0BzQdAbpMjI-hLTRRRU82VTBXazg)

---

[7] "Cost his other clients" See e.g., https://drive.google.com/open?id=0BzQdAbpMjI-hWHlYdERhcGhRd0U

44

Mr. Edwards admits his representation of Plaintiff **"will make future cases with the Saint Paul City Attorney's office more difficult"** (*See* https://drive.google.com/file/d/0BzQdAbpMjI-hMVRweUtYTFl4T1k/view?usp=sharing)

Mr. Edwards admits his true reason for withdrawal is a totally unrelated lawsuit against Ms. Middlecamp by stating **"also Lindsey Middlecamp"** following a question as to why he was withdrawing. (*See* https://drive.google.com/open?id=0BzQdAbpMjI-hUVQ4Q3NKcXptZmc)

Mr. Edwards admits his true reason for withdraw is to maintain his own business and relationship with the Saint Paul City Attorney's Office **"If that's the case it would be unethical and improper."** (*See* https://drive.google.com/open?id=0BzQdAbpMjI-hZW5UdFpIbHhtekk)

Mr. Edwards admits his representation of Plaintiff will interfere with other clients in Ramsey and Hennepin County" (*See* https://drive.google.com/open?id=0BzQdAbpMjI-hQnlyc29nYUxqWGM)

Mr. Edwards admits to *not* fighting for his current clients **"not if it's going to cost my other clients** [before the Saint Paul City Attorney's Office]**"** (*See* https://drive.google.com/file/d/0BzQdAbpMjI-hWHlYdERhcGhRd0U/view?usp=sharing)

Mr. Edwards admits that SPCA Steve Christie threatened his other cases **"I've got 20 other cases in Ramsey County right now"** (*See* https://drive.google.com/open?id=0BzQdAbpMjI-haGJfVkpMV1Q2QjQ)

Mr. Edwards admits to not liking Mr. Christie but his desperate desire to maintain an **"amicable relationship"** Mr. Christie (*See* https://drive.google.com/open?id=0BzQdAbpMjI-hSXFfd2ZyZkxsdFE)

Mr. Edwards states **"This is why god created malpractice insurance"** when being confronted with his misconduct. (*See* https://drive.google.com/open?id=0BzQdAbpMjI-hc05RRWlOWTRJQzQ)

Mr. Edwards admits the Saint Paul City Attorney's Office is pursuing collaterally abusive charges against me to further victimize me following Minneapolis Assistant City Attorney Lindsey Middlecamp's illegal desperate media campaign to bring frivolous charges for allegedly posting public comments on my own Facebook. Mr. Edwards admits to dropping my case to maintain his relationship with Steve Christie over his client's interests **"They are going after the victim and not the bad guy."** (*See* https://drive.google.com/open?id=0BzQdAbpMjI-hZkFkNHUtUXo3dzQ)

71.     The independent recording was provided to Plaintiff in order to corroborate his long-held suspicions and claims that SCPA Steve Christie was routinely directing defense attorneys working on cases with him to draft motions or conduct proceedings in an effort to

45

advantage the City of Saint Paul Attorney's Office.  In fact, Mr. Christie emailed Mr. Edwards

on October 2nd, 2017 at 2:00PM and had provided specific instructions to Mr. Edwards on how

to draft the motion to withdraw:

> The Minnesota Practice Series discusses a motion by an attorney to withdraw from
> representation under Rule 703 (not 7.03) of the Minnesota General Rules of Practice and
> Rule 1.16 of the Minnesota Rules of Professional Responsibility.  It notes that the court
> considering a motion to withdraw is not concerned primarily with the ethical propriety of
> withdrawal which is properly left to the lawyer and the PR Board.  However, it further
> states:
>
> "As is evident from the complexity of the rule, many factors may determine whether
> withdrawal is appropriate.  These include whether the client has agreed to withdrawal,
> whether it is possible to protect the client's interests upon withdrawal, whether sufficient
> time exists to give reasonable notice and for the client to obtain successor counsel, and
> others."  3A Minnesota Practice Series, Minnesota General Rules of Practice Annotated,
> Rule 703, p. 670 (2010 ed.).    In this case, Mr. Edward's motion is silent on the position
> of his client and is generally conclusive on some of the other identified factors.  In
> addition to the defendant, the prosecution would also ask to be present a hearing on the
> motion which might also touch upon other scheduling concerns.

72.      There is significant additional evidence that Mr. Christie has directed Mr.

Edwards on how to conduct proceedings or collude in exchange for mutual help.  However, Mr.

