## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brock Fredin,<br><br>    Plaintiff,<br><br>v.<br><br>Grace Elizabeth Miller, and<br>Catherine Marie Schaefer,<br><br>    Defendants. | Case No. 18-cv-466 (SRN/HB)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS GRACE MILLER AND CATHERINE SCHAEFER** |

Plaintiff Brock Fredin ("Fredin"), appearing *pro se*, has initiated a series of lawsuits in Federal Court as a means to continue the relentless victimization of three[1] women who lawfully obtained harassment restraining orders ("HRO") against Fredin and later contempt orders for Fredin's violations of those HROs. Fredin has also sued Judges[2], Referees[3], City Attorneys[4], police officers, journalists[5] and even his own counsel[6] in a relentless attempt to prove a grand conspiracy that exists only in Fredin's alternative reality. In each case, Fredin's claims have been dismissed, but not before he was able to inflict additional trauma on Defendants.

---

[1] Fredin initiated a lawsuit against Lindsey Middlecamp (17-cv-03058), who has also moved for summary judgment on Fredin's claims.

[2] *Fredin v. Elizabeth A. Clysdale et al.*, 18-cv-00510

[3] *Fredin v. James Street et al.*, 19-cv-02864

[4] *Fredin v. Lyndsey M. Olson et al.*, 18-cv-2911

[5] *Fredin v. City Pages et al.*, 19-cv-00472

[6] *Fredin v. Halberg Criminal Defense et al.*, 18-cv-02514

Fredin's pleadings evidence the ramblings of a man angered by the numerous court proceedings in which he has been found guilty of harassment. He seeks revenge through this and the other cases he has filed by weaponizing this Court's docket as a means to perpetrate his ongoing harassment of his victims.

In this case Fredin is suing Defendants Grace Elizabeth Miller ("Miller") and Catherine Marie Schaefer ("Schaefer") for defamation *per se*, abuse of process, nonconsensual sexual solicitation, negligence, intentional infliction of emotional distress, and civil conspiracy. (Amended Complaint "AC" [Doc. 53].)

Miller and Schaefer move for summary judgment, pursuant to Fed. R. Civ. P. 56, on all of Fredin's claims, because Fredin has failed to state claims as a matter of law or has failed produce any evidence supporting them.

## BACKGROUND

A.   The Harassment of Grace Miller

The genesis of these lawsuits stem from Fredin's breakup from Miller in late 2015. (AC. ¶¶ 11-13.) Shortly thereafter, Miller obtained an HRO in Ramsey County District Court on January 28, 2016, following repeated harassing conduct by Fredin, including the following disturbing exchange:

| | |
|---|---|
| Miller: | how [a]bout we be friends. . . . |
| Fredin: | Nope. We are dating. Yes, you're taking me to see your family. |
| Miller: | I'm done talking to you tonight. . . . |
| Fredin: | Be a good girl for me. Here's a hot photo of what you can't have. [webcam photo of Fredin] |

. . .

| Fredin: | Too bad you aren't in this tonight on your knees thinking of me.;) [photo of woman in lingerie] You should have nightly tasks. |
| Miller: | Stop it. |
| Fredin: | You really should meditate nightly, get on your knees, and think of me. It's good for your mental health. Also you're not going on any more first dates. |

. . .

| Fredin: | Why are you opposed to these things? |
| Miller: | because I don't want a relationship with you anymore. I told you[.] |
| Fredin: | You do and will though. You need it. . . . |

. . .

| Fredin: | You're a very boring person. You have zero interests or excitement in your life. I would never be your friend. However, I will go on occasional dates with you and you're taking me out for my birthday. |

*Miller v. Fredin*, No. A16-0613, 2017 WL 280974, at *2 (Minn. Ct. App. Jan. 23, 2017).

Following an evidentiary hearing in which numerous other disturbing text messages and Facebook posts were offered into evidence, as well as the compelling testimony of Miller, Referee James Street unequivocally found that Fredin continually contacted Miller using email, text messages, and telephone calls after Miller blocked his communication by Facebook and phone. *Id.* at *3. The Court determined that the unwanted communications, together with other conduct constituted harassment and the Court granted Miller a two-year HRO[7]. *Id.* Fredin then violated the HRO by continuing to

---

[7] A district court may issue a harassment restraining order if it has "reasonable grounds to believe that the respondent has engaged in harassment." Minn. Stat. § 609.748, subd. 5(b)(3) (2014). "Harassment" is defined in relevant part as "repeated incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of another." Minn. Stat. § 609.748, subd. 1(a)(1) (2014).

contact Miller online. Fredin appealed the HRO to the Minnesota Court of Appeals. Judge Kevin G. Ross authored an opinion on January 23, 2017, affirming Referee Streets' Order and finding "[s]ufficient evidence . . . support[ed] the district court's finding that Fredin's persistent, unwanted communication in the face of Miller's attempts to prevent the communication substantially affected Miller's safety and privacy." *Miller v. Fredin*, No. A16-0613, 2017 WL 280974, at *3 (Minn. Ct. App. Jan. 23, 2017).

