# EXHIBIT 4

Page 1

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF MINNESOTA

3    ————————————————————————————————————————

4    Brock Fredin,

5              Plaintiff,

6         v.                    No. 17-03058 (SRN/HB)

7    Lindsey Middlecamp,

8              Defendant.

9    ————————————————————————————————————————

10   Brock Fredin,

11             Plaintiff,

12        v.                    No. 18-cv-00466(SRN/HB)

13   Grace Elizabeth Miller and

14   Catherine Marie Schaefer,

15             Defendants.

16   ————————————————————————————————————————

17

18              DEPOSITION OF BROCK FREDIN

19               Taken December 5, 2019

20               Scheduled for 9:30 a.m.

21

22

23

24

25   REPORTED BY: JONATHAN WONNELL, RMR

1    A    No.
2    Q    A method to contact you through Match.com?
3    A    Yes.
4    Q    What other information is on the profile?
5    A    That's it.
6    Q    Do you have a copy of that profile?
7    A    I provided it in discovery.
8    Q    So other than the documents you provided,
9  you don't have any other documents related to your
10  Match.com profile?
11    A    Correct.
12    Q    What other user names did you use on
13  Match.com?
14    A    Gopher Badge apparently was a name that
15  I -- I may have used on Match.com.  That's it.
16    Q    What about PaperTreadmill?
17    A    It's possible.  I can't -- I can't
18  remember.  If that was in discovery, then it was.
19    Q    But that's one of your user names?
20    A    I know that it was one of my user names,
21  yes.
22    Q    What about thumb_problems?
23    A    I believe so.  Maybe.
24    Q    Well, what makes you question that?
25    A    I am not looking -- you didn't provide me

1  exhibits, so I can't remember what I provided.
2    Q    Okay.  But if it's in your answers to
3  interrogatories, that would be accurate?
4    A    Absolutely, yes.
5    Q    Do you recall which site you used that
6  user name on?
7    A    I do not.
8    Q    What about View Fine?
9    A    Yes.  That sounds like I provided it in
10  discovery.
11    Q    I'm reading this from your discovery, if
12  there's any question.
13    A    Okay.
14    Q    My question, though, is:  Which site was
15  that used on?
16    A    I'm not sure.
17    Q    And then another one -- again, all one
18  word -- ForYouAlwaysNow.  Which site was that user
19  name used on?
20    A    There was only three sites:  Match.com,
21  OkCupid and Plenty of Fish, that I believe the vast
22  majority of those user names were used on.  I can't
23  remember specifically which site.
24    Q    Okay.  Did those profiles contain the same
25  information as the Match.com profile or were they

1  different?
2    A    Same or similar.
3    Q    How would they be different?
4    A    I don't know.
5    Q    Do you still have copies of those
6  profiles?
7    A    I do not.
8    Q    Why did you close down your OkCupid
9  profile?
10    A    I don't recall.
11    Q    What about Plenty of Fish?
12    A    I don't recall.
13    Q    Match.com?
14    A    The last time I had a Match.com profile
15  was related to dating Grace Miller.  The reason I
16  deleted it was because Grace Miller continued to
17  communicate obsessively with me by sending me direct
18  e-mails and then alleging that my profile itself was
19  a message to her.  I deleted the profile that day or
20  the next day, and that was the last time I had a
21  Match.com profile.  She wanted me to delete the
22  profile.
23    Q    Did you have multiple profiles on a single
24  site?
25    A    I don't remember.

1    Q    It's possible you did?
2    A    I don't remember.
3    Q    Why would you have had multiple profiles
4  on a single site?
5    A    Generally speaking, I had one profile.
6  For example, on Match.com, I had a profile, and I
7  can't remember exactly, but I believe that I opened a
8  new one after -- I can't remember.  I believe that it
9  was always one profile.  I can't remember.
10    Q    You also have a profile on Fetlife.com?
11    A    I do not have profiles there anymore.
12    Q    But you did?
13    A    Yes.
14    Q    Using the user names:  Science, Slutville
15  and Slave Market; is that correct?
16    A    If it was in discovery, yes.  I can't
17  remember specifically.
18    Q    And what would be contained on those
19  profiles?
20    A    The same or similar content.
21    Q    You also have another user name, Epicview;
22  is that correct?
23    A    Yes.
24    Q    And that's on collarspace.com?
25    A    Again, that profile was -- I don't have

Page 54

1 it; but, yes, I did.
2    Q    You also used Momentum Chaser?
3    A    If it was in discovery.
4    Q    What's the nature of the profile that you
5 had on Collarspace.com?  What information did it
6 contain?
7    A    The same or similar.
8    Q    When you say "same or similar," I want to
9 make sure that we've got a full list of the
10 information that would be contained.
11       So would your name, Brock Fredin, be
12 included?
13   A    No.
14   Q    It would just be the user name?
15   A    Correct.
16   Q    Okay.  Would it have generally your
17 location, where you live?
18   A    Yes.
19   Q    It would contain -- would it contain
20 height and weight?
21   A    Yes.
22   Q    Would it contain sexual preferences?
23   A    Yes.
24   Q    Would it contain frequent hangouts or
25 places you like to go?

Page 55

1    A    No.
2    Q    Would it contain a method to contact you?
3    A    Within the site itself.
4    Q    Did you ever share your e-mail or
5 cellphone number on that site?
6    A    I'm not sure.
7    Q    Did you ever share it with users of that
8 site that contacted you?
9    A    Generally, no.
10   Q    What other profile information would be
11 contained that we haven't spoken about?
12   A    That's it.
13   Q    You set up the account "Epicview" on
14 CollarSpace; is that correct?
15   A    Yes.
16   Q    Do you recall when you did that?
17   A    Generally probably 2015 or '14.
18   Q    And walk me through how one opens an
19 account on CollarSpace.
20   A    Go to the site.  There's a registration
21 form.  I do not believe that it had anything more
22 than just simply registering through one single page.
23   Q    You're given a user name and password?
24   A    Correct.
25   Q    And that's something you set up?

Page 56

1    A    Yes.
2    Q    And they would have sent you a
3 confirmation e-mail --
4    A    Yes.
5    Q    -- that included that information?
6    A    Maybe, yes.  Yup.
7    Q    According to your interrogatory answers,
8 you maintained the CollarSpace profiles until
9 approximately November of 2018?
10   A    I -- if that's in the interrogatory, that
11 was based on review of my records.
12   Q    Okay.  Did you frequently use that site to
13 interact with others?
14   A    I wouldn't say frequent, but I did use it
15 to interact with others.
16   Q    On a consistent basis?
17   A    I'm not sure how you define "consistent,"
18 but I did communicate with others, you know, weekly
19 maybe.
20   Q    And there's another profile on SA.com.
21 What's "SA"?
22   A    I do not have the profile listed there
23 anymore, but that is the same or similar profile.
24   Q    Is it seekingarrangements.com?
25   A    Yes.

Page 57

1    Q    And is the user name "Gator" the one you
2 used?
3    A    Yes.
4    Q    And the Gator profile is the same or
5 similar to Epicview?
6    A    In the sense that it provides biographical
7 summary information.
8    Q    I think you mentioned before there's also
9 pictures associated with these profiles?
10   A    Yes.
11   Q    Are they generally selfies that you've
12 taken of yourself?
13   A    Yes.
14   Q    You have also a profile on Grindr,
15 G-r-i-n-d-r, and Bumble?
16   A    Yes.
17   Q    User name Felix?
18   A    I had one.  That was deleted in 2017.
19 I've had subsequently similar Bumble profiles related
20 to my name or my middle name.
21   Q    Why did you use the name Felix?
22   A    That's a good question.  I named that
23 after Supreme Court Justice Felix Frankfurt.
24   Q    Why didn't you use your own name?
25   A    Because of Lindsey Middlecamp's -- I

15 (Pages 54 - 57)

1 believe at that time she had doxed my name. It's
2 actually how -- you know, I was very up front as soon
3 as I got online communication. I was always -- I was
4 up front as soon as I got to know someone that that
5 was not my real name.
6    Q    You also maintained profiles on Tinder or
7 Hinge; is that correct?
8    A    Yes.
9    Q    Okay. And there the user names you used
10 were Brock, William or Eric, correct?
11    A    Yes.
12    Q    Why use the name Eric?
13    A    It's a Norwegian first name, again, to
14 escape Lindsey Middlecamp's smear campaign against me
15 on the internet.
16    Q    Is it generally true that all of these
17 profiles were active in 2016 from time to time?
18    A    Not all of them, no. Some of the profiles
19 were just recent. For example, Hinge. I thought
20 that I had provided dates. If not, if you can give
21 me a specific user name, I can attempt to give you a
22 specific date in which that user name was active.
23    Q    In a lot of these responses you say that
24 the profile was prepared on November 11th, 2019.
25 What is significant about November 11th, 2019?

1    A    Can you read me exactly what it said?
2    Q    Date, for example, I'm looking at the
3 Bumble, Tinder, Hinge response.
4    A    So those three sets of profiles were
5 likely available on November 11th, 2019.
6    Q    Well, you have the same response of
7 November 11th, 2019 with respect to all of the
8 profiles.
9    A    Okay. Well, that was a mistake. Like,
10 for example, the Match.com stuff was all from 2015 or
11 early 2016. Again, plaintiff shall keep all that
12 stuff was 2015, 2016 and maybe 2017 a little bit.
13 I've had maybe two or three profiles going forward in
14 the last year to two years. If you want me to update
15 that response, I can.
16       MR. BREYER: Do you want to take a quick
17 break?
18       THE WITNESS: Okay.
19       (Whereupon, a recess was taken from 10:59
20 a.m. to 11:02 a.m.)
21 BY MR. BREYER:
22    Q    Mr. Fredin, we just took a short break.
23 Just to remind you, you're still under oath. Do you
24 understand that?
25    A    Yes.