Christie's illegal practice of colluding with and directing defense attorneys to draft motions to

effectively prejudice the administration of justice.  During a phone call with another local lawyer

she reported an alleged incident regarding Mr. Christie taking defense attorney's golfing to

effectively advantage City of Saint Paul Attorney's Office.  An excerpt of the recording has been

published on (*See* https://drive.google.com/file/d/0BzQdAbpMjI-

hc0k4MXR6R3B5LVk/view?usp=sharing).  What remains clear, is that Mr. Christie was clearly

tampering with the Plaintiff's counsel to advantage Defendants.

46

73.     After discovering his misconduct and collusion with the prosecutor, Mr. Edwards was investigated by the Minnesota Professional Responsibility Board where he is awaiting potential consequence.

74.     Rather than stop at one or even two acts of retaliation, On December 12th, 2017 Defendant Miller went further by filing for an HRO extension in an effort to contact his third attorney with a St. Croix County Wisconsin Sheriff's Deputy named Zachary Hendricks. Like in many other instances, Defendant Miller took her retaliation to a new level by personally directing Deputy Hendricks to contact his criminal lawyer to serve her civil papers to extend her HRO. This could liberally be construed as witness tampering under MN. Stat. § 609.498.

### Defendant Schaefer's Appointed Lawyer Peter Mayer

75.     From the outset of his appointment as Attorney for Defendant Schaefer, Peter Mayer did everything in his power to utterly destroy Plaintiff, smear his character with repeated *ad hominem* attacks, circumvent the law to further his agenda in the litigation and, most importantly, prevent Plaintiff any reasonable access to a resolution. This was no surprise as he was a self-proclaimed follower of Ms. Middlecamp and envied her livelihood attacking men and living off the publicity. True to his lack of character, ethics and any moral compass whatsoever, Peter Mayer is not at all ashamed of his behavior. Rather, he boasts and brags about his extremist position and the harm he inflicted on Plaintiff. This is evident from the City Pages article in which Peter Mayer was quoted attacking the Plaintiff.

76.     Peter Mayer took these radical views into *Schaefer v. Fredin* by attacking Plaintiff in any way he could – which included fabricating allegations, overtly lying to the court, circumventing procedural laws and breaching the Rules of Professional Responsibility – all the while thwarting Plaintiff's access to a resolution. In fact, Peter Mayer even went so far as to

47

demand that Referee Clysdale terminate all of Plaintiff's freedom by demanding – prison time – where there was never an allegation that Plaintiff had ever spoken to her, met her, or was a danger to her. This is disturbing given that fact that in the one-and-a-half-years Plaintiff was unlawfully subjected to Defendant Schaefer's HRO, Plaintiff was repeatedly described by friends and co-workers as a responsible, intelligent, caring and an attentive person and multiple coworkers reasoned that in the hundreds of hours they spent with Plaintiff that they never saw anything warranting a need for a harassment restraining order. No one – not even Karmen McQuitty – believed that Plaintiff should be subject to an HRO from a woman he has never spoken to or met who lives in a different state. Peter Mayer deliberately disregarded the best interests of the parties by making unsupported and baseless contentions motivated by his radical feminist desire to thwart Plaintiff's access to a resolution and his desperate urges to please Defendants and Ms. Middlecamp. It was Peter Mayer and Catherine Schaefer that posed (and continues to pose) a clear and present danger to the Plaintiff and his fiancé and his best interests, which the Ramsey County Courts have uniformly and blindly ignored.

77.     Meanwhile, as Peter Mayer took the position that Plaintiff should have no ability to speak his opinion online, he was also taking advantage of the situation by extending his legal reputation and credentials within the City of Minneapolis. Indeed, Peter Mayer took radical positions and made baseless allegations that forced a never-ending array of litigation, motion practice, court appearances and multiple show cause hearings as explained more fully below. In the end, Plaintiff, Plaintiff's mother, and most importantly, the Plaintiff's fiancé all lost in *Schaefer v. Fredin* while Peter Mayer made an enormous in-road within the City of Minneapolis

48

Attorneys Office and extended his junior experience within the Dorsey Whitney firm by churning thousands of dollars and counting straight to the bank.

78.    To any reasonable person with knowledge of Peter Mayer, he should never have been appointed Attorney for Defendant Schaefer as his radical views are simply inconsistent with representing an Ivy-league educated middle-aged woman able to earn an income herself to pay for legal representation.  As shown below, however, Peter Mayer was appointed Attorney for Defendant Schaefer because he was someone who would defend Defendants and Ms. Middlecamp's vindictive prosecution, prolonging of the litigation and the unlawful imposition of collateral pile-on harassment restraining orders.  Indeed, appointing Peter Mayer as Attorney for Defendant Schaefer was not only highly prejudicial, but it was intended by Defendants to retaliate against Plaintiff for his behavior during the *Miller v. Fredin* proceedings. Not only did the appointment of Peter Mayer unnecessarily increase the cost of the ongoing litigation to both Plaintiff, Defendant Schaefer, and Defendants but Peter Mayer's behavior throughout the proceeding was so prejudicial to Plaintiff and detrimental to the him that it rendered the *harassment* hearings virtually meaningless and the whole proceeding constitutionally deficient for a host of reasons.