     B.    <u>The Harassment of Catherine Schaefer</u>

In January 2014, prior to his relationship with Miller, Fredin attempted to date Schaefer. (Declaration of K. Jon Breyer ("Breyer Decl."), Ex. 1, Order granting motion to show cause for contempt ¶2). The two exchanged messages through an online dating site and agreed to meet. Schaefer later called off the meeting after she received several odd and intense messages from Fredin that made her uncomfortable. (*Id*.) Fredin responded with a desperate plea, at one point offering her money to reconsider. (*Id*. ¶3). Over the next two years Schaefer would receive unsolicited messages from Fredin. Writing under a pseudonym, Fredin wrote "no one will talk to me . . . I'm hot and still nothing. You blocking me breaks my heart. I'm so hurt. I start to treat all women like shit based on the lessons women like you provide. You're just perpetuating the problem. Fuck you. Seriously. Fuck you. Why are you so fucking heartless, bitch?" (Breyer Decl., Ex 2., Affidavit of Catherine Schaefer p.14 [8]). Another message the same night threatened Schaefer with "consequences," and listed the names of her advisors at Penn State

---

[8] The page number relates to the page of the exhibit, not the page number printed on the individual documents that comprise the exhibit.

University, where she was then pursuing a PhD. (*Id*. pp. 15-16). After contacting police and being told there wasn't much that could be done, Schaefer took to Facebook, detailing how Fredin, a guy she'd never met, was haunting her. A friend shared her post with Miller and the two connected.

Schaefer obtained a temporary HRO against Fredin in Ramsey County following harassing conduct by Fredin. Following the evidentiary hearing an HRO was issued for two years prohibiting Fredin from directly or indirectly contacting Schaefer. (Breyer Decl., Ex. 1 ¶1).

After the Ramsey County District Court issued an HRO in 2016, Fredin continued to indirectly contact Schaefer. *See Schaefer v. Fredin*, No. A19-0657, 2020 WL 1921101 (Minn. Ct. App. Apr. 20, 2020). In January 2018, Schaefer moved for an order to show cause why the district court should not hold Fredin in contempt for violating the 2016 HRO. *Id.* at *2; Breyer Decl., Ex. 1. In May 2018, the court found that Fredin had violated the 2016 HRO in each of the ways that Schaefer had identified. *Id.* Schaefer then moved for a 50-year HRO based on new alleged HRO violations. *Id.* In particular, she asserted that Fredin "continues to falsely file court documents to draw me into further hearings, which have been dismissed." *Id.* In October 2018, the district court found that Fredin was in violation of the 2016 HRO for additional conduct, including the filing of a TRO against Schaefer in Wisconsin, and the failure to disclose the Ramsey County 2016 HRO to the Wisconsin court in an effort to ensure that Schaefer would be forced to appear with him in court. *Id.* The Ramsey County District Court found that Fredin's

request for a TRO in Wisconsin was "designed to thwart the very purpose of the 2016 HRO." *Id.*

In November 2018, the district court held a two-day evidentiary hearing on the 2018 HRO petition, at which Schaefer and Fredin testified. *Id.* After the expiration of the 2016 HRO, the court granted Schaefer's request for a 50-year HRO, finding that Fredin had committed two or more violations of the 2016 HRO. *Id.* at *3. The court adopted its findings from its earlier May 2018 and October 2018 orders, and found that Fredin was barred by collateral estoppel from contesting the previously issued findings, as the orders addressed identical issues, involved the same parties, and Fredin had had a full and fair opportunity to be heard. *Id.* On appeal, the Minnesota Court of Appeals affirmed. *Id.* at *7.

On February 22, 2017, City Pages ran a story titled "Accused stalker Brock Fredin is writing a horror story, and he's the main character." (Breyer Decl., Ex. 3). The article was based on the HROs each of the women obtained, the public court filings, and the Court of Appeals decision. The article also drew information obtained from profiles Fredin had posted on datingpsychos.com, an online site that allows anonymous character assassination. Schaefer's profile states that she "stalks, harasses, and bullies." Miller's profile calls her a "certified piece of shit," a "bully" who will "stalk and harass you" and "drag you into a legal battle." (Breyer Decl., Ex. 2, p. 21).

## Procedural Posture

Fredin filed his Complaint on February 16, 2018 [Doc. 1]. Defendants moved to dismiss the Complaint [Doc. 18] and Fredin moved to file an Amended Complaint,

seeking leave to add a claim for copyright infringement; to delete his claims for false arrest/imprisonment, malicious prosecution, civil fraud, and prima facie tort; and to add and clarify the allegations concerning his remaining claims [Doc. 29]. Defendants opposed the amendments as futile, but did not oppose the deletion of the false arrest/imprisonment, malicious prosecution, and prima facie tort claims [Doc. 32].

Magistrate Bowbeer issued a Report & Recommendation ("R&R") on October 17, 2018, dismissing Fredin's invasion of privacy claim and dening Fredin's attempt to amend the Complaint to include a claim of copyright infringement[9] [Doc. 38]. The R&R permitted Fredin to file his Amended Complaint, which removed the claims of false arrest/ imprisonment, malicious prosecution, civil fraud, and prima facie tort. The R&R was adopted by this Court on December 11, 2018 [Doc. 41].

The operative Amend Complaint ("AC") contains the remaining claims for defamation *per se*, abuse of process, nonconsensual sexual solicitation, negligence, intentional infliction of emotional distress, and civil conspiracy [Doc. 53].