1    Q    We were talking about profiles on various
2 websites that you established.
3       (Fredin Exhibit 2 was marked for
4       identification.)
5 BY MR. BREYER:
6    Q    So what's been handed to you is Exhibit 2,
7 which appears to be your Gator profile on
8 seekingarrangements.com -- is that correct?
9    A    Yes.
10    Q    And the general information contained in
11 the profile we spoke before, we see that here,
12 correct?
13    A    Yes.
14    Q    And this particular profile, you've
15 included two photos of yourself, right?
16    Q    You took those photos?
17    A    Yes.
18    A    Yes.
19    Q    And you used those photos on other
20 profiles; is that true?
21    A    Yes.
22    Q    Is the information contained in this
23 profile accurate?
24    A    No.
25    Q    What parts of it are not accurate?

1    A    The net worth and annual income.
2    Q    The remainder of it, though, is accurate?
3    A    (Reading document). Yes.
4    Q    You can put that one aside.
5       (Fredin Exhibit 3 was marked for
6       identification.)
7 BY MR. BREYER:
8    Q    So you have in front of you Exhibit 3.
9 Exhibit 3 is a screen shot of CollarSpace.com; is
10 that correct?
11    A    Yes.
12    Q    Okay. And in the middle of the document
13 it has several pieces of information. Do those
14 pieces of information make up your profile on
15 CollarSpace?
16    A    Yes.
17    Q    Is the information depicted there
18 accurate?
19    A    No.
20    Q    Okay. What part is not accurate?
21    A    Orientation, age, weight.
22    Q    Is this information --
23    A    State.
24    Q    I'm sorry. Is this information that you
25 provided?

16 (Pages 58 - 61)

Page 62

1     A     The state is also inaccurate.
2          Now that I mention that, maybe I
3   overlooked the state here.  The state here is not
4   accurate as well.  I didn't see that.  In the Seeking
5   Arrangements profile, the state and the city is
6   inaccurate.
7     Q     What should it have been?
8     A     I believe that that city and state was
9   taken from the time that the profile was opened.
10  Here it says 2011, which at that time was accurate,
11  but currently it is not accurate, just to be clear
12  about that.
13         Again, the same or similar issue with this
14  profile; state, depending on whenever the profile was
15  opened was accurate, but currently is inaccurate, and
16  then the orientation is inaccurate as well.
17    Q     Okay.  But the information shown in this
18  profile is information that you entered, correct?
19    A     Yes.
20    Q     Okay.  The remainder -- except for the
21  state and orientation, the remainder of it's correct?
22    A     Yes.
23    Q     Okay.  Why would you have identified your
24  orientation in that way if it was inaccurate?
25    A     Potentially it was identified at the time

Page 63

1   the profile was opened.
2     Q     And this is the profile of epicview.  And
3   epicview is your user name?
4     A     Yes.
5     Q     And is this just an example of a message
6   exchange with an individual who uses the name
7   GlitterBomb29?
8     A     Yes.
9     Q     Does this generally depict how these
10  messages are exchanged on this site?
11    A     Yes.
12    Q     And are the messages contained on this
13  site, are they saved to your computer?
14    A     No.
15    Q     Where are they saved to?
16    A     I'm not sure.  The site.
17    Q     Do you still maintain the epicview user
18  name?
19    A     No.
20    Q     When did that end?
21    A     I'm not sure.
22    Q     Do you still have a profile on
23  CollarSpace.com?
24    A     Yes.
25    Q     What user name are you using?

Page 64

1     A     I'm not sure.  I'd have to review my
2   records.
3     Q     What records would you review, the
4   CollarSpace.com site?
5     A     I deleted all of them.  If I have an
6   account, I'm not sure.  If I do, it's not relevant to
7   this action.
8     Q     Can you state with any certainty whether
9   you have an account or not --
10    A     I do.
11    Q     -- on CollarSpace.com?
12    A     I do.
13    Q     You're just using a different user name;
14  is that true?
15    A     Any user name was potentially -- let's
16  see.  Let me check.  It was the Momentum Chaser.  I
17  don't -- I don't know.  I would have to check.
18  They're all -- I don't use it actively anymore.  I
19  deleted these profiles, and I simply don't -- I don't
20  know.  I don't use them very often.
21         (Fredin Exhibit 4 was marked for
22         identification.)
23  BY MR. BREYER:
24    Q     I'm showing you what's been marked as
25  Exhibit 4.  And it appears to be two e-mail messages

Page 65

1   to you from CollarSpace.com.  Is that true?
2     A     Yes.
3     Q     And the e-mail address is
4   brockf12@gmail.com.
5     A     Yes.
6     Q     Is that the e-mail that you were using in
7   2016?
8     A     No.  I used a different e-mail --
9     Q     What e-mail did you use --
10    A     -- for dating profiles.
11    Q     What e-mail did you use?
12    A     Field.gator@gmail.
13    Q     But the e-mail address depicted on
14  Exhibit 4, the one I just read into the record, is
15  your e-mail address, true?
16    A     Yes.
17    Q     This shows e-mails to you welcoming you to
18  CollarSpace.com; is that right?
19    A     Yes.
20    Q     And it says for future reference your
21  log-in information is, and then it uses or references
22  a user name and a password; is that accurate?
23    A     Yes.
24    Q     And that's your user name and password,
25  true?

17 (Pages 62 - 65)

Page 66

1    A    That is not accurate.  This was created by
2  Catherine Schaefer in concert with Grace Miller.  The
3  reason I knew this is because I did not use this
4  e-mail for dating profiles.  Additionally, when I
5  went to review this profile name, I found that it was
6  associated with the smear campaign lodged against me
7  online.
8    Q    What evidence do you have that my clients
9  created the user name epicviewfu?
10    A    Because Catherine Schaefer had e-mailed me
11  directly taunting me, related to the harassment
12  restraining order proceeding and the smear campaign
13  online against me, and then suddenly these profiles
14  popped up within hours.  The user name blackoutx2
15  references a, quote, unquote, blackout campaign, and
16  the x2 is pretty easily identifiable as times two,
17  which is two people, Catherine Schaefer and Grace
18  Miller.
19        And then the content in the profile
20  itself, which was false, defamatory information
21  referencing the smear campaign against me that
22  included my full name, e-mail address, phone number,
23  address, work information, yadda, yadda, yadda in the
24  profile itself.  And then I also received direct
25  e-mails from epicview -- if it was FU or epicview --

Page 67

1  the discovery information, I'm not sure if that FU is
2  exactly accurate.  I believe that user name it was
3  either this or there was a slight change.  But I
4  reviewed e-mails also from this profile to the
5  epicview profile.
6        So what happened was they derived a new
7  user name based on the epicview profile to continue
8  to taunt me asking me if I had read this blackout
9  profile.
10    Q    So your belief that Catherine Schaefer
11  and/or Grace Miller created the profile is because
12  they had your e-mail address?
13    A    The reason that I know Catherine Schaefer
14  created this profile is because she had communicated
15  directly to me within minutes or hours of creating
16  this profile, and I had not communicated with anyone
17  else or rarely communicated with anyone else, so I
18  knew it was her.
19        And then --
20    Q    Well, I want to stop you there.  I want to
21  understand why you knew it was her.  And you gave me
22  one of the reasons was because she had your Gmail
23  e-mail address.  True?
24    A    She knew my e-mail address, yes.
25    Q    Okay.  What was the other reason you

Page 68

1  believe that she was the creator of the account,
2  other than the fact that you believe she knew your
3  Gmail address?
4    A    She referenced knowledge of Grace Miller.
5    Q    She referenced knowledge of Grace Miller
6  where?
7    A    Through an individual named Joshua Post
8  Lee.
9    Q    Those communications are not on
10  CollarSpace.com, were they?
11    A    They were on Facebook.
12    Q    So is it your allegation that the fact
13  that she knew your e-mail address and the timing of
14  the Facebook posts led you to believe that she, being
15  Catherine Schaefer, created these CollarSpace
16  accounts?
17    A    They were part and parcel to Grace Miller
18  and Catherine Schaefer's scheme to file bogus
19  restraining orders and then trying to bait me with
20  responses.  Catherine Schaefer had the other profile
21  on this website CollarSpace.com.  Her user name is
22  GlitterBomb29.  And she had directly communicated
23  with me minutes or hours before opening these
24  profiles.
25        And then I later found out that she was

Page 69

1  pursuing this vindictively by way of an individual
2  named Joshua Post Lee, who was the only other person
3  I had ever told about Grace Miller, and that's how
4  she obtained the information, and she contacted Grace
5  Miller while I was dating her and then used that
6  information to pursue her into filing bogus
7  restraining orders and then creating this smear
8  campaign by leaking this restraining order to, you
9  know, state-sponsored Twitter campaign that's
10  CardsAgstHrsmt.
11        But the other reason that this was
12  associated with Catherine Schaefer is because the
13  content itself was specific to knowledge that only
14  Catherine Schaefer could have had about me at that
15  time, including the fact that I had an e-mail
16  address, my phone number, my work location, and then
17  my, you know, interests, my dating interests; only
18  information that Catherine Schaefer would have known
19  at that time, as well as what I later found out to be
20  her connections to Joshua Post Lee.
21    Q    And so, again, I want you to focus on how
22  it is that she was the one in your mind that set up
23  these accounts.  And, again, you've told me that she
24  is aware of your e-mail address as brockf12@gmail.com
25  and then it's the proximity of the Facebook posts

Page 70

1 that followed. Is that accurate?
2    A    No. There were no Facebook posts. I have
3 no idea what was going on.
4    Q    So other than your belief that she knew
5 your Gmail address, what other evidence, as opposed
6 to speculation, do you have that she created the
7 account?
8    A    Her admission to communicating to me at
9 that time on the same website within hours of these
10 profiles popping up, in addition to the same tactics
11 associated with Lindsey Middlecamp's revenge
12 pornography on CardsAgstHrsmt where she posted naked
13 photos of men, including underage boys, which is
14 absolutely disgusting.
15    Q    Tell me about the communication that
16 Catherine Schaefer purportedly sent to you on
17 CollarSpace.com that you just referenced.
18    A    She sent two or three e-mails saying that
19 she would see me in court and claiming that it would
20 be, quote, unquote, fun.
21    Q    Where are those e-mails?
22    A    I provided those e-mails in discovery.
23    Q    If you didn't produce those e-mails in
24 discovery, where are they?
25    A    I did provide them. They were on my