79.    Most importantly, however, everything about the appointment of Peter Mayer as Attorney for Defendant Schaefer by Ms. Middlecamp was problematic, irregular, unlawful and outright corrupt.  First, Ms. Middlecamp appointed Peter Mayer out-of-the-blue and without any notice to the parties.   Ms. Middlecamp never provided an explanation for this and the Ramsey County Court refused to entertain objections to Peter Mayer's appointment. Nonetheless, the purpose of Peter Mayer's appointment as Attorney for Defendant Schaefer

49

was apparent: to have a voice friendly and politically-connected to Ms. Middlecamp in the litigation that could be characterized as acting on behalf of Ms. Middlecamp to advance her unlawful and retaliatory imposition of pile-on harassment restraining orders on Plaintiff indefinitely.

80.     Second, Ms. Middlecamp appointed Peter Mayer at a free rate per hour without notice or an opportunity to be heard by the Plaintiff. This is a usurious, outrageous and downright criminal rate for an Attorney for an Ivy-league educated middle-aged woman. This remains particularly egregious since Plaintiff had paid his counsel $10,000 to represent him in the *Schaefer v. Fredin* action. And – Plaintiff had never met her – and all the claims were later revealed to originate from telemarketers!

81.     Third, and most importantly, Peter Mayer was appointed to be an Attorney for Defendant Schaefer when he was appointed by Ms. Middlecamp and Defendant Miller to advance knowingly prejudicial, outrageous, and false media coverage. Thus, Defendans and Ms. Middlecamp's appointment of a junior Attorney for Defendant Schaefer was not only unethical under Rule 1.11 of the Rules of Professional Conduct, but was inconsistent with Due Process, prejudicial to the proceeding and, most importantly, harmful to the Plaintiff.

82.     Lastly, perhaps most troubling about the whole corrupt enterprise was Defendant Miller and Defendant Schaefer's failure to disclose their prior relationship and dealings to the parties at the time of Peter Mayer's appointment as Attorney for Defendant Schaefer. After his appointment as Attorney for Defendant Schaefer, Plaintiff subsequently learned that Defendant Miller and Ms. Middlecamp were both a participant in coaching Peter Mayer's appointment. Tabloid records reveal that Defendant Miller strongly admitted to

coaching this knowingly false legal action and that Peter Mayer's representation was acquired unlawfully by exploiting the City of Minneapolis's contractual relationship with Dorsey and Whitney. Furthermore, upon information and belief, Peter Mayor used his influence in the local bar (having interned for Chief Justice Abrahamson of the Wisconsin Supreme Court) and position in the Hennepin County Bar Association to desperately garner attention from Defendants and Ms. Middlecamp. Peter Mayer's unusual appointment as Attorney for Catherine Schaefer at a prejudicial rate of $0 per hour raises serious questions as to whether the Attorney for Defendant Schaefer appointment was a political kickback. And, as explained below, Defendants and Ms. Middlecamp used the unfettered appointment to churn over $20,000 in fees and counting on Plaintiff and his fiancé, in effect using his appointment to perpetrate a bankrupting scheme.

83.     Of most importance and illustrative of the warped enterprise, however, was Peter Mayer's actual conduct in the *Schaefer v. Fredin and Miller v. Fredin* litigation. To characterize his conduct as deplorable would be an understatement. Peter Mayer's numerous documented incidents of unethical conduct throughout the litigation was not only indicative of a pattern of unlawful behavior, but it severely prejudiced Plaintiff and his best interests to a point where the entire proceeding was inconsistent with Due Process. Throughout the litigation, the record is quite clear that Peter Mayer was little more than a witness for Defendant Schaefer rather than an Attorney for his client. In fact, at times Peter Mayer took positions that were so extreme against Plaintiff that – to her credit – not even Defendant Schaefer agreed with them as part of his campaign of harassment and bad faith litigation directed at Plaintiff in the matter.