## ARGUMENT

## I.    Summary Judgment

Summary judgment is appropriate when the submissions to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Layton v. U.S.,* 984 F.2d 1496,

---

[9] Fredin alleged that he is the sole owner of copyrighted photographs that Defendants reproduced and distributed without his permission on the Twitter account @CardsAgstHrsmt and in the City Pages article. This Court found that the proposed copyright infringement claim was futile and leave to add the claim should be denied [Doc. 38, p. 30].

1499 (8th Cir. 1993). The party opposing summary judgment may not simply rely upon pleadings. The opposing party must set forth specific facts showing that there is a genuine issue for trial. Rule 56(c). The nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A mere "scintilla of evidence" is insufficient to defeat summary judgment, *id.* at 252, 106 S.Ct. 2505, and if a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate. *Id.* at 256, 106 S.Ct. 2505; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Where a party is proceeding pro se, court has obligation to read party's supporting papers liberally and interpret them to raise the strongest arguments that they suggest, but a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome motion for summary judgment. *Lee v. Coughlin*, 902 F.Supp. 424 (S.D.N.Y. 1995). Although courts must "grant deference to pro se litigants . . . the court will not assume the role of advocate for the pro se individual and the court will not allow defective or insufficiently pled pro se claims to proceed." *Sneh v. Bank of N.Y. Mellon*, No. 12-cv-954 (MJD/JSM), 2012 WL 5519690, at *5 (D. Minn. Oct. 30, 2012), R. & R. adopted, 2012 WL 5519682 (D. Minn. Nov. 14, 2012).

## II.    Defamation *Per Se*

Fredin fails to articulate the exact statements he alleges are defamatory or even where such statements are allegedly published. Instead, he leaves Defendants and this Court guessing as to what those statements might be and where they may have been published.  In the section of the Amended Complaint titled "Defendants Defamation of Plaintiff to Cover-up Revenge Porn Sexual Advertisements" he asserts that Schaefer "provided" and "adopted" statements in a City Pages article "that she received unwanted phone and/or text messages from [him]" (AC ¶38), and that Defendants told City Pages reporter Michael Mullen that Fredin had sent them an overwhelming number of "odd," "intense," and "sexually suggestive" text and Facebook messages (*Id.*)

"A defamatory statement is one that tends to harm the plaintiff's reputation and lower him in the estimation of the community." *Jadwin v. Minneapolis Star & Tribune Co.*, 390 N.W.2d 437, 443 (Minn. Ct. App. 1986). In Minnesota, the elements of a defamation claim are: "(a) a false and defamatory statement about the plaintiff; (b) in unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community." *Weinberger v. Maplewood Review*, 668 N.W.2d 667, 673 (Minn. 2003). "Statements are defamatory per se if they falsely accuse a person of a crime, of having a loathsome disease, or of unchastity, or if they refer to improper or incompetent conduct involving a person's business, trade, or profession." *Longbehn v. Schoenrock*, 727 N.W.2d 153, 158 (Minn. Ct. App. 2007). Defamation per se is "a rule of damages," however, "not of defamatory meaning," and "means that damages are presumed and

recoverable without proof of actual harm to reputation." *Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297, 307 (Minn. Ct. App. 2001).

As the Minnesota Supreme Court explained in *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 28 (Minn. 1996), a defamation plaintiff generally must establish harm to reputation because defamation actions compensate for injury to reputation, in contrast to invasion of privacy torts, which "compensate for 'mental distress from having been exposed to public view.' " *Id.* (quoting *Time Inc. v. Hill*, 385 U.S. 374, 384–85 n.9, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967)). Accordingly, the Court concluded that emotional-harm damages are allowed in Minnesota only as "parasitic" damages. *Id.* at 27. Put another way, emotional-harm damages "are insufficient in themselves to make the slander actionable, but once the cause of action is made out without them, they may be tacked on as 'parasitic' to it." *Id.* (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112, at 794–95 (5th ed. 1984)).

Privilege is a recognized defense to a defamation action in Minnesota. *Matthis v. Kennedy*, 67 N.W.2d 413, 417 (Minn. 1954); *Mahoney & Hagberg v. Newgard*, 729 N.W.2d 302, 306 (Minn. 2007). Privileged defamatory matter is divided into two classes: (1) that which is absolutely privileged, and (2) that which is qualifiedly and conditionally privileged. *Id*. Absolute privilege means that immunity to liability is given to the speaker even for intentionally false statements, while a qualified or conditional privilege grants immunity only if the privilege is not abused and defamatory statements are publicized in good faith and without malice. *Id*.

A.    <u>The Statements In The City's Pages Article Are Protected by Absolute Privilege - The "Litigation Privilege"</u>

Here, Fredin claims that the content of the City Pages article was defamatory. Defendants are not the authors of the City Page article and they did not publish the alleged statements. Further, all of the statements attributed to them in the article are not statements made by them to the reporter, but rather are statements taken verbatim from public court records and, almost entirely, from an affidavit Defendant Schaefer filed seeking an HRO.  (AC ¶38) (Breyer Decl. Ex. 2). Statements made in the context of a harassment proceeding, and those made by affidavit in support of those proceedings, are afforded an absolute privilege and are not grounds for a defamation claim.