Page 71

1 computer. I saved them.
2    Q    You still have them, correct?
3    A    I provided PDF printouts of those e-mails.
4 I still have them. You have them.
5    Q    And these were messages sent to you
6 through the CollarSpace.com site?
7    A    Yes.
8    Q    When?
9    A    Late May 2016 and early June 2016.
10    Q    Okay. Anything else that you can think of
11 as evidence that connects Catherine Schaefer to these
12 profiles, either epicviewfu or BlackOutx2?
13    A    Her self-admission in Ramsey County
14 District Court that she had communicated with me
15 through that site. At the same time, her knowledge
16 of my dating interests. Her intimate knowledge and
17 obsession with me. Her knowledge of Grace Miller,
18 which was knowledge that no one else could have.
19 Essentially, her direct admissions in Ramsey County
20 District Court of all of the facts surrounding these
21 profiles.
22    Q    When she communicated to you through these
23 two or three e-mails we talked about earlier, was it
24 through her GlitterBomb account?
25    A    She communicated with me through this

Page 72

1 epicviewfu profile and the BlackOutx2 profile as well
2 as the GlitterBomb29 profile.
3    Q    Yes. But I want to talk about the two or
4 three e-mails that you received from her that you
5 referenced before. Was that from her GlitterBomb
6 account?
7    A    Those e-mails were from epicviewfu or
8 BlackOutx2.
9         (Fredin Exhibit 5 was marked for
10         identification.)
11 BY MR. BREYER:
12    Q    So I'm showing you Exhibit 5, a document
13 that you produced to us. Is this the message you
14 were referencing in your earlier answer?
15    A    Yes.
16    Q    And, again, it's a message from Blackoutx2
17 to you, correct?
18    A    Yes.
19    Q    And you believe BlackOutx2 is Catherine
20 Schaefer?
21    A    I know that's Catherine Schaefer.
22    Q    And, again, from this message, how do you
23 know it's Catherine Schaefer?
24    A    Because Catherine Schaefer references the
25 Ramsey County District Court action which she filed

Page 73

1 within days of this e-mail. "We will be coming soon"
2 mentions a reference to the smear campaign as well as
3 the bogus restraining orders they filed.
4    Q    And to be clear, the entirety of the
5 message is: "We know about you. We will be coming
6 soon." Is that correct?
7    A    Yes.
8    Q    There's no reference to any sort of smear
9 campaign or court case, is there?
10    A    It's pretty clear "we will be coming soon"
11 references the subsequent Ramsey County Court action
12 Catherine Schaefer filed against me.
13    Q    And that's how you interpreted it?
14    A    At the time, I did not know that. I would
15 have to check exactly when she filed that restraining
16 order, but I did find that out as soon as I was
17 served with it.
18    Q    So, again, you're linking this based on a
19 particular connection between this message and the
20 filing of the HRO?
21    A    As well as background information related
22 to Catherine Schaefer. For example, "We know about
23 you" references her stalking with me and the fact
24 that she contacted Grace Miller in 2015.
25    Q    How? How does it reference that?

19 (Pages 70 - 73)

Page 74

1    A    The "We know about you," again, is a
2  reference to the subsequent smear campaign against me
3  as well as their efforts to contact any and all
4  people that they knew that I had dated.
5    Q    Why do you think he sent this as opposed
6  to anyone else that knew you or of you or interacted
7  with you on CollarSpace?
8    A    Because of the direct timeline between the
9  Glitterbomb communication and the -- these profiles
10 popping up as well as information related to Joshua
11 Post Lee, who admitted to acting in concert with
12 Catherine Schaefer to provide her knowledge.
13   Q    To the best you can recall, what were the
14 communications from Catherine Schaefer using the user
15 name GlitterBomb to you in May and June of 2016?  To
16 the best of your knowledge, what did they say?
17   A    I don't -- I don't recall exactly.  But I
18 do remember her profile.
19   Q    Well, do you remember what the contents of
20 those e-mails were that makes you think that she was
21 also the creator of BlackOutx2 and epicviewfu?
22   A    I don't know.  It just all lined up.  It
23 was pretty obvious to me.  I'm not that smart, but it
24 was pretty clear.
25   Q    Other than it all lining up, any other

Page 75

1  evidence that she's the creator of those profiles?
2    A    Just her own admissions in Ramsey County
3  District Court.
4    Q    You're not alleging that Grace Miller or
5  Lindsey Middlecamp created those profiles, are you?
6    A    I'm alleging that Grace Miller acted in
7  concert indirectly.
8    Q    But she didn't create the profiles?
9    A    Correct.
10   Q    The password for both epicfu and
11 BlackOutx2 is lower case C, lower case J, 050589.  Is
12 that a password that you've used?
13   A    No.
14   Q    Do either of those letters or numbers have
15 any meaning to you?
16   A    050589 have absolutely no meaning to me
17 whatsoever.  I would assume that maybe they're
18 someone's birthdate.  The "C," I guess -- I never
19 actually looked at the password before, but now that
20 I do, maybe Catherine Schaefer; her first name is
21 "C."  That password is nothing I've used before, and
22 I've never used passwords of that syntax.
23   Q    When you received these e-mails opening
24 the profiles of epicviewfu, BlackOutx2, along with
25 the passwords, you then had the ability, did you not,

Page 76

1  to alter those profiles?
2    A    Did I have the ability?  I'd never
3  checked, so no, I did not have the ability.  I did
4  not log in.  In fact, I didn't read that e-mail until
5  I had to for purposes of providing it for discovery.
6  The e-mail itself was never read or clicked into
7  because I knew that it was click bait.  But pursuant
8  to Magistrate Judge Bowbeer's court order, I had to
9  click in it to produce the PDF, and I did so at that
10 point, which was a month ago.
11   Q    To log into CollarSpace, you just need a
12 user name and a password, correct?
13   A    Yes.
14   Q    And that will give you access to the
15 profile?
16   A    Yes.
17   Q    And you can close the profile down with
18 these credentials?
19   A    I'm not sure.
20   Q    You can alter the profile; is that
21 correct?
22   A    Yes, you can.
23   Q    And you can close out the account?
24   A    I don't -- I think so.
25   Q    Well, Mr. Fredin, you testified earlier

Page 77

1  that you had an account at CollarSpace and you closed
2  it down.
3    A    That's true, yes, I did.  I -- what I mean
4  by that is the fact that -- I don't want to get into
5  some -- the short answer is yes, you can delete it,
6  making it not available publicly.  I believe that the
7  data is still contained on the servers that the site
8  is hosted on.
9    Q    When you received messages from BlackOutx2
10 and epicviewfu, were they sent to your Gmail account?
11   A    Yes.
12   Q    And you opened them?
13   A    Can you restate the question before that
14 just to make sure I'm understanding?
15   Q    When you received messages from these two
16 user name accounts at CollarSpace, you would open the
17 messages and read them, correct?
18   A    No, that's not true.  I opened one or two
19 of them, and then I received them in my mail, and
20 they were all unread.  So generally, no, but I did
21 read a few of them.  Reading them from my own e-mail
22 in-box, because they were forwarded to me from the
23 site.
24        (Fredin Exhibit 6 was marked for
25        identification.)

Page 78

BY MR. BREYER:

1 BY MR. BREYER:
2    Q    Exhibit 6, again, is a document that you
3 produced to us, and it appears to be the in-box for
4 the CollarSpace account.  Is that accurate?
5    A    Yes.
6    Q    Okay.
7    A    That's my Gmail -- no, I'm sorry.  That's
8 my Gmail in-box, just to be clear.
9    Q    This is your Gmail in-box?
10    A    Yes.
11    Q    Okay.  So when messages are sent to you on
12 CollarSpace.com, they appear in your Gmail in-box?
13    A    They are forwarded from the site to the
14 e-mail associated with the profile.  In this case
15 because Catherine Schaefer had associated my e-mail
16 with the profile, they would have been forwarded to
17 my Gmail in-box.
18    Q    So when the accounts were opened in your
19 name and you received these welcome e-mails along
20 with the passwords and user names, is it your
21 testimony that you did not open them?
22    A    I did open a few of them.  I -- you can
23 see the information without necessarily reading them
24 and clicking into them.  They were generally unread
25 messages in my Gmail in-box.

Page 79

1    Q    On the first page it shows that the
2 Welcome to CollarSpace e-mail was sent to you on
3 June 2nd, correct?
4    A    Yes.
5    Q    And we're talking about June 2nd, 2016; is
6 that right?
7    A    Yes.
8    Q    Okay.  And immediately you receive several
9 other messages from other users of that website,
10 true?
11    A    Yes.
12    Q    And you opened some of them, correct?
13    A    Two, maybe.
14    Q    Do you recall which two?
15    A    I do not.
16    Q    You have alleged in this lawsuit that you
17 received unsolicited messages for sex.  Are these the
18 messages you're referring to?
19    A    These messages -- yes.  They included
20 references to sexual activity, with the e-mails
21 themselves that were forwarded to the account.  For
22 example, the user names themselves referenced sexual
23 activity, and they're being sent directly to my
24 e-mail in-box.
25    Q    Where are those messages?