51

84.     Much of Peter Mayer's inappropriate conduct was detailed in the May 2nd, 2017 transcript in support of Constructive Contempt against Plaintiff. (*See* Ex. 2) Peter Mayer and Defendant Schaefer's misconduct in *Schaefer v. Fredin* included, but was not limited to the following instances in which he failed to comply with the Rules of Professional Conduct:

- As his records demonstrate, Peter Mayer conducted no factual investigation whatsoever into Plaintiff's or Defendant Schaefer's allegations. For example, he never sought documents or police reports related to Defendant Schaefer's allegations of harassment, the Plaintiff's remarks or Defendant. Schaefer's psychiatric records. He never once subpoenaed the phone numbers contained in Defendant Schaefer's false allegations. Instead, Peter Mayer adopted Defendant Schaefer's allegations as a matter of course.

- Peter Mayer attempted to waive Defendant Schaefer's appearance at every hearing due to the fact she lived in Pennsylvania. Nonetheless, Plaintiff was ordered and required to incur heavy financial and physical burdens to bear the cost of litigation that simply had no legal basis, from a woman he had never met, seen, or spoken with previously.

- Peter Mayer insulted the Plaintiff on-the-record in front of Plaintiff's own mother by recommending "prison" time for filing an ethics complaint to remove the fake sexual advertisements Defendant Schaefer published on the Internet. Moreover, Peter Mayer brought show cause hearings to chill any free speech as it relates to the Plaintiff detailing the outrageous and unethical pattern of conduct perpetuated by the Defendants and to prevent him from seeking legal relief from the unending revenge porn targeting his identity.

- Peter Mayer repeatedly made demonstrably false statements to the court. His misrepresentations to the court ranged from documented lies as to when papers were served, his knowledge of a swat raid to serve his show cause papers on Plaintiff, to attempts to blame Plaintiff's counsel for serving a deposition notice.

- Peter Mayer did not merely become an advocate for Defendant Schaefer in the litigation, however. he instead was an active witness on Ms. Middlecamp's behalf. Peter Mayer repeatedly introduced into the record unsworn and untrue facts through improper testimony and reports to the court. This included his own supposed observations, alleged statements from the Plaintiff's ex-girlfriend Defendant Miller and Ms. Middlecamp and supposed random anonymous Internet memes or Twitter profiles he purportedly claimed by his own unchecked assessments were somehow authored by Plaintiff. Moreover, Peter Mayer failed

52

to disclose his relationship with Ms. Middlecamp throughout litigation (even after Ms. Middlecamp sought her own HRO).

- Peter Mayer and Defendant Schaefer repeatedly gave interviews to the media about the case, including *The Huffington Post and the City Pages. See, e.g.,* http://www.citypages.com/news/accused-stalker-brock-fredin-is-writing-a-horror-story-and-hes-the-main-character/414395703. He had absolutely no regard for the Plaintiff's privacy or the best interests of Defendant Schaefer instead choosing to seek out the limelight on his behalf. This clearly violates Professional Responsibility Rule 3.6.

- Peter Mayer was ordered by Referee Clysdale to arbitrate disputes between Plaintiff and Defendant Schaefer. Rather than attempt to work out solutions in the best interests of all parties, Peter Mayer summarily created even more show cause hearings despite being told by Referee Clysdale that they would be "dismissed with prejudice" if he continues to cite lawful Facebook posts as HRO violations.

- Peter Mayer continued to bring extraordinary contempt hearings on February 16th, 2018 (adjudicated after this complaint was filed) to pile-on contempt hearings with Defendant Miller and Ms. Middlecamp. In doing so, he sat in the gallery of the Middlecamp v. Fredin contempt hearing used as a rouse to block the prior federal lawsuit against her and even outrageously interrupting and began acting as a witness on Ms. Middlecamp's behalf during the trial. (See February 14th, Middlecamp v. Fredin contempt hearing and Tran.)

- As proof of a direct connection, Ms. Middlecamp is connected to Defendant Schaefer on Facebook and both Defendant Schaefer began sitting with and attending the very same hearings as Ms. Middlecamp. (*See* Ex. 2.)

85. Perhaps the most troubling aspect of the *Schaefer v. Fredin* Decision is what Peter Mayer and Defendants did with it. They were not content with simply bringing bad-faith litigation against Plaintiff. Rather, they wanted to publicly humiliate him, cause him to be fired from his job and irreparably destroy his reputation and ability to practice his career. They did this by unlawfully publishing the *Schaefer v. Fredin* Decision and disseminating it to the tabloid media to incite negative publicity against Plaintiff. Peter Mayer refused to recuse himself from the proceeding despite his misconduct.

86.    In doing so, Defendants violated several Professional Responsibility Rules and engaged in conduct illustrating that they were unfit to participate within the cases. This is particularly so in light of the sensitive and prejudicial allegations that they deliberately chose to include in the *Schaefer v. Fredin and Miller v. Fredin* Decisions ("Decisions"), which they personally disseminated to the media and the public. The publication of the Decisions was a clear act of bad faith, harassing behavior designed to retaliate against Plaintiff for the filing of the appeal against his ex-girlfriend Defendant Miller.