In Minnesota, the absolute privilege extends to "[a]ny publication made, whether oral or in writing, ... made ... in the character of a judge, juror, witness, litigant or counsel-in the performance of the public duty or in the exercise of the private right upon which the immunity is based." *Matthis v. Kennedy*, 243 Minn. 219, 224-25 (1954). "[E]ven the presence of express malice does not destroy the privilege." *Id*. at 224; *Pinto v. Internationale Set, Inc.*, 650 F. Supp. 306, 308 (D. Minn. 1986). Further, it is not limited to statements during trial or at an evidentiary hearing, but extends to any "quasi-judicial proceeding" and covers "anything that may possibly be pertinent" to the litigation. *Cole v. Star Tribune*, 581 N.W.2d 364, 369 (Minn. Ct. App. 1998). Thus, a litigant's communication is privileged if it has "some relation" to a judicial proceeding. *See Mahoney & Hagberg v. Newgard*, 729 N.W.2d 302, 306 (Minn. 2007).

Here, the statements alleged by Fredin to be defamatory arise in the context of harassment court proceedings and are immunized under the absolute privilege. For this reason, Fredin may not maintain a claim of defamation for any statements found in the City Pages article, because each and every alleged defamatory statement was taken from the public Court file and can be traced to Schaefer's affidavit filed in her request for an HRO. (Breyer Decl., Ex. 2).

Fredin alleges that the following statement from the City Pages Article is defamatory, "Before they met in person, Fredin sent a series of 'very odd' and intense texts. Schafer decided a meeting was 'not in her best interests.'" (AC ¶38). The statements attributable to Schaefer were taken verbatim from her affidavit filed in Ramsey County Court in support of her request for an HRO. (Breyer Decl., Ex. 2, p.22) (noting "several **very odd** texts came from Brock . . .enough to make me decide that meeting this person was **not in my best interest**.")) These statements are protected by an absolute litigation privilege. They are also statements of opinion protected under the First Amendment.

The Court has already ruled that Defendants' statements characterizing Fredin's texts as "odd," "intense," and "haunting," and stating that meeting him would not be in their "best interests," were statements of opinion, not defamation. (Doc. 38 at p.11). The Court found that such a statement of opinion is not actionable as defamation, because it is protected speech under the First Amendment. *Hunt v. Univ. of Minn.*, 465 N.W.2d 88, 93 (Minn. Ct. App. 1991).

Fredin also claims that the following statement is defamatory, "Over the next two years, she was contacted dozens of times by unfamiliar cell phone numbers and online dating profiles. In longer communiques, Schaefer recognized Fredin's 'unique' writing style, *she wrote in the affidavit*. Other messages just said, "Hi Cat." No one else called her that." (AC ¶38)(emphasis added). Fredin has testified that he attributes the two phrases "unique" and "Hi Cat" to Schaefer and the remainder to Mullen (Breyer Decl., Ex. 4, Fredin Depo. pp. 113-114). As with other statements attributed to Schaefer, these too were taken directly from her affidavit in the Ramsey County proceeding. Fredin's allegation states this fact. *See also* Breyer Decl. Ex. 2, p. 23 ("Brock has a unique way of writing that would alert me that it was him." And describing receiving messages stating, "Hi Cat"). These statements are protected by an absolute litigation privilege. They are also statements of opinion (explained below) and are true. *See Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980)(truth is a complete defense to a defamation claim).

B.      Substantially True Statements Cannot Support a Defamation Claim

Statements that are substantially true that a reasonable person could find to be a "supportable interpretation" of an ambiguous set of circumstances are not actionable because they are not provably false. *Hunter v. Hartman*, 545 N.W.2d 699, 707 (Minn. Ct. App. 1996)("If any reasonable person could find the statements to be supportable interpretations of their subjects, the statements are incapable of carrying a defamatory meaning, even if a reasonable jury could find that the statements were mischaracterizations." (internal citation and quotations omitted)). A statement is

13

substantially true and not defamatory if "its gist or sting is true [and] it produces the same effect on the mind of the recipient which the precise truth would have produced." *Jadwin v. Minneapolis Star & Tribune Co.*, 390 N.W.2d 437, 441 (Minn. Ct. App. 1986).

Fredin alleges that the statement that "[Defendant Schafer] canceled and told Fredin to stop contacting her" is defamatory. (AC ¶38). However, the statement does not carry a defamatory meaning. The statement does not falsely accuse Fredin of a crime, of having a loathsome disease, or of unchastity, nor does it refer to improper or incompetent conduct involving a Fredin's business, trade, or profession. *Longbehn v. Schoenrock*, 727 N.W.2d 153, 158 (Minn. Ct. App. 2007). It is also a statement of fact. (Breyer Decl., Ex. 2, p. 22).

Similarly, the statement "[e]xasperated, Schaefer took to Facebook, detailing how a guy she'd never met was haunting her. A friend shared her post. Another Twin Cities woman soon reached out. Schaefer wasn't Fredin's only victim," is also "substantially true" and not capable of a defamatory meaning. (AC ¶38.) Indeed, Fredin recognizes that fact in his pleading by acknowledging that Schaefer and Miller met via Facebook and that they shared their victim experiences with one another. (*Id.*)  Further, simply because Fredin disagrees with the statement, does not make it defamatory. *Hunter*, 545 N.W.2d at 707 ("A commentator who advocates one of several feasible interpretations of some event is not liable in defamation simply because other interpretations exist. Consequently, remarks on a subject lending itself to multiple interpretations cannot be the basis of a successful defamation action because as a matter of law no threshold showing of "falsity" is possible in such circumstances.") Again, the statement must have a defamatory

meaning and as a matter of law the above statement cannot be reasonably  interpreted as containing a defamatory meaning.