Page 80

1    A    They're here in this -- in these e-mails
2 that are sent.
3    Q    Why didn't you produce them?
4    A    I did produce them.
5    Q    You believe you produced the messages?
6    A    These are the messages.  I produced the
7 messages to the best of my ability.  You know,
8 without hiring a private investigator and going
9 through a very costly forensic data service, it would
10 be difficult -- I can't log into these profiles, so
11 all of this data is available through the servers
12 that this website uses, which is Cloudflare.
13    Q    Okay.  But you didn't produce those to us?
14    A    I was unable to, because I did not
15 subpoena Cloudflare for the data.  But I did produce
16 the e-mails in discovery in PDF formats and screen
17 shots, to the best of my ability.
18         There were also several hundred other
19 e-mails that were sent that Gmail may have deleted
20 between October 17, 2018 and June 12, 2019, because
21 my in-box at that time -- and I was unable to buy
22 extra space.  So Gmail deleted a bunch of e-mails.
23 Now that I remember that -- and I will include that
24 in the deleted log.
25    Q    Mr. Fredin, your allegation with respect

Page 81

1 to unsolicited -- with respect to your allegations
2 that you were solicited for sex, were those
3 solicitations all through CollarSpace.com?
4    A    I also received text messages and people
5 knocking on my door.
6    Q    From which user did you receive these
7 solicitations, looking at this document?
8    A    These users that are listed via their user
9 name, text messages from random numbers.  I did not
10 know who they were.  And I did not know who was
11 knocking on my door.
12    Q    Which specific users sent you the
13 unsolicited --
14    A    The user name --
15    Q    -- e-mails for sex?
16    A    Yeah.  All of these user names here that
17 are listed in the e-mails.
18    Q    But you said you didn't open most of
19 these.
20    A    You could easily view them in my Gmail
21 in-box without reading them directly.  I was afraid
22 to read them directly because of the nature of the
23 nonconsensual sexual soliciting Catherine Schaefer
24 executed on me.
25    Q    But it's true, is it not, that the

21 (Pages 78 - 81)

1 document you produced to us as Exhibit 6 doesn't
2 contain any of that information?
3    A    No, it does.
4    Q    Where?
5    A    Here, in each e-mail.
6    Q    Where is the solicitation?  Read it to me.
7    A    Every single e-mail uses solicitation.
8    Q    Looking at Exhibit 6, read me the
9 solicitation.
10    A    Okay.  New message on CollarSpace.com for
11 BlackOutx2 from loyalsubformaster.  "BlackOutx2, you
12 received a message on CollarSpace.com from
13 loyalsub4Master at 6/2/16 at 7:00 a.m.  You can click
14 here.  Next message."
15        Do you want me to continue?
16    Q    Point out to me in that sentence or in
17 that line item where the solicitation is.
18    A    "New message on CollarSpace.com for
19 BlackOutx2 from loyalsub4Master."  Also same message
20 from a user name Makemeurwife.  Same message from
21 dianefritz8395.  Same message from atyourfeet1965.
22 Same message from alanna020 with time stamps and the
23 content related there into the message that is
24 included in each e-mail.
25    Q    So is this the entirety of the messages

1 from these users?
2    A    No.  Between October 17th and June 12th,
3 2019, there were hundreds of other messages that were
4 also in here but were deleted because of size
5 restrictions on Gmail.  I produced all of the saved
6 e-mails that I received.  It was so overwhelming that
7 I did not save them.  But the revenge pornography law
8 was implemented on August 1st, 2018, and there were
9 several messages after -- I'm sorry.  That was 2017.
10 There were several messages after that date that were
11 in conflict of that law.
12    Q    You state that had you saved these
13 messages.  How did you save them?
14    A    Screen shots.
15    Q    And is Exhibit 6 a screen shot?
16    A    Correct.
17    Q    Okay.  And so my question with respect to
18 these messages, where is the content or the substance
19 of the message, or is this it?
20    A    The messages, I believe, were also the
21 ones that were still saved in my Gmail were
22 available, and I clicked into them, and then I saved
23 them as PDFs and provided them in discovery.  The
24 content that offered the sexual solicitation was part
25 and parcel to the user name BlackOutx2, which offered

1 me for non-consensual sexual activity to each of
2 these users and then the time stamps included
3 messages to that profile itself, as well as people
4 knocking on my door and receiving a number of phone
5 calls and text messages related to non-consensual
6 sexual activity.
7        (Fredin Exhibit 7 was marked for
8        identification.)
9 BY MR. BREYER:
10    Q    You've been handed Exhibit 7.  And, again,
11 it's a different form, but it is messages that you
12 had provided to us from CollarSpace.com; is that
13 correct?
14    A    Yes.
15    Q    Okay.  These messages, too, just indicate
16 that you received a message, but the message itself
17 is not included; is that right?
18    A    The message is contained here in the sense
19 that -- by way of sending a message to my Gmail
20 in-box, it is a message itself from the user
21 requesting non-consensual sexual activity.
22    Q    And that's my question, is where in this
23 message, this document you provided to us, does it
24 show --
25    A    Yeah, the entire -- the entire message --

1    Q    Let me -- let me finish the question --
2    A    Oh, sorry.
3    Q    -- and then you can answer.
4    A    I'm sorry.
5    Q    Otherwise, the court reporter can't take
6 down what we say.
7        So these messages which you provided which
8 are now part of the Exhibit 7, are these messages --
9 are these the messages you claim contain
10 non-consensual sexual solicitations?
11    A    Yes.
12    Q    Are there any other messages that you make
13 the same claim?
14    A    There are text messages, phone calls.
15 There are messages, I believe, on Grindr related to
16 this as well.  That profile was deleted.  I was
17 unable to obtain information.
18    Q    But Catherine Schaefer didn't post a
19 profile of you on Grindr, did she?
20    A    No.
21    Q    So again, the message that we see on
22 Exhibit 7, that is, in fact, your claim for
23 nonconsensual sexual activity?
24    A    The entire message, correct.
25    Q    And this Exhibit 7 shows the entirety of

Page 86

1 three separate messages, correct?
2    A    Correct.
3    Q    Is that true?
4    A    Yes.
5    Q    There's no more to these messages that
6 you're claiming makes up your claim?
7    A    False.  No.  That's not true.
8    Q    What is it?
9    A    The messages are part and parcel to being
10 attached to the profile itself Blackoutx2, which was
11 offering my full name, my e-mail, phone number,
12 dating interests, to hundreds of these users who
13 then, in fact, messaged me by way of communicating
14 through the profile which forwarded the message to
15 me.
16    Q    And the entirety of the message is what we
17 see in Exhibit 7?
18    A    The message itself, potentially the direct
19 content related, is contained on servers or in these
20 profiles themselves.  I did not log in to these
21 profiles for obvious reasons.
22    Q    Okay.  So you did not log in, and you did
23 not review the content of these mechanical's; is that
24 true?
25    A    That's true.

Page 87

1    Q    Is there any message at all in which you
2 reviewed the content?
3    A    I did -- I mean, the content of the
4 message is the message itself that's forwarded to me,
5 but what you're speaking of is the secondary body of
6 the e-mail to BlackOutx2 or epicviewfu, and that is
7 contained on that site.  The message contains the
8 subject, address, body.  These messages themselves
9 obviously contain a body, which is requesting sexual
10 activity, but there's a secondary body of the direct
11 content of the message that's on the website.
12    Q    Okay.  So I just want to make this very
13 clear.
14        So the document showing the in-box screen
15 shot shows notifications of messages to you through
16 CollarSpace.com, correct?
17    A    I would not characterize it as
18 notification of a message.  I would characterize it
19 as a direct message offering sexual solicitation.
20    Q    So there's a direct message that's
21 depicted in the in-box in that exhibit, true?
22    A    Yes.
23    Q    Okay.  That is not the entirety of the
24 message, is it?  You would have to open the message
25 up and view its contents; is that accurate?

Page 88

1    A    I would not characterize it in that way.
2 I believe that the entirety of the message is here,
3 and then there's a secondary message that's available
4 on the website itself if you click on it.
5    Q    Okay.  But you did not view the secondary
6 messages, as you call them?
7    A    That's correct.
8    Q    So the only messages you reviewed are the
9 ones that are depicted here in Exhibit 7?
10    A    Yes, that's true.  In addition to looking
11 at the profiles that they were messaging, BlackOutx2,
12 which I could view publicly.
13    Q    So you went to the profile BlackOutx2?
14    A    Yes.
15    Q    Did you also go to the profile epicviewfu?
16    A    Yes.
17    Q    And upon viewing those profiles, you
18 became aware that the profile was created for you?
19    A    I wouldn't characterize it as for me, but
20 they were characterized as a --
21    Q    They were your profile?
22    A    No, absolutely not.  They were produced by
23 Catherine Schaefer as part and parcel to her smear
24 campaign against me.
25    Q    So upon reviewing these profiles, why

Page 89

1 didn't you take them down?
2    A    Because I did not want to add any
3 additional information to the profiles themselves
4 because they were not associated with me whatsoever,
5 and it would be a conflict for me to attempt to
6 remove these profiles because of the nature of the
7 profiles themselves.
8    Q    You said the profiles weren't associated
9 with you.  They did not contain any personal
10 information of yours?
11    A    What I mean by that is I did not create
12 the profiles in any way whatsoever.  I had no
13 knowledge of their creation until I found out that
14 Catherine Schaefer had produced them, so as if I
15 tried to remove the profiles, it would be, you know,
16 adding my information to profiles in which I did not
17 create.  I did not want any confusion whatsoever over
18 the fact that I did not create these profiles.
19    Q    So looking back at Exhibit 5, there is a
20 profile in the middle of that document.  Do you see
21 that?
22    A    Yes.
23    Q    Can you tell from Exhibit 5 whose profile
24 that is?
25    A    It is BlackOutx2.