87.    On December 8th, 2017, Defendant Miller attempted to petition to extend her HRO just months before its original expiration on March 21st, 2018. While there haven't been any violations or contact in those two (2) years, Defendant Miller was attempting to use the extension to further retaliate and prevent Plaintiff from speaking out against her misconduct. This was mainly cited where Defendant Miller claimed online criticism was the true reason for her extension through the inclusion of yet again more Facebook posts. Additionally, Defendant Miller outrageously made bogus claims that Plaintiff had made reports with various law aenforcement agencies. This is categorically false.

88.    On December 8th, 2017, Defendant Miller attempted to petition to extend her HRO just months before its original expiration on March 21st, 2018. While there haven't been any violations or contact in those two (2) years, Defendant Miller was attempting to use the extension to further retaliate and prevent Plaintiff from speaking out against her misconduct. This was mainly cited where Defendant Miller claimed online criticism was the true reason for her extension through the inclusion of yet again more Facebook posts. Additionally, Defendant Miller outrageously made bogus claims that Plaintiff had made reports with various law

54

enforcement agencies. Plaintiff made attempts to subpoena and provide proof that he never made any such reports and further believed that she was mistaken or deliberately mischaracterizing the record to be fraudulently granted a new HRO.

89.     Moreover, during the course of service, Deputy Zachary Hendricks again stalked and terrorized the Plaintiff. In doing so, he began calling his personal cell phone on January 26th, 2018 incessantly and even made it ring during his attendance at a funeral before leaving a voice message. Indeed, Defendants directed Deputy Hendricks to call likely during this event to further bring emotional distress.[8]

90.     In so far as Plaintiff made a small number of Facebook posts criticizing and/or displaying Defendants actions as a matter of law, describing the lengths in which they went to retaliate, the Dependents running low on options, escalated even further by coaching collateral pile-on HRO petitions to silence and deprive him of constitutional free speech criticism rights, manufactured media campaigns, retaliated against Plaintiff for appealing the original *Miller v. Fredin* HRO, and an ongoing effort to bring vindictive prosecution as a collateral action to both retaliate and preserve their ability to harass and destroy the Plaintiff's life.

## COUNT I:  DEFAMATION *PER SE*

### (Defendants)

91.     Plaintiff Fredin re-alleges and incorporates by reference paragraphs 1 through 7 and 34 through 90 of the Complaint as though fully set forth herein:

92.     Defendants have made false and defamatory statements concerning Plaintiff Fredin as set forth above in this Complaint.

---

[8] Indeed, Deputy Hendricks called multiple times and left this voicemail (number redacted). *See e.g.*, https://drive.google.com/open?id=1HJ7pFODM4mMiA60PYsAwXMFfbOSWKBas

93. Defendants have made false and defamatory statements concerning Plaintiff Fredin as set forth above in this Complaint.

94. Defendants statements are statements of fact and are demonstrably false.

95. Defendants defamatory statements accused Plaintiff Fredin of committing a serious crime, *i.e.* stalking, and are therefore defamatory *per se*.

96. Defendants have published and continues to publish these false statements to numerous individuals on an analogous Twitter account and the *City Pages* tabloid.

97. Defendants enjoys no privilege concerning these statements.

98. As a result of Defendants defamatory statements and unlawful conduct, Plaintiff Fredin has suffered severe harm and is entitled to actual and punitive damages in an amount to be proven at trial. Plaintiff Fredin also seeks injunctive relief requiring Defendants to remove the defamatory material and posts from the Twitter account @CardsAgstHrsmt and the *City Pages* tabloid.

## COUNT II: ABUSE OF PROCESS

### (Defendants)

99. Plaintiff Fredin re-alleges and incorporates by references paragraph 1-7, and 34 through 90 of this Complaint as though fully set forth herein.

100. Defendants used civil and encouraged collateral criminal process against Plaintiff by filing a false HRO Petition from Defendant Schaefer in June 2016, September 2016 Contempt Hearings May 2017 Contempt hearings, and February 2018 Contempt hearings, various knowingly false police reports from January 2016 to present, in an effort to retaliate and bring vindictive prosecution to deprive Plaintiff of legitimate First Amendment rights.

101.    Defendant Schaefer encouraged collateral criminal process against Plaintiff by filing various knowingly false police reports from March 2014 to present, in an effort to retaliate and bring vindictive prosecution to deprive Plaintiff of legitimate rights.

102.    Defendants used Ms. Middlecamp professional position as an Assistant Minneapolis City Attorney for the collateral purpose of intimidating and/or encouraging an illegal search warrant on Plaintiff's home to remove lawful and peaceful criticisms on his Facebook.