> C.   Statements of Opinion Are Not Defamatory

Statements of opinion are not defamatory under Minnesota law. *Hunt v. Univ. of Minn.*, 465 N.W.2d 88, 93-94 (Minn. Ct. App. 1991). To distinguish between protected expressions of ideas and actionable assertions of fact, Minnesota courts rely on the framework developed in *Janklow v. Newsweek*, 788 F.2d 1300 (8th Cir. 1986), *cert. denied*, 479 U.S. 883 (1986). *See Hunt*, 465 N.W.2d at 93-94; *Lund v. Chicago and Nw. Transp. Co.*, 467 N.W.2d 366, 369 (Minn. Ct. App. 1991). Under *Janklow*, courts evaluate whether a statement has defamatory meaning using four factors: (1) the statement's precision and specificity; (2) the statement's verifiability; (3) the social and literary context in which the statement is made; and (4) the statement's public context. *Janklow*, 788 F.2d at 1302-03. These factors are "considered together," and "the decision whether a statement is fact or opinion must be based on all the circumstances involved." *Id.* at 1302. Whether a statement can be interpreted as stating facts or can be proven false is a question of law. *McGrath v. TCF Bank Sav. FSB*, 502 N.W.2d 801, 808 (Minn. Ct. App. 1993).

Fredin alleges that statement contending that his writing style is "unique," that the messages, "some sexually suggestive", continued for weeks" and that Schaefer's evidence of unwanted contact through the years was "overwhelming," all constitute defamatory statements. (AC ¶38.) They do not. They are clear statements of opinion. These statements of opinion are of the same nature and category as statements this Court has already ruled are statements of opinion, not defamation. (Doc. 38 at p.11) (finding

that Schaefer's statements characterizing Fredin's texts as "odd," "intense," and "haunting," and stating that meeting him would not be in her "best interests," were statements of opinion.)

Because the alleged defamatory statements do not contain a defamatory meaning, are statements of opinion, and are protected by an absolute privilege, Fredin's claim is not sustainable and must be dismissed.

## II.    Abuse of Process

Fredin alleges that Miller and Schaefer "used civil and encouraged collateral criminal process against [him] by filing a false HRO Petition" in June 2016; filing false police reports from January 2016 to present; initiating contempt proceedings in September 2016, May 2017, and February 2018; and obtaining an unlawful search warrant through then-Assistant City Attorney Lindsey Middlecamp. (AC ¶¶ 49-55.) He contends that Defendants sought the HROs for the purposes of manufacturing a knowingly false coordinated smear campaign, retaliating against him, harassing and intimidating him, attempting to silence his First Amendment right to free speech, preventing him from seeking legal redress, concealing their unlawful activities by making false police reports, and garnering attention for their social media campaigns. (*Id*.)

"Process" is defined as "'[t]he proceedings in any action or prosecution; a summons or writ, esp. to appear or respond in court.' " *Eclipse Architectural Group, Inc. v. Lam*, 814 N.W.2d 692, 697 (Minn. 2012) (quoting *Blacks Law Dictionary 15*74 (9th ed. 2009)). To prevail on an abuse of process claim, Fredin must prove: "(1) the existence of an ulterior purpose; and (2) the act of using the process to accomplish a result not

within the scope of the proceedings in which it was issued, whether or not the result might otherwise be lawfully obtained." *Questar Data Sys., Inc. v. Serv. Mgmt. Grp., Inc.*, 502 F. Supp. 2d 960, 963 (D. Minn. 2007)."[T]he gist of an action for abuse of process is the misuse or misapplication of the process, after it has once been issued, for an end other than that which it was designed to accomplish." *Hoppe v. Klapperich*, 28 N.W.2d 780, 786 (Minn. 1947).

Minnesota law permits a person who is the victim of harassment to a seek a restraining order from a district court. Minn. Stat. § 609.748, subd. 2 (2017). Harassment is defined as "repeated incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of another. . .." *Id*. at subd. 1(a). This Court has previously dismissed a similar abuse of process claim alleged by Fredin against the same Defendants in *Fredin v. Clysdale*, No. 18-CV-0510 (SRN/HB), 2018 WL 7020186, at *11 (D. Minn. Dec. 20, 2018)(concluding that neither Miller nor Schaefer used the judicial process to achieve an outcome outside the scope of the proceedings).

As stated above, for Fredin to prevail on his claim of abuse of process, he must allege that the "process" was used to accomplish a result not within the scope of the proceeding. *See Hoppe*, 28 N.W.2d at 786. Here, Fredin alleges that the HRO proceedings where  brought to "prosecute Plaintiff"; a purpose specifically within the scope of the proceedings. *See* Minn. Stat. § 609.748, subd. 1(a); *see also Johnson v. Arlotta*, No. A11-630, 2011 WL 6141651 at *3 (Minn. Ct. App. Dec. 12, 2011) (finding that former

boyfriend's blog posts and emails was harassment for purposes of granting an HRO under Minn. Stat. § 609.748).