1    Q    So you're looking at Exhibit 7 again?
2    A    Exhibit 6.
3    Q    So when you say --
4    A    Exhibit 7.
5    Q    So you say "text messages," then, do I
6 infer that to mean that you would get a notification
7 in your in-box but you would also get a text message
8 with the same information?
9    A    At that time, that's the way that I had it
10 set up, as well as receiving several other text
11 messages related to this, people contacting me, that
12 I ignored.
13    Q    So the text messages, again, are --
14 contain the same messages that we saw in Exhibit 6?
15    A    Yes.  And the phone that I was using, I
16 never turned on again after the property was
17 returned.  So those text messages themselves are
18 simply unavailable.
19    Q    Where is that phone now?
20    A    That phone was deleted, and I believe that
21 it was sold on the internet.
22    Q    When was it deleted?
23    A    When I sold the phone on the internet, I
24 deleted the data associated with it.
25    Q    You didn't keep any copies?

1    A    I didn't turn on the phone after -- well,
2 let me back up.  I don't recall if I turned it on.  I
3 did not turn on the phone.  I sold it on the
4 internet.  I don't remember, actually.
5    Q    Who did you sell it to?
6    A    I don't remember.
7    Q    How did you sell it on the internet?
8    A    I don't remember.
9    Q    When did you sell it on the internet?
10    A    For all intents and purposes, when I
11 received the property -- let me back up.
12        When I received the property back, because
13 there were so many items, they took 60 to 70 items,
14 that it was overwhelming.  And so the phone that this
15 stuff was on, I had like five or six phones.  I
16 couldn't remember exactly which phone I was using at
17 that time.
18        I sold one phone which could have been
19 that phone, and I may have the phone still in
20 property.  My life has been sort of in whack.  So I
21 don't know exactly where it is.  I believe that it's
22 in storage, in a storage unit in St. Louis Park
23 because my mom, before she died, had it, and she put
24 all of my stuff in a storage unit.  And I had one or
25 two phones, and I don't recall if that was the exact

1 phone that I had when all of this went down.
2        But I ignored all of these text messages
3 that were forwarded and utilized simply the e-mails
4 themselves.
5    Q    Okay.  So you ignored them and you did not
6 read them?
7    A    I read them.
8    Q    Okay.  And you read them using the phone?
9    A    Correct.  They were push notifications on
10 the phone.
11    Q    Okay.  And the content of the text
12 message, is it the same as what's depicted in
13 Exhibit 6?
14    A    Yes.  In addition, I had received several
15 other direct text messages from individuals.
16    Q    But let's just stick with the
17 CollarSpace.com text messages.  You did not open
18 those messages to read the secondary content?
19    A    Correct.
20    Q    The other text messages that you
21 referenced, where did they come from?
22    A    Numbers.  Telephone numbers.
23    Q    Do you know where those text messages came
24 from or how they obtained your phone number to text
25 you?

1    A    Yeah.  I mean, my number was contained in
2 the profile itself, and so I received a couple text
3 messages from the profile.
4    Q    And where are those text messages?  Are
5 they on the phone?
6    A    They were ridiculous messages.  I deleted
7 them immediately.  I did not respond to them.  I
8 believe that they were on the phone, but I deleted
9 them as soon as I received them and ignored them.
10    Q    Okay.  So focusing just on the text
11 messages.  You got text messages through the
12 CollarSpace --
13    A    I received, like, two text messages
14 through the only available phone number that they
15 knew that I had, and I deleted those messages
16 instantly, and they were associated with the same
17 campaign.
18    Q    Okay.  And is that the entirety of the
19 text messages, then, that --
20    A    Yes, in addition to all of the push
21 notifications and direct text messages from these
22 e-mails.
23    Q    Right.  We've talked about the push
24 notifications that ended up in your in-box and were
25 texted to you, which are identical to the ones that

25 (Pages 94 - 97)

Page 110

1 Gmail account, correct?
2    A    Have other people used it?  I'm the only
3 one who uses that Gmail account.
4    Q    Okay.
5         (Fredin Exhibit 9 was marked for
6         identification.)
7 BY MR. BREYER:
8    Q    So what I'm showing you now is Exhibit 9.
9 And this is the online version of the City Pages
10 article; is that correct?
11   A    Yes.
12   Q    And it's the same City Pages article that
13 is the basis for several of your defamation
14 allegations; is that true?
15   A    Yes.
16   Q    And this article was posted on February
17 22nd, 2017, correct?
18   A    Yes.
19         (Fredin Exhibit 10 was marked for
20         identification.)
21 BY MR. BREYER:
22   Q    So you've got the City Pages article in
23 front of you there.  I'm also giving you Exhibit 10.
24 Exhibit 10 is the amended complaint that you filed in
25 the lawsuit against Ms. Miller and Ms. Schaefer; is

Page 111

1 that accurate?
2    A    Yes.
3    Q    Okay.  And if you turn to page 3 -- I'm
4 sorry.  Turn to page 10 of this document.  On
5 paragraph 38 you begin to describe the City Pages
6 article and those portions of the article that you
7 deem offensive or defamatory; is that accurate?
8    A    Yes.
9    Q    Okay.  And in paragraph 38 you go through
10 and quote portions of the article that you claim are
11 defamatory and then below it you write "truth" and
12 then give your version of the events; is that
13 correct?
14   A    Yes.
15   Q    So falsehood 1 states, "Before they met in
16 person, Fredin sent a series of 'very odd' and
17 intense texts.  Schaefer decided a meeting was 'not
18 in her best interests.'"  Do you see that?
19   A    Yes.
20   Q    What was defamatory about that particular
21 paragraph?
22   A    Everything.
23   Q    Be specific.
24   A    The text speaks for itself.  Catherine
25 Schaefer sent repeated obsessive e-mails to me.  I

Page 112

1 responded very briefly.  And she was forcibly trying
2 to set up a date, and I stood her up.  The intense,
3 very odd text messages were coming from Catherine
4 Schaefer attempting to force a date upon me in which
5 I stood her up, at which point she became apparently
6 very angry.
7         At the time, however, I did not know this
8 was Catherine Schaefer.  It was a catfish profile.
9 It was a very masculine dominant profile that I
10 wasn't sure if it was male or female.  I thought
11 potentially it could be male.  So I just didn't know
12 who it was or anything related to that.  And so the
13 intense and odd text messages were Catherine
14 Schaefer's.
15   Q    So it's that language, correct?  Very odd,
16 intense text messages that you find offensive?
17   A    I find them false.
18   Q    Okay.  And the quotes around those words,
19 that's Ms. Schaefer's opinion, not yours, correct,
20 that the text messages were very odd and intense?
21   A    They were -- as far as I know, Michael
22 Mullen pulled those from his own mind.  He produced
23 those out of nowhere.
24   Q    So that's Mr. Mullen's expression, not
25 Ms. Schaefer's?

Page 113

1    A    Plainly reading the article that's the way
2 that I read it.
3    Q    Okay.  And moving on to falsehood
4 number 2, it says, "Defendant Schaefer canceled and
5 told Fredin to stop contacting her."  Do you see
6 that?
7    A    I do.
8    Q    That's also Mr. Mullen's words, not
9 Ms. Schaefer's, correct?
10   A    I don't know if that was Michael Mullen or
11 Catherine Schaefer.
12   Q    Let's move on to number 3.  It says, "Over
13 the next two years, she" -- being Ms. Schaefer --
14 "was contacted dozens of times by unfamiliar
15 cellphone numbers and online dating profiles.  In
16 longer communiqués, Schaefer recognized Fredin's
17 unique writing style, she wrote in her affidavit.
18 Other messages just said, 'Hi Cat'."
19         No one else called her that.  Do you see
20 that?
21   A    Yes.
22   Q    Okay.  Are those Mr. Mullen's words or are
23 those Ms. Schaefer's words?
24   A    I believe that they're both Mr. Mullen and
25 Catherine Schaefer.

Page 114

1  Q   Okay.  Which words are Ms. Schaefer's?
2  A   The, quote, unquote, unique writing style
3 and then the, quote, unquote, Hi Cat.
4  Q   Okay.  What is defamatory by
5 characterizing the writing style as unique?
6  A   The unique writing style references
7 unfamiliar dating profile contact, unfamiliar
8 cellphone contact.  That was extrapolated from her
9 affidavits, as well as her own statements to Michael
10 Mullen that were categorical false.
11  Q   Focus on the three words, "unique writing
12 style."
13  A   Right.
14  Q   There's a nothing offensive about that
15 statement, what you're finding offensive is that
16 there was other activity surrounding this, correct?
17  A   Catherine Schaefer had stated to
18 Mr. Mullen that she had received contact, quote,
19 unquote, dozens of times by unfamiliar cellphone
20 numbers.  I don't know if that's in the transcript or
21 an affidavit.
22  Q   Okay.
23  A   But that's her statement to Mr. Mullen
24 that is additionally defamatory and categorically
25 false.

Page 115

1  Q   In that sentence she doesn't make any
2 reference to you, does she?
3  A   Yeah.  She said she recognized Fredin,
4 which is a reference to me.
5  Q   Claiming you had a unique writing style,
6 correct?
7  A   Yeah.
8  Q   Okay.  So the unique writing style is not
9 the offensive language.  It's the preceding sentence
10 talking about the fact that she had received
11 unfamiliar cellphone numbers and online dating
12 profiles, correct?
13  A   Generally.
14  Q   Okay.  And then the "Hi Cat", there's
15 nothing offensive about that, is there?
16  A   Yeah, because I never sent an e-mail --
17 it's insane.  I mean, she's just taking random text
18 messages or dating profile communications and
19 claiming it's me and it was later found to be totally
20 false before producing it in the City Pages article
21 that ruined my life.
22  Q   So I'm focusing on specifically the
23 language of the City Pages article that you claim is
24 defamatory.  You've identified "Hi Cat," and I want
25 to understand why that's defamatory.