103.    Defendants statements concerning Plaintiff in the Petition were false.

104.    Defendants filed the false legal action for the collateral purpose of harassing, intimidating, and otherwise tormenting Plaintiff.

105.    Defendants filed the false legal action for the collateral purpose of instigating greater attention to their associated media campaign(s) and in order to interfere with Plaintiff Fredin's professional standing.

106.    As a result of Defendant's malicious abuse of process, Plaintiff has suffered damages, including but not limited to, damage to his personal and professional reputation, loss of professional privilege and severe emotional distress. Plaintiff Fredin is entitled to actual and punitive damages in an amount to be determined at trial.

## COUNT III: NON-CONSENSUAL SEXUAL SOLICITATION

### (Defendants)

107.    Plaintiff Fredin re-alleges and incorporates by references paragraph 1-7 and 29-33 of this Complaint as though fully set forth herein.

108.    Defendants have engaged, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard for causing, emotional distress and fear to Plaintiff, namely the publication and dissemination, confidential email

addresses, and publishing of sexual advertisements on the Internet impersonating his identity in an effort to bring actions and/or broadcasting false claims through adult websites thereby sending him countless unsolicited sexual invitations to his personal email from people both visiting and making direct contact to the adult profile.

109.    As a proximate result of Defendants actions, Plaintiff Fredin has suffered, and continues to suffer severe and extreme emotional distress, entitling him to actual and punitive damages, in an amount to be proven at trial.

## COUNT IV:  INVASION OF PRIVACY

### (Defendants)

110.    Plaintiff Fredin re-alleges and incorporates by references paragraph 1-7 and 21-23 of this Complaint as though fully set forth herein.  Defendants have engaged, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard for causing, emotional distress and fear to Plaintiff, namely the publication and dissemination, confidential email addresses, and publishing of sexual advertisements on the Internet impersonating his identity in an effort to bring actions and/or broadcasting false claims through adult websites thereby sending him countless unsolicited sexual invitations to his personal email from people both visiting and making direct contact to the adult profile.

111.    Plaintiff Fredin re-alleges and incorporates by references paragraph 1-3 of this Complaint as though fully set forth herein.  Defendants have intentionally intruded upon his confidential space to appropriate his private photographs and outrageously published his confidential photos within *Twitter* smear campaigns and *City Pages* article

112.    Defendants have intruded, appropriated, and outrageously published his private email addresses within profiles impersonating him on the internet and given them without consent to tabloid reporters.

113.    As a proximate result of Defendants actions, Plaintiff Fredin has suffered, and continues to suffer severe and extreme emotional distress, entitling him to actual and punitive damages, in an amount to be proven at trial.

## COUNT V:  NEGLIGENCE

### (Defendants)

114.    Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 7 and 34 through 90 as if fully set forth herein.

115.    On March 30, 2017, Defendant Schaefer, through her agents, servants and/or friends, were aware that the reports were reckless and/or negligent in initiating a Complaint No: 16122823 concerning Plaintiff Fredin.

116.    In March 2017, Defendant Schaefer, was reckless and/or negligent in initiating a Complaint No: 16253015 concerning Plaintiff Fredin.

117.    Defendant Schaefer, was reckless and/or negligent in initiating a Complaint No: 16122823 and 16253015 concerning Plaintiff Fredin.

118.    Between 2014 to present, Defendant Schaefer, was reckless and/or negligent in initiating a report(s) with the Ferguson Township and/or Minneapolis, and/or Saint Paul Police

119.    In March and April 2017, Defendant Schaefer, through her agents, servants and/or friends, were aware that the reports were false, mischaracterized, and a danger to Plaintiff and others.

59

120.    On October 5, 2016, Defendant Schaefer, through her agents, servants and/or friends,, had an affirmative duty to protect the Plaintiff.  Defendant Schaefer failed to take reasonable actions to attempt to intercept and/or investigate the false police reports the consistent with her affirmative duty to investigate.

121.    On January 1st, 2016, the Decedent suffered the loss of a relationship that otherwise would have been avoided had Defendant Schaefer not breached her duty of care and had acted in a manner consistent with her affirmative duty to investigate.

122.    On April 28th, 2017, the Plaintiff suffered a no-knock swat raid directly to gain investigative details surrounding these false reports that would have been avoided had Defendant Schaefer not breached her duty of care and had acted in a manner consistent with her affirmative duty to investigate.

123.    As a result of the Defendant Schaefer's tortious actions and conduct, Plaintiff seeks damages in an amount commensurate with the injuries and damages sustained by the Plaintiff and his family, altogether with the costs and disbursements of this action, in an amount to be determined at a jury trial in this action.