Because privacy and safety are legitimate purposes to initiate an HRO proceeding under Minn. Stat. § 609.748, as well as pursuing enforcement of those Orders, Fredin's claim fails to establish that Defendants sought to achieve a purpose outside the scope of the HRO proceedings. Indeed, as demonstrated by the HROs issued by Ramsey County District Court following numerous evidentiary hearings and, in the case of Schaefer's HRO, affirmed by the Minnesota Court of Appeals, Fredin cannot argue that the HROs were baseless or were sought for an improper purpose. None of the evidence supplied to the court during those proceedings, and none of the police reports reviewed by those courts, have ever been found to have been false or used to "bring baseless and fraudulent criminal charges . . ." (AC¶ 53.)   Fredin was criminally charged and convicted. *See* Register of Actions, *State v. Fredin*, Case No. 62-cr-17-3156 (Ramsey Cty. Dist. Ct.) In light of these court rulings, Fredin cannot sustain a claim of abuse of process.

### III.   Nonconsensual Sexual Solicitation

Fredin alleges that Miller and Schaefer  impersonated him, used his email address, and posted his photograph on an adult website, which caused him to receive "countless unsolicited sexual invitations to his personal email" from individuals who had accessed the fake profiles. (AC ¶ 61.) Specifically, he alleges that Schaefer impersonated him, created false online profiles, and posted his legal name and email address on an "online

explicit dating site" and on sexual advertisements[10]. (AC ¶¶ 1, 14, 18.) Fredin claims that he received via his email and phone number numerous responses, sexual images, and invitations for sex from individuals who accessed the fake profiles. (*Id*. ¶¶ 16, 19.) Fredin further avers that Defendants intended to cause emotional distress and fear to Plaintiff by disseminating his contact information and using his identity to publish online advertisements for sex. (*Id*. ¶ 69.) Fredin has adduced no evidence that Defendants impersonated him by creating false online profiles, and posting his name and email address on explicit dating sites. To the contrary, the evidence points to Fredin as the person who created the profiles, as he had complete and unfettered control of them from the very moment they were created. (Breyer Decl. Ex. 4, Fredin Depo. p. 65.)

Minnesota law recognizes a suit for damages when a person "uses the personal information of another to invite, encourage, or solicit sexual acts without the individual's consent and knows or has reason to know it will cause the person whose personal information is used to feel harassed, frightened, threatened, oppressed, persecuted, or intimidated . . . ." Minn. Stat. § 604.31, subd. 2.

At his deposition, Fredin testified that he had created an account on the website www.collarspace.com using the username "Epicview". (Breyer Decl. Ex. 4, pp. 53, 55.) That profile was created by Fredin and it disclosed his location, height and weight, sexual preferences, included a photo of Fredin, and provided the viewer of the profile a means to contact Fredin through email.  (*Id*. pp. 54-55, 57.) Fredin was an active user of the

---

[10] This Court has already determined that Fredin's email address and the photographs depicted in the Amended Complaint are not private facts that a reasonable person would find highly offensive and thus those allegations are not actionable. [Doc. 38 at 22-23]

website, communicating with would-be suiters on a weekly basis. *Id*. p. 56. Fredin also maintained active profiles on numerous other adult websites. (*Id*. pp. 57-61.)

Fredin claims that Defendants created two false accounts on www.collarspace.com using the usernames "EpicViewf12" and "blackoutx2". (AC ¶17-18.) Because of these profiles Fredin claims that he "received thirty (30) to fifty (50) emails from men through his mobile phone and email account. Some of these messages contained explicit images, others were merely nonconsensual invitations for sex." (AC ¶19.)  At Fredin's deposition, he testified that he deleted all of the records from www.collarspace.com and, consequently, many of the purported messages have been lost. (Breyer Decl. Ex. 4, p. 64.) Fredin also confirmed that the profile under the username "EpicViewf12" is the same as the one created under the username "EpicViewfu." (*Id*. p. 128.) In each instance Fredin received the confirmation email establishing both usernames and providing the passcodes to make changes to the accounts. Fredin had complete control over the accounts. (*Id*. p. 65.) Fredin also admitted that he received only one message from the EpicViewf12 account. He also failed to produce the actual profile for EpicViewf12 in discovery. (*Id*. pp. 129, 131.)

During questioning as to why he believed Schafer and Miller had created the EpicViewfu profile, Fredin provided the following "evidence":

> Q: What evidence do you have that my clients created the user name EpicViewfu?

> A: Because Catherine Schaefer had e-mailed me directly taunting me, related to the harassment restraining order proceeding and the smear campaign online against me, and then suddenly these profiles popped up within hours. The user name blackoutx2 references a, quote, unquote,

> blackout campaign, and the x2 is pretty easily identifiable as times two,
> which is two people, Catherine Schaefer and Grace Miller.

(*Id*. p. 66.)

As to the Blackoutx2 profile, Fredin provided a similar response claiming that the timing of the profiles coincided with Schaefer's filing of her restraining order. (*Id*. pp. 132-133.) Conceding that nothing in the profile points to Schaefer as its creator, Fredin claimed that her IP address was associated with the profile. When asked to identify the IP address, he could not, as he did not actually have that information, nor did he attempt to subpoena it from www.collarspace.com. (*Id*. pp.132-143.) Instead, Fredin claimed that a "friend" helped him identify the IP address, but Fredin refused to identify the friend or whether the captured IP address was in fact Schaefer's. (*Id.*)

Because Schaefer allegedly knew Fredin's email address, and referenced Miller in a Facebook post on or about the time the purported false profile was created, Fredin surmises that Schaefer must have created the EpicViewfu profile. (*Id*. pp. 67-68.) Fredin also claimed to have received a message from Schaefer using the username "Blackoutx2" (*Id*. p. 72.) However, the entirety of that message is "We know about you. We will be coming soon." (*Id*. p. 73) (AC ¶20.) From this message, Fredin claims that it must be Schaefer because 'we will be coming soon' references the subsequent Ramsey County Court Action Catherine Schaefer filed against me." (*Id*. p.73.) When pressed on his strained and tenuous interpretation of the message, Fredin could not provide a cogent response (*Id*. p. 74.)