Page 116

1  A   She's referencing the fact that she
2 received messages using "Hi Cat", which simply never
3 happened.
4  Q   So it's just not true; it's not that it's
5 defamatory, correct?
6  A   Well, it paints me in a negative light, so
7 therefore it is defamatory claiming that I have sent
8 messages which I have not, you know, making me out to
9 be like an online stalker or a stalker in general,
10 which simply was later found to be false.  And, I
11 mean -- later found to be false, I knew it was false,
12 but it was later proven false by the St. Paul Police
13 Department.
14  Q   Again, my question is around your
15 identification of "Hi Cat" as being offensive.  I
16 want to understand that because I think what you're
17 saying is it's simply not true, not that it's
18 defamatory, somehow it has ruined your reputation for
19 having been associated with the phrase "Hi Cat"?
20  A   The "Hi Cat" is a reference to receiving
21 unsolicited messages from me or that I was somehow
22 targeting her on the internet by continuing to pursue
23 her which -- you know, painting me in a light of
24 being an online harasser, which is defamatory.
25  Q   You've used that phrase with her, though,

Page 117

1 before, "Hi Cat"?
2  A   No.
3  Q   And there's no communication between you
4 and her where you used that phrase?
5  A   Correct.  I don't know -- I didn't know
6 who she was.
7  Q   Falsehood number 4 says, "Exasperated,
8 Schaeffer took to Facebook, detailed how a guy she
9 never met was haunting her.  A friend shared her
10 post.  Another Twin Cities woman soon reached out.
11 Schaefer wasn't Fredin's only victim."  Correct?
12  A   Yes.
13  Q   The statement that "another Twin Cities
14 woman soon reached out, Schaefer wasn't Fredin's only
15 victim," those are Mr. Mullen's words, correct?
16  A   I believe it's a combination of statements
17 by Catherine Schaefer to Mr. Mullen or Mr. Mullen's
18 statements himself.
19  Q   Well, you've got the article sitting next
20 to you.
21  A   Okay.
22  Q   Tell me what in its context you believe is
23 her words as opposed to Mr. Mullen's.  So if you look
24 on page 2 of the article, for instance --
25  A   Yeah, I see it.

1    Q    Okay.  There's no quotes around any of
2  those words, correct?
3    A    That's true.
4    Q    So none of those quotes are associated or
5  attributed to Ms. Schaefer?
6    A    Mr. Mullen would not have knowledge of
7  that statement without having talked to Catherine
8  Schaefer.  I'm not sure how Mr. Mullen would know
9  Schaefer took to Facebook, for example, which is
10 second through fifth word in that paragraph.
11   Q    Well, maybe this will help, Mr. Fredin.
12 If you move down to falsehood number 5, you'll find
13 that on the very top page of page 3 of the article,
14 which is Exhibit 9.
15   A    Okay.
16   Q    Okay?  Can you read that to yourself?
17   A    Sorry.  Which paragraph?
18   Q    The very first one.  The very first at the
19 top of the page.  It says, "The messages, some
20 sexually suggestive, continued for weeks.  'Get on
21 your knees and think of me,' he wrote, according to
22 the ruling."
23        Do you know what ruling is referenced
24 here?
25   A    Actually, I do not.

1    Q    It's a court ruling, correct?
2    A    Yes.
3    Q    And so those words, those statements, came
4  from a court ruling according to the article,
5  correct?  I mean, it says according to the ruling,
6  correct?
7    A    I can't remember.  I'd have to verify my
8  records.
9    Q    The last falsehood, falsehood number 7
10 here, you have stated, "Schaefer's evidence of
11 unwanted contact through the years was overwhelming."
12 And we find that language on page 3, third paragraph.
13   A    There's no page numbers on this article.
14   Q    Right.  You're going to have to just count
15 the pages.  It's one paragraph down from where we
16 were just looking at.  It starts with "Hanson filed."
17   A    Okay.  I see it.
18   Q    Those words are Mr. Mullen's words,
19 correct?  There's no quotations attributing those
20 statements to Ms. Schaefer?
21   A    I'm not sure.  I believe that Ms. Schaefer
22 provided those statements to Mr. Mullen.
23   Q    Well, the statements she provided to
24 Mr. Mullen are in quotes.  There's no quotes around
25 that sentence, is there?

1    A    Yeah, but he can be paraphrasing the
2  statements Ms. Schaefer gave to Mr. Mullen.
3    Q    Right.  So they're Mr. Mullen's words
4  paraphrasing something Ms. Schaefer would have said?
5    A    I don't know.  It sounds like Ms. Schaefer
6  gave those statements to Mr. Mullen.  I just don't
7  know.  I had no knowledge of this article being
8  constructed, so I have no idea.
9    Q    Well, you're making allegations in this
10 lawsuit that these statements were hers and that they
11 were defamatory.
12   A    Correct.  Yes.
13   Q    Are you saying you're mistaken?
14   A    No.
15   Q    So how do you attribute the statements in
16 the article, specifically falsehood number 7, to
17 Ms. Schaefer?  What basis do you have to make this
18 allegation?
19   A    Recent FOIA request information which
20 sheds light on the fact that Catherine Schaefer was
21 contacting the City Pages at least at the time of
22 January 24th, 2017.  And so the evidence here
23 indicates that Catherine Schaefer -- there was an
24 admission that Catherine Schaefer contacted the City
25 Pages and NPR.  Not NPR, but M as in Mary, so

1  Minnesota Public Radio.
2    Q    But that doesn't help us understand your
3  allegation that she made this statement as opposed to
4  Mr. Mullen.
5    A    The FOIA request from the City of
6  Minneapolis indicates that Lindsey Middlecamp and
7  Catherine Schaefer apparently had communicated with
8  the City Pages in an effort to make statements to
9  Mr. Mullen, so I believe that it's a combination
10 therein of both Mr. Mullen and Catherine Schaefer.
11   Q    But you don't know what statements were
12 provided to Mr. Mullen?  Your FOIA request didn't
13 discover that?
14   A    It said -- yeah, I mean, it was very
15 specific.  It said that Catherine Schaefer had made
16 allegations of unwanted contact over many years,
17 which was totally bogus.  But that was in the FOIA
18 request.
19   Q    Your request and their response?
20   A    I'm sorry.  Yes, you're right, Mr. Breyer.
21 That was in the production provided by way of the
22 City of Minneapolis.
23   Q    Okay.  And whose statements were those
24 that you just recited to me?
25   A    Those statements were directly from

31 (Pages 118 - 121)

Page 122

1 Lindsey Middlecamp referencing her own conversation
2 with Ms. Schaefer. And because she was referencing a
3 direct conversation with Ms. Schaefer, it is my
4 belief that it is not hearsay.
5    Q   Well, I don't care if it's hearsay or not.
6 I'm trying to understand what on the basis of the
7 response leads you to believe that the words we just
8 reviewed are Ms. Schaefer's as opposed to
9 Mr. Mullen's?
10    A   I truly feel it's a combination of
11 Ms. Schaefer's false statements to Mr. Mullen
12 directly without citing any record in Ramsey County
13 District Court as well as Mr. Mullen's statements
14 paraphrasing those statements and him adding
15 additional information himself to extrapolate without
16 citations to the court record.
17       MR. BREYER: Why don't we take a short
18 break for lunch and then we'll come back.
19       THE WITNESS: Okay.
20       (Whereupon, at 12:37 p.m. a lunch recess
21 was taken.)
22
23
24
25

Page 123

1          AFTERNOON SESSION
2               (1:20 p.m.)
3       * * * * * * * * * *
4       Whereupon,
5          BROCK FREDIN,
6 the witness testifying at the time of
7 recess, having been previously duly sworn,
8 was further examined and testified as
9 follows.
10       * * * * * * * * * *
11 EXAMINATION RESUMED BY COUNSEL FOR THE DEFENDANTS
12 BY MR. BREYER:
13    Q   So, Mr. Fredin, we're back on the record
14 after a break for lunch. I'll remind you you're
15 still under oath. Do you understand that?
16    A   Yes.
17    Q   In addition to the brockf12@gmail.com
18 account you also referenced two other e-mail accounts
19 today, the Baron Tharson account and a Field.gator
20 account. Do you recall that testimony?
21    A   I do.
22    Q   Okay. When you searched for responsive
23 e-mails and other documents, did you search those
24 e-mail accounts as well?
25    A   Yes.

Page 124

1    Q   Okay. You did a full search of those --
2 of both of those e-mail accounts?
3    A   Yes.
4    Q   And did you retrieve any documents from
5 those accounts that you produced to us?
6    A   I believe so.
7    Q   Did you withhold any documents from those
8 accounts that you reviewed in production?
9    A   To the best of my knowledge, I did not. I
10 will do a second search to ensure that I have not
11 withheld any documents.
12    Q   The process to search those two accounts,
13 was it the same method of searching you described
14 earlier using keywords?
15    A   Yes.
16    Q   Did you use the same keywords?
17    A   Yes.
18    Q   When you did the search for the e-mail
19 accounts, you did so presumably using a laptop that
20 you currently use?
21    A   Actually, I was at a law library.
22    Q   Okay. Do you have any other devices other
23 than the five phones you described earlier that would
24 contain e-mails or other documents related to this
25 case or these cases?