## COUNT VI:  FALSE ARREST/IMPRISONMENT

### (Defendants)

124.    Plaintiff Fredin re-alleges and incorporates by references paragraphs 58-65 of this Complaint as though fully set forth herein.  Defendants took increasingly outrageous, unethical, and escalating actions to make false police reports and/or falsely allege Facebook posts were threatening and/or HRO violations to bring about a no-knock swat style raid on his

personal residence in Hudson, Wisconsin in a direct effort to place him in unconsented confinement.

125.    Defendants intended to unlawfully confine and did unlawfully confine Plaintiff.

126.    Plaintiff was at all times conscious of the confinement and did not consent to the confinement.

127.    The confinement was not otherwise privileged.

128.    Upon information and belief, Defendants acted at the best and direction of Minneapolis Assistant City Attorney Lindsey Middlecamp and Saint Paul Police Sergeant David McCabe.

129.    As a proximate result of the confinement, Plaintiff suffered harm entitling him to damages in an amount to be determined at trial.

## COUNT VII:  MALICIOUS PROSECUTION

### (Defendants)

130.    Plaintiff Fredin re-alleges and incorporates by references paragraphs 1-7, 34-90 of this Complaint as though fully set forth herein,  Defendants coached, initiated, and engaged in a practice of generating police reports without probable cause.

131.    On January 2017, Defendant Miller reported that her phone and laptop computer had been hacked by Plaintiff without probable cause.

132.    Defendant Miller made the police report with malicious intent.

133.    On April 24th, 2017, the Saint Paul Police seized all of his computers and digital assets during a no-knock swat style raid.  The underlying investigation was closed without probably cause or suspicion to believe that Plaintiff hacked Defendant Miller's phone.

61

134.    Between March 2014 and present, Defendant Schaefer generated countless police reports with three law enforcement agencies that all originated without probable cause.

135.    Defendant Schaefer made the police reports with malicious intent.

136.    In each case, the police took actions to investigate the claims, and initiated subpoenas and/or search warrants indicating the numbers originated from telemarketers and the case was dismissed in Plaintiff's favor where on various dates including April 4th, 2018 the Saint Paul Police received subpoena results indicating the number 763-515-4376 was not connected to Plaintiff and was rather a local business offering sales call.

137.    On March 30th, 2017, the Saint Paul Police verified the number reported by Defendants 619-300-7684 was a telemarketer.

138.    As a proximate result of the seizure of all of his digital assets and malicious prosecution, Plaintiff suffered harm entitling him to damages in an amount to be determined at trial.

## COUNT VIII:  CIVIL FRAUD

(Defendants)

139.    Plaintiff Fredin re-alleges and incorporates by references paragraphs 1-138 of this Complaint as though fully set forth herein, Defendants coached, initiated, and engaged in a practice of deliberately misrepresenting material fact.

140.    Defendants knew that every police report regarding Facebook posts was not an HRO violation and began to knowingly misrepresent this fact to law enforcement.

141.    Defendants know that every police report regarding phone calls and/or text messages was deliberately mispresenting material fact.

142.    Defendants failed to provide material facts to the Ramsey County District Court during several evidentiary hearings including their prior dealings and the fact each was being coached by the other.

143.    Defendants made no attempt to bring about a reasonable solution or determine the facts of the case.

144.    Defendants rather continued to engage in harassment to induce the Plaintiff to act.

145.    Defendants created Twitter and City Pages smear campaigns to induce the Plaintiff to take affirmative steps to both investigate and seek their removal where the Defendants misrepresented his actions in an effort to commit fraud.

146.    As a proximate result of the civil fraud, Plaintiff suffered harm entitling him to damages in an amount to be determined at trial.

## COUNT IX:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Defendants)

147.    Plaintiff Fredin realleges and incorporates by references paragraph 1-146 of this Complaint as though fully set forth herein.

148.    Defendants have engaged, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard for causing, emotional distress to Plaintiff, namely the publication and dissemination to the media, confidential civil litigation, and coaching of false legal actions and/or broadcasting false claims through their personal media platform and a *City Pages* tabloid.

63

149.    Defendants violated state civil procedure and state law in withholding material evidence adverse to the Defendants namely their prior dealings in ongoing efforts to humiliate the Plaintiff during court appearances.

150.    As a proximate result of Defendants actions, Plaintiff has suffered, and continues to suffer severe and extreme emotional distress, entitling him to actual and punitive damages, in an amount to be proven at trial.

## COUNT X:  CIVIL CONSPIRACY

### (Defendants)

151.    Plaintiff Fredin realleges and incorporates by references paragraph 1-150 of this Complaint as though fully set forth herein.