As for the purported messages Fredin received seeking unsolicited sex, he admitted only opening "one or two" and left the others "unread." (*Id*. p. 77.) A review of those messages finds no sexual solicitations whatsoever. (*Id*. pp. 78, 79 – 84.) (Breyer Decl., Ex. 5.) As fredin testified, it was not the content of the message or the expression of a solicitation in the email/text, instead he simply viewed every message, whether he read them or not, as an unsolicited solicitation for sex. (*Id*. pp. 84-86, 88.) As for the text messages Fredin alleges he received, Fredin explained that they are "unavailable" and the phone he received those text messages on was "delated" and sold on the internet. (*Id*. p. 94.)

Because Fredin has absolutely no evidence of who created the profiles, and has produced no evidence that the profiles invited, encouraged, or solicited sexual acts, he cannot maintain his claim under Minn. Stat. § 604.31, subd. 2.

## IV.    Negligence

Fredin alleges that Defendants owed him a general duty of reasonable care, and breached that duty by filing false police reports and initiating false complaints in state court. (AC ¶¶ 73-81.)

To state a claim for negligence, a plaintiff must establish "(1) the existence of a duty of care; (2) breach of that duty; (3) proximate causation; and (4) injury." *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn. 2007). "Duty is a threshold question '[b]ecause a defendant cannot breach a nonexistent duty.'" *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 582 (Minn. 2012) (quoting *Domagala v. Rolland*, 805 N.W.2d 14, 22

(Minn. 2011)). The existence of a duty is a legal question for the court to resolve. *Id.* (citing *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986)).

To begin, Defendants do not owe Fredin any duty of care. As this Court has previous concluded "[i]t would be antithetical to the goals of the civil justice system to impose a duty of care on Ms. Miller [or Ms. Schaefer], in particular, as she was found to be the victim of Fredin's HRO violation. Reasonable minds cannot differ on this point, and under these facts, there is no proximate cause as a matter of law." *Fredin v. Miller*, No. 19-CV-3051 (SRN/HB), 2020 WL 3077708, at *11 (D. Minn. June 10, 2020). The Court should make the same finding here.

Additionally, even if Defendants owed their convicted harasser a duty of care, that duty does not extend to police reports. The statute dealing with false police reports is a criminal statute, not a civil statute, and there is no private cause of action provided. Minn. Stat. § 609.505, subd. 1. Moreover, Defendants have not been found guilty of violating the statute or submitting false police reports. As discussed in Section II, *supra*, Defendants filed police reports and obtained HROs through evidentiary hearings held before the Ramsey County District Court.  Nothing in those proceedings or in the findings of those judicial officers suggest that Defendants ever filed a false police report or that there was insufficient evidence of Fredin's misconduct[11].

---

[11] Criminal charges were brought by the St. Paul City Attorney's Office and Fredin was convicted of stalking on October 17, 2018. *See* Register of Actions, *State v. Fredin*, Case No. 62-cr-17-3156 (Ramsey Cty. Dist. Ct.) "Thus, it would not be reasonable to infer that the police report was false." *Fredin v. Clysdale*, No. 18-CV-0510 (SRN/HB), 2018 WL 7020186, at *7 (D. Minn. Dec. 20, 2018).

## V.     Intentional Infliction of Emotional Distress

Fredin's IIED is alleged to have arisen from Defendants engaging in "a course of extreme and outrageous conduct with the intention of causing, or reckless disregard for causing, emotional distress to Plaintiff, namely the publication and dissemination of sexual advertisements and coaching of false legal actions and/or broadcasting false claims through their revenge porn media platforms @CardsAgstHrsmt and a City Pages tabloid to cover up their misconduct." (AC ¶ 85.) Fredin claims he suffered the loss of employment, the "loss of all his assets," and a police raid as a result. (*Id*. ¶¶ 86-87.) Fredin avers he experienced severe and extreme emotional distress as a result of Defendants' alleged actions. (*Id*. ¶ 88.)

To sustain a claim for IIED, Plaintiff must allege: (1) the conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) it caused emotional distress; and (4) the distress was severe. *See Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (citing *Hubbard v. United Press International, Inc.* 330 N.W.2d 428 at 438-39 (Minn. 1983)). Minnesota law approaches IIED cautiously, keeping it "'sharply limited to cases involving particularly egregious facts,'" and requiring a "'high threshold standard of proof'" to submit the claim to the jury. *Id*. at 864 (quoting *Hubbard*, 330 N.W.2d at 439). Minnesota courts have found that conduct is extreme and outrageous when it is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Hubbard*, 330 N.W.2d at 439. IIED claims are "sharply limited to cases involving particularly egregious facts." *Id*. Liability does not extend to

"insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *See* Restatement (Second) of Torts § 46 cmt. d (1965).