Page 125

1    A   I have documents in a number of file
2 folders.
3    Q   And were those file folders searched in
4 response to our requests?
5    A   Yes and no. I mean, there's so many
6 documents that it would be exhaustive. I relied upon
7 digital documents that I could find that were
8 reproductions of those documents.
9    Q   Okay. Why do you have reproductions of
10 those documents as opposed to the original document?
11    A   Because those files are in storage and
12 there are so many documents. I'm one person. I
13 can't possibly go through each and every document,
14 whereas a keyword search avails that information
15 quickly.
16    Q   When you say they're in storage, are they
17 in the storage unit you described earlier?
18    A   Yes.
19    Q   Okay. And you have access to that storage
20 unit?
21    A   I do.
22    Q   And where is it located?
23    A   The storage unit has been located in
24 St. Louis Park.
25    Q   When was the last time you were at the

Page 126

1 storage unit?
2     A    Probably August.
3     Q    Other than the five phones you described
4 earlier, what other electronic devices may be in that
5 storage unit?
6     A    That's really a -- that's all I know.
7     Q    I'm sorry.  Did you give me a number?
8     A    No.  That's about it.  That's all I can
9 recall that is associated with documents.
10    Q    So there are no computers of any type?
11    A    Correct.
12    Q    Okay.  Did you search any of your
13 computers or did you only use the computer at the law
14 library?
15    A    I did search using a phone that I had.
16 And then when I was at the law library forwarded some
17 of the documents to the brockf12 account in order to
18 use their resources, essentially, to produce the
19 PDFs.
20    Q    From January of 2016 to present, what
21 computers, if any, have you used to communicate
22 either through Collarspace or these other online
23 profiles or the e-mails addresses that you provided?
24    A    The iMac that I had that was seized
25 pursuant to Lindsey Middlecamp's unlawful actions

Page 127

1 against me and then -- that's pretty much it.
2     Q    Okay.  And you haven't searched the iMac;
3 is that correct?
4     A    I can't turn it on because the files have
5 been compromised.
6     Q    Have you tried to turn it on?
7     A    No.
8     Q    When you refer to compromised files, again
9 we're talking about the police seizure of that device
10 as well with others?
11    A    I can't trust any devices that have been
12 seized by law enforcement.
13    Q    And where is that iMac today?
14    A    I believe that it's in the storage unit.
15 I'm sorry.  I'm contradicting myself.  It is in the
16 storage unit.  It's in storage.  I'm not trying to
17 intentionally mislead.  There's so many devices, I'm
18 just trying to associate specific devices to where
19 they're at.
20    Q    Yeah.  And if you want to correct the
21 testimony, I'm perfectly fine doing that.  I'd rather
22 get your best recollection rather than your guess.
23    A    My best recollection is that it's in the
24 storage unit.
25    Q    We talked about two Collarspace accounts

Page 128

1 earlier.  Now I want to talk about a third one called
2 EpicViewf12.  Are you familiar with that profile?
3     A    So I think that's the same profile as the
4 EpicViewfu.
5     Q    Okay.
6     A    There's just a name issue with it.  I
7 believe that it's F12 was the actual name.  And I
8 don't know how the FU came about, if maybe -- I
9 believe that it was always EpicView F12 because
10 that's a derivative of my e-mail address which is
11 brockf12.
12    Q    Okay.  Are the profiles -- is the profile
13 for EpicViewf12 the same as EpicViewfu?
14    A    Yes.
15         (Fredin Exhibit 11 was marked for
16         identification.)
17 BY MR. BREYER:
18    Q    So, Mr. Fredin, Exhibit Number 11, that's
19 just been handed to you.  You know what?  Set that
20 exhibit aside a moment.  Let's do this one first.
21         (Fredin Exhibit 12 was marked for
22         identification.)
23 BY MR. BREYER:
24    Q    Okay.  Exhibit 12 is -- again, it appears
25 to be one of these messages from collarspace.com.  Is

Page 129

1 that correct?
2     A    Yes.
3     Q    And this one relates to the user name
4 EpicViewf12.  Is that also correct?
5     A    Yes.
6     Q    And it's messaging you at your user name
7 at Collarspace, which was EpicView?
8     A    Correct.
9     Q    Okay.  Is this the only message you
10 received from EpicViewf12?
11    A    Generally there was -- it was between one
12 and three messages.  It could have been one, it could
13 have been upwards of three.  When I received the
14 messages from BlackOutx2, I sort of mixed them
15 together.
16    Q    So this is the one you produced to us and
17 it says, "See you soon, Brock," and then your
18 response is, "Do not contact me ever again."  Do you
19 see that?
20    A    Yes.
21    Q    Okay.  So what other messages, if any, did
22 you receive from EpicViewf12, or is this it?
23    A    There's another message that says -- I
24 can't remember if it's from this one or the BlackOut
25 profile, but it's like along a similar path of saying

1 did you check out the profile for taunting me. There
2 was between one and three messages between these two
3 profiles.
4    Q    Okay. Now let's look back at Exhibit 11 I
5 just handed to you earlier. It's the one to your
6 right.
7    A    Okay.
8    Q    So Exhibit 11 appears to me to be the
9 profile for BlackOutx2; is that correct?
10    A    Yes.
11    Q    And this profile is -- correct me if I'm
12 wrong -- is exactly the same as the profile for
13 EpicViewf12 and EpicViewfu.
14    A    No, that's not correct.
15    Q    Okay. What is different about it?
16    A    This -- I don't -- the EpicViewf12 profile
17 was made inactive shortly after these messages were
18 sent. I don't recall exactly what was in the
19 profiles themselves other than reviewing my records.
20 But what I do recall is that this profile was
21 different altogether from the EpicViewf12 profile.
22    Q    Is it true to say that we don't have a
23 profile today of EpicViewf12?
24    A    It exists, but it's publicly inactive and
25 appears to be a conduit in which Catherine Schaefer

1 used simply to taunt me in order to persuade me to
2 view this profile.
3    Q    Okay. So we don't have that profile
4 description because it hasn't been produced, correct?
5 You didn't produce that to us?
6    A    I don't recall. I potentially did. I
7 will check my records.
8    Q    Okay. But this is the profile in
9 Exhibit 11 for BlackOutx2?
10    A    Correct.
11    Q    Okay. And this you did produce to us?
12    A    Yes.
13    Q    So help me understand more of what we're
14 looking at in Exhibit 11. It's got the profile for
15 BlackOutx2 on the left and then it looks like there's
16 a posting to the right. Do you have any knowledge
17 whether that posting to the right is authored by
18 BlackOutx2 or by somebody else?
19    A    It was clearly authored by Catherine
20 Schaefer.
21    Q    Okay. Why do you say that?
22    A    Because these taunting messages came at
23 the same time as her glitter bomb profile messages to
24 me. I rarely received messages and so Catherine
25 Schaefer's profile had communicated with me and then

1 these came and then she filed the restraining order
2 against me. So it was clearly Catherine Schaefer.
3        I mean, in addition to the fact that all
4 of my information was included here, the user name
5 itself was indicative of her blackout smear campaign,
6 and then, you know, these journal entries that were
7 publicly available that listed my name claiming that
8 I stalked and harassed women and that I was in
9 violation of a restraining order.
10    Q    This is a two-page document. I want you
11 to point to me the specific language in this profile
12 that indicates that it's Catherine Schaefer.
13    A    The entire profile itself is directly
14 linked to Catherine Schaefer. There is no other
15 person who would have created this.
16    Q    Right. I want you to point me to --
17    A    The entire profile content, every
18 single --
19    Q    Every single word on this indicates that
20 it was Catherine Schaefer?
21    A    Absolutely. Absolutely. Beyond a doubt.
22    Q    But there's no content within this,
23 specific content, that would direct you to Catherine
24 Schaefer, only your belief that she put this entire
25 profile together, correct?

1    A    Her IP address is associated with it.
2    Q    Where does her IP address show up?
3    A    It is available through the site itself.
4    Q    Have you requested the IP addresses from
5 the site?
6    A    Yes, I did actually.
7    Q    Okay. Do you have those in your
8 possession?
9    A    I do not have them in my possession.
10    Q    Why not?
11    A    Because I don't have the -- or at the time
12 I didn't have the bandwidth to pursue fighting
13 through a subpoena to get the IP records.
14    Q    So you never subpoenaed Collarspace and
15 you never received a log of IP addresses related to
16 this account, correct?
17    A    That is true, yes.
18    Q    So we don't know if her IP address is
19 associated with this profile or not?
20    A    I'm a hundred percent sure that it's
21 Catherine Schaefer's IP address.
22    Q    Okay. You say that, but I'm wondering if
23 it's not linked to any particular IP address because
24 you didn't subpoena those records, correct?
25    A    Simply because I didn't subpoena doesn't

Page 134

1 mean that the IP addresses are not linked to
2 Catherine Schaefer.
3     Q    Okay.  Do you have any documents that show
4 the IP addresses related to this account?
5     A    Actually, so what happened is I did
6 receive certain network information when I -- who is
7 some of the smear campaign stuff that was out against
8 me that I included, like a couple of websites, and it
9 was all -- so what happened is the information that I
10 received back indicated that Catherine Schaefer was
11 viewing with her IP address -- and that's included in
12 some of these complaints.
13          For example, it was included in the motion
14 to dismiss opposition -- that Catherine Schaefer's IP
15 address was used to view information linked to the
16 smear campaign, specifically like a honey pot website
17 that was set up was linked back to her location in
18 State College Pennsylvania as well as her IP address.
19     Q    Okay.  But I want you to focus on this
20 particular account, this BlackOutx2.  You have no
21 documents, records or logs indicating that her IP
22 address is associated with this whatsoever, correct?
23     A    I don't know how to answer your question.
24 I don't know.
25     Q    Well, either you have a document that

Page 135

1 shows her IP address associated with this or you
2 don't.  You certainly didn't produce anything to us.
3 I'm wondering whether you have the document or not?
4     A    I would really have to review my records
5 to ensure -- the IP address I have is associated with
6 Catherine Schaefer and is related to the smear
7 campaign as a whole.
8     Q    But, again, I want you to focus on purely
9 the Collarspace profiles.
10     A    Right.  Yeah.  So I didn't subpoena this
11 website, but this content could only have been
12 created by Catherine Schaefer.  It's indicative of
13 Catherine Schaefer during the same time period
14 Catherine Schaefer had been posting a lot about
15 "Black Lives Matter" on Facebook and there's a photo
16 of two -- it's a black couple engaging in some sort
17 of romance.
18     Q    So that leads you to believe --
19     A    It's clearly Catherine Schaefer.
20 Everything about it.  The messages that were sent
21 directly after Catherine Schaefer had messaged me
22 with her profile and which she admitted to
23 possessing.  Yeah.
24     Q    So just so I'm clear, so she was
25 supportive of "Black Lives Matter"; is that right?