152.    Defendant Miller directed Defendant Schaefer to harm Plaintiff Fredin and to falsely petition for an HRO in June/July 2016 constituting an ongoing conspiracy, express or implied, that was conceived no later than April 24th, 2016.

153.    Based on court records, Defendant Schaefer began her fraud on the Court during this period, and ultimately during a late November 2016 evidentiary hearing upon an apparent direction and signal from Defendant Miller.  At all times Defendant Schaefer and Defendant Miller acted in concert in carrying out the fraud, false arrest, defamation, malicious prosecution, as described in preceding paragraphs.  Both Defendant Schaefer and Defendant Miller have, to varying degrees, participated in planning and carrying out the objectives of the conspiracy, but both are nevertheless liable for the concerted action of their fellow co-conspirator.

154.    The objective of the conspiracy was to commit false arrest/imprison Plaintiff.

64

155.    In furtherance of this conspiracy, Defendants undertook actions constituting civil conspiracy to commit the common law torts of false arrest/imprisonment by unlawfully confining Plaintiff as described in the preceding paragraphs.

156.    As a proximate result of this conspiracy, Plaintiff suffered the physical and emotional harm set forth herein.

## COUNT XI:  PRIMA FACIE TORT

### (Defendants)

157.    Plaintiff Fredin realleges and incorporates by references paragraph 1-90 of this Complaint as though fully set forth herein.

158.    Defendants made extrajudicial statements and directed their attorney(s) to make statements to the press by publishing and personally disseminating to the media the confidential January 2016 decisions in *Miller v. Fredin* and November 2016 decision in *Schaefer v. Fredin*.

159.    Defendants made such extrajudicial statements in order to create a "high-profile" case that would generate negative publicity towards Plaintiff to cause him harm and prevent him from fully and fairly litigating the trial in *Miller v. Fredin, Schaefer v. Fredin, and Middlecamp v. Fredin*, and State of MN. v. Fredin.

160.    Defendants knew their statements about Plaintiff in the February 22nd, 2017 decision in Miller v. Fredin were false and untrue as explained in more detail above.  Defendants made their false statements particularly salacious and over-the-top to generate media coverage and to inflict harm on Plaintiff.  Defendant made their false statements knowing they were false and/or with reckless disregard for the falsity.  Furthermore, Defendants made such statements with the deliberate intent to harm Plaintiff's reputation, employment, livelihood, professional standing, and his opportunity to fairly litigate the issues.

161.    As set forth above, the trials were heavily influenced by Defendants January 2017 decision in *Miller v. Fredin* and the November 2016 decision in *Schaefer v. Fredin*. Plaintiff was unduly prejudiced at trial by the April to present various matters in *Miller v. Fredin, Schaefer v. Fredin, Middlecamp v. Fredin,* and *State of MN v. Fredin* and Defendant's extrajudicial acts of publishing and disseminating it to the media.

162.    As a result of Defendant's extrajudicial statements to the press, Plaintiff was denied his constitutional right to due process and to a fair trial in the various matters under the United States Constitution, Fourteenth Amendment. Plaintiff's constitutional right to access due process and seek legal redress has been unduly restricted and denied for an extended period of time, which continues as the filing of this Complaint. Additionally, Plaintiff has unconstitutionally been denied and stripped of his property as a result of Defendant's denial of Plaintiff's right to a fair trial. Plaintiff has suffered substantial economic losses, permanent damage to his personal and professional reputation and deprivation of his liberty. Plaintiff is entitled to damages inn an amount to be determined at trial.

## ATTORNEY FEES AND COSTS

Plaintiff demands reasonable attorney fees, costs, and fees pursuant to 28 U. S. C. §1927.

## JURY TRIAL DEMANDED

Plaintiff demands a jury on all issues which may be properly tried by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Fredin prays that the Court:

a.  Enter judgment in favor of Plaintiff Fredin against Defendants;

b.  Enter judgment awarding Plaintiff Fredin compensatory damages on all counts herein to compensate Plaintiff Fredin for Defendant's activity complained of herein and for

any injury complained of herein, inclusive of interest and costs, in an amount to be determined at trial;

c. Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

d. Enter judgment awarding Plaintiff Fredin injunctive relief requiring Defendants to remove her defamatory statements concerning Plaintiff Fredin from the Twitter account @CardsAgstHrsmt and *City Pages* tabloid;

e. Enter judgment awarding Plaintiff Fredin his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

f. Order such other relief that the Court deems just and appropriate.

Dated: February 16, 2018
Hudson, WI

/s/ Brock Fredin

Brock Fredin
1905 Iris Bay .
Hudson, WI 54016
(612) 424-5512 (tel.)
brockf12@gmail.com
*Plaintiff, Pro Se*