Here, the Defendants' alleged "extreme and outrageous" conduct was reporting Fredin's alleged violations of the HROs to police and City Pages using Defendants' court filings in an article. As described above, none of these acts establish an underlying tort and, therefore, cannot be the basis for an IIED claim. *See, e.g., Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 866 (Minn. 2003) (filing false police reports did not rise to outrageous conduct); *Schibursky v. International Business Machines Corp.*, 820 F.Supp. 1169, 1183 (D. Minn. 1993) (finding that verbal harassment by the plaintiff's supervisor fell short of egregious conduct required); *Lund v. Chicago and Northwestern Transp. Co.*, 467 N.W.2d 366, 369–70 (Minn. Ct. App. 1991) (finding that the employer's conduct did not establish an IIED claim where the plaintiff experienced verbal harassment, adulteration of his coffee, and the posting of a derogatory memorandum); *Eklund v. Vincent Brass and Aluminum Co.*, 351 N.W.2d 371, 379 (Minn. Ct. App. 1984) (concluding that the plaintiff's depression, embarrassment, and humiliation were insufficient to support an IIED claim).

Because Fredin has failed to establish an underlying tort giving rise to his IIED or, alternatively, establish that the claimed false police reports were acts so "extreme and outrageous" so as to be recognized under Minnesota law, his IIED claim must be dismissed. *See Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 866 (Minn. 2003) citing *Fuller v. Local Union No. 106,* 567 N.W.2d 419, 423 (Iowa 1997) (concluding that the defendant did not engage in extreme and outrageous conduct when he falsely reported to

the police that the plaintiff was driving while intoxicated); and *Holland v. Sebunya*, 759 A.2d 205, 212 (Me.2000) (stating that calling the police and having the plaintiff physically removed from a meeting does not constitute extreme and outrageous behavior, even if the removal was not warranted)).

Lastly, Fredin has provided no medical records or expert testimony that purports to establish that Defendants alleged conduct is the proximate cause of his IIED. For this reason too, Fredin's claim must be dismissed.

## VI.    Civil Conspiracy

Fredin claims that Miller and Schaefer conspired in "carrying out the fraud, negligence, invasion of privacy, false arrest, defamation, malicious prosecution[12] . . . (AC ¶ 91.)  More specifically, Fredin alleges that Miller directed Schaefer to falsely petition for an HRO in June 2016. (AC ¶90.) The objective of the conspiracy, according to Fredin, was to "smear" him and "commit false arrest/imprison Plaintiff to cover up revenge pornography. (AC ¶ 92-93.) As noted earlier, Fredin removed the claims of false arrest and imprisonment from his Amended Complaint and the Court dismissed the invasion of privacy claim [Doc. 38]. Consequently, the alleged conspiracy focuses on the alleged defamation and negligence by Defendants.

The elements of a civil conspiracy require "(1) a combination of two or more people (2) to commit an unlawful act or a lawful act by unlawful means." *Hong Chen v. Mar*, 2011 WL 2119406, at *5 (Minn. Ct. App. May 31, 2011) (citing *Harding v. Ohio Cas. Ins. Co.*,

---

[12] There are no claims of invasion of privacy, false arrest, or malicious prosecution pleaded in the Amended Complaint.

41 N.W.2d 818, 824 (Minn. 1950)). A civil conspiracy claim is dependent on an underlying tort claim. *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997); *see also Hong Chen*, 2011 WL 2119406, at *5 (observing that liability is "predicated upon the tort committed by the conspirators and not upon the conspiracy, allegations of conspiracy do not change the nature of the cause of action.")

A explained above, Fredin has not successfully pleaded an underlying tort upon which the alleged conspiracy was based and, for that reason alone, the claim should be dismissed. Even if an underlying tort claim survives this motion, the conspiracy claim still fails as a matter of law.

A plaintiff alleging a conspiracy must establish sufficient facts that would permit a reasonable jury to find that the parties to the alleged conspiracy reached an agreement to violate the plaintiff's rights. This Fredin has failed to do. Alleging that two or more people had the opportunity to conspire—i.e., that they could have met with each other, or called each other, or e-mailed each other—is obviously not sufficient to "nudge[ ]" a conspiracy claim "across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Here there is no evidence that Defendants entered into a conspiracy with one another. What the record does reflect is that they acted on their own to protect their own interests—or that they had entirely legitimate reasons for their actions. If it were enough merely to allege that women subjected to harassment by the same person discussed their cases with one another and supported each other through the ordeal, then pleading a conspiracy "would be a sure thing." The bottom line is that Fredin has no evidence of an agreement to

conspire to defame or file false police reports against him or any evidence for that matter that the purported agreement was to "commit an unlawful act or a lawful act by unlawful means." *Hong Chen v. Mar*, 2011 WL 2119406, at \*5 (Minn. Ct. App. May 31, 2011).

## **CONCLUSION**

For all the foregoing reasons, Fredin's Amended Complaint must be dismissed it its entirety and with prejudice.

Dated:    July 23, 2020                    **KUTAK ROCK LLP**

By  *s/ K. Jon Breyer*
K. Jon Breyer (#302259)
60 South Sixth Street
Suite 3400
Minneapolis, MN 55402
Telephone: (612) 334-5057
jon.breyer@kutakrock.com

*Attorneys for Defendants Grace Elizabeth Miller and Catherine Marie Schaefer*