Page 136

1     A    She had posted similar photos on her
2 Facebook at the same time.
3     Q    But not this photo?
4     A    Not that photo.
5     Q    No?  Okay.  So because she was supportive
6 of that movement and she used -- and this particular
7 profile uses an African American, you assume that
8 it's Catherine Schaefer who posted it?
9     A    No, I don't assume.  I'm a hundred percent
10 sure that it was Catherine Schaefer.
11     Q    So help me understand the hundred percent
12 sure.  Is that a hundred precent sure feeling or a
13 hundred percent sure because you have some evidence
14 or documents that indicated it was her?
15     A    I have a bunch of evidence produced in
16 discovery that indicates that this is from Catherine
17 Schaefer.
18     Q    Okay.  And tell me what that evidence is.
19     A    IP addresses related to the smear
20 campaign.  I have, you know, hundreds of these
21 e-mails.
22     Q    You say you have --
23     A    I have hundreds of tweets that are revenge
24 pornography-based from CardsAgstHrsmt.  I think
25 that's -- another element of this is the fact that

Page 137

1 the revenge porn campaign that Lindsey Middlecamp
2 produces on CardsAgstHrsmt is eerily almost if not
3 identical to this sort of conduct.
4          For example, this is a shirtless black
5 man.
6     Q    All right.  So let's back up and try this
7 again.  How did you capture Ms. Schaefer's IP
8 address?
9     A    I received data from an analytics service.
10     Q    Which service?
11     A    Google Analytics.  Showing that HTTP
12 requests made to retrieve data were made, in
13 reference to this whole smear campaign, were made
14 from State College, Pennsylvania, and it indicated
15 her IP address at the same time that all of this was
16 going down.
17     Q    Well, you made the -- so Google Analytics
18 ran or captured the IP address related to what
19 communication or website?
20     A    I believe that it was a website dorseyhq
21 or lindseymiddlecamp.com.
22     Q    And those are websites that you created,
23 correct?
24     A    That's false.
25     Q    Well, how did you get the Google Analytics

35 (Pages 134 - 137)

1  if they weren't websites that you had control over?
2      A    I received the information by way of a
3  friend, but I did not have direct knowledge of any
4  intentions or actions related to any websites going
5  up.
6      Q    Who's the friend?
7      A    I'm not going to answer that question.
8      Q    Why not?
9      A    Because it's not relevant.
10     Q    Well, you just described for me how you
11 obtained the IP address of my client through a
12 friend. I'd like to know the friend's name.
13     A    Right. And I'm not going to answer that
14 question.
15     Q    Well, Mr. Fredin, you're making a claim
16 that Ms. Schaefer created these false profiles
17 because you believe that her IP address is associated
18 with them. You then tell me that the IP address was
19 obtained through two websites, lindseymiddlecamp
20 and dorseyhq, for which you say you don't control but
21 that are controlled by a, quote, unquote, friend.
22        So I'll ask you again, who's the friend?
23     A    I did a search of these websites. They
24 don't exist. Dorseyhq doesn't exist.
25 Lindseymiddlecamp doesn't exist.

1      Q    It did, because you just told me it did.
2      A    But it doesn't exist. And the information
3  I received was simply for legal purposes to track
4  down private investigators Catherine
5  Schaefer's involvement.
6      Q    Who developed the site dorseyhq and
7  lindseymiddlecamp.com?
8      A    I will object on relevance.
9      Q    They were created by Anthony Zappin,
10 correct?
11     A    Again, I'm objecting on relevance.
12     Q    You and Mr. Zappin collaborated on the
13 creation of those websites and other websites, true?
14     A    I'm objecting on relevance.
15     Q    You're refusing to answer the question as
16 to who created the website dorseyhq and
17 lindseymiddlecamp.com; is that correct?
18     A    I'm objecting on relevance. I'm not
19 refusing to answer.
20     Q    Well, Mr. Fredin, there's a website with
21 my client's name attached to it along with some
22 harmful information contained within it. How it's
23 not relevant, I don't understand. But if you're
24 going to maintain the objection and not answer we can
25 certainly certify that question to the Court. So I'm

1  giving you another opportunity if you'd like to
2  disclose the name of your friend which you're legally
3  required to do, I hope you do it now. Who's the
4  friend?
5      A    You mentioned content harmful to your
6  client, yet your client has refused and destroyed my
7  life on CardsAgstHrsmt, the City Pages, everywhere,
8  and yet you claim a website that doesn't exist is
9  somehow providing harmful content to your client.
10 The website does not exist. So --
11     Q    Mr. Fredin --
12     A    And it's not relevant to this action
13 whatsoever. So, again, if you find, you know, reason
14 to, you know, try and offer intimidation tactics to
15 claim somehow that your client is being harmed when
16 your client is in fact destroying me, the only thing
17 that I can remember is Lindsey Middlecamp's
18 destruction of my life. And so I am objecting on
19 relevance to any other content where you're trying to
20 misdirect the intent of this lawsuit.
21        I am the plaintiff in this lawsuit against
22 your clients. Your clients have harmed me. So
23 there's no basis or relevance whatsoever for your
24 question.
25     Q    Mr. Fredin, you've testified -- you

1  testified. I didn't offer you this information. You
2  testified as to both of these websites that existed.
3  Now whether they exist today or not is not my
4  question. The question is who did you collaborate to
5  create the websites?
6      A    I testified that analytical information
7  was produced in the complaint or the amended
8  complaint and/or the opposition on motion to dismiss.
9  And that information pertained to IP addresses.
10 That's all I'm testifying to.
11     Q    Right. And I want you to tell me the
12 source of that information which you identified as
13 your friend. Your friend's name is who?
14     A    I conducted a private investigation
15 through attorneys to determine, you know, IP
16 addresses associated and data therein.
17     Q    Which attorneys?
18     A    I'm going to object on attorney-client
19 privilege.
20     Q    The name of the attorneys is not covered
21 by the privilege. The identification of the
22 attorneys, please.
23     A    The only thing that I can tell you with
24 reference to the identification of the attorney is
25 the fact that I retained at least two lawyers during

36 (Pages 138 - 141)

Page 142

1 this entire process and those lawyers' names are
2 included in all of the discovery that I've produced,
3 including the City Pages article. And so those names
4 have been provided and I'm not in any way violating
5 attorney-client privilege.
6    Q    I'm not asking you to violate the
7 privilege. I'm asking just for the names of the two
8 attorneys that you claim --
9    A    I produced those names. Those names are
10 very easy to determine --
11    Q    Do you not recall their names?
12    A    I do recall their names.
13    Q    What are they?
14    A    The only reason that I am objecting on
15 attorney-client privilege is because I will have to
16 review whether or not the names or identities of
17 those lawyers are provided -- or covered, rather, by
18 attorney-client privilege. If they're not, then I'll
19 answer your question as soon as I possibly can.
20 However, it's pretty obvious to find from notices of
21 appearances and so forth.
22    Q    Right. So why wouldn't you just tell me
23 their names?
24    A    Because I'd have to review whether or not
25 the names or identities are included to determine

Page 143

1 whether or not I am in full compliance.
2    Q    Well, you just told me they're on filings.
3    A    They are. It's public.
4    Q    So they've already been disclosed, it's
5 public. So I'm just asking you for that public
6 information. What are their names?
7    A    I don't know if names are protected by
8 attorney-client privilege.
9    Q    Okay. Let's go back to the friend,
10 because your friend is not a lawyer. What's your
11 friend's name that set up these websites?
12    A    Again, I'm objecting on relevance. I'm
13 not going to answer that question.
14    Q    Okay.
15           (Fredin Exhibit 13 was marked for
16           identification.)
17 BY MR. BREYER:
18    Q    Mr. Fredin, I've handed you what's been
19 marked as Exhibit 13. And this is a website that was
20 created around Ms. Grace Miller. Have you seen this
21 website before?
22    A    I have seen it.
23    Q    Did you create it?
24    A    I'm objecting on relevance.
25    Q    You won't answer the question whether you

Page 144

1 created this website or not?
2    A    Correct.
3    Q    You provided content to this website,
4 true?
5    A    I'm objecting on relevance.
6    Q    You had assistance in creating this
7 website with the friend that you won't identify. Is
8 that also true?
9    A    I'm objecting on relevance.
10    Q    Well, Mr. Fredin, I don't take your
11 relevancy objections very well, especially since
12 they're dealing with the direct content of the claims
13 in this lawsuit, including my client, Grace Miller.
14 So if you're going to continue that objection then
15 we'll simply go to the Court and get some redress.
16 But for now I need to know whether you participated
17 in the creation of the content of this website.
18    A    It appears to show a masculine woman who
19 looks like my ex-girlfriend, Grace Miller.
20    Q    The question was did you participate in
21 the content of this website, yes or no?
22    A    I see the photo of Grace Miller whose
23 masculinity I was attracted to. I see Karmen
24 McQuitty's ex parte communication to her mother
25 defaming and taunting me on Facebook. Yet Karmen

Page 145

1 McQuitty and my ex-girlfriend, United States Air
2 Force Major Grace Miller, is using, according to this
3 content, restraining orders to silence and gag me
4 while at the same time defaming and taunting me,
5 which is ridiculous. That's all I'm seeing from this
6 content here.
7           I don't know if this content that you're
8 producing is identical to what I've seen in court
9 filings. When I say that I've seen this website,
10 this is a website that I've seen in court filings.
11    Q    Right. So back to my question. Did you
12 contribute to the content of this website contained
13 in Exhibit 13, yes or no?
14    A    I'm objecting on relevance. I have no
15 understanding of how this is relevant to the claims
16 in this action.
17    Q    You're refusing to answer?
18    A    I'm not refusing to answer. I am
19 objecting on relevance.
20    Q    Sure you are. Right. You've objected on
21 relevance and now you can answer the question. Did
22 you participate in the content of this website?
23    A    I'm not going to answer this question.
24    Q    There are numbered pages in this document
25 and if you turn to pages 6, 7, 8, 9, so start with

37 (Pages 142 - 145)