# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Brock Fredin,<br><br>    Plaintiff,<br><br>v.<br><br>Lindsey Middlecamp,<br><br>    Defendant. | Case No. 17-cv-3058 (SRN/HB)<br><br><br>**ORDER** |

Brock Fredin, 1180 7th Ave., Baldwin, WI 54002, Pro Se.

K. Jon Breyer, Kutak Rock LLP, 60 S. 6th St., Ste. 3400, Minneapolis, MN 55402, for Defendant Middlecamp.

| | |
|---|---|
| Brock Fredin,<br><br>    Plaintiff,<br><br>v.<br><br>Grace Elizabeth Miller, and<br>Catherine Marie Schaefer,<br><br>    Defendants. | Case No. 18-cv-466 (SRN/HB)<br><br><br>**ORDER** |

Brock Fredin, 1180 7th Ave., Baldwin, WI 54002, Pro Se.

K. Jon Breyer, Kutak Rock LLP, 60 S. 6th St., Ste. 3400, Minneapolis, MN 55402, for Defendants Miller and Schaefer.

SUSAN RICHARD NELSON, United States District Judge

## I.     BACKGROUND

Before the Court are the summary judgment motions filed by Defendant Lindsey Middlecamp (17-cv-3058 [Doc. No. 179]) and Defendants Grace Miller and Catherine Schaefer (18-cv-466 [Doc. No. 171].)   Also before the Court are the following related motions:  (1) Plaintiff's Motion to Strike (17-cv-3058 [Doc. No. 199]); Plaintiff's October 13, 2020 Motion for Rule 11 Sanctions (17-cv-3058 [Doc. No. 216]); and Plaintiff's Motions to Unseal (17-cv-3058 [Doc. No. 223]; 18-cv-466 [Doc. No. 193].)[1]

For the reasons set forth below, Defendants' summary judgment motions are granted, Plaintiff's Motion to Strike is denied in part and denied as moot in part, Plaintiff's October 13, 2020 Motion for Rule 11 Sanctions is denied, and Plaintiff's Motions to Unseal are denied.

### A. Facts

The facts underlying these two cases concern Plaintiff Brock Fredin's interactions with three women:   Defendants Grace Schaefer, Catherine Miller, and Lindsey Middlecamp.   Each of these women has litigated against Fredin in Ramsey County District Court, where they each successfully obtained 50-year harassment restraining orders

---

[1]     Also pending before the Court are Defendants' Motions for a Temporary Restraining Order (17-cv-3058 [Doc. No. 212]; 18-cv-466 [Doc. No. 189]), Defendants' Motions to Declare Plaintiff a Vexatious Litigant (17-cv-3058 [Doc. No. 209]; 18-cv-466 [Doc. No. 186]), and Plaintiff's November 5, 2020 Motions for Rule 11 Sanctions (17-cv-3058 [Doc. No. 233]; 18-cv-466 [Doc. No. 202].)  The Court addresses these motions in a separate order.

("HROs") against him, which remain in place. *See Schaefer v. Fredin*, No. A19-0657, 2020 WL 1921101 (Minn. Ct. App. Apr. 20, 2020), *review denied*, (Minn. July 23, 2020); *Miller v. Fredin*, Nos. A18-1154/A18-1155, 2019 WL 3293766 (Minn. Ct. App. July 22, 2019), *review denied*, (Minn. Oct. 15, 2019).  Because these two federal cases, 17-cv-3058 and 18-cv-466, involve certain overlapping facts, and overlapping motions, the Court addresses them in this consolidated order.

The discovery record in these two cases is rather limited, with Plaintiff taking no discovery of Defendants.  While Fredin asserts that Magistrate Judge Hildy Bowbeer unfairly denied him the opportunity to conduct discovery, her October 29, 2019 Orders [Doc. No. 102]/[18-cv-466, [Doc. No. 93] set forth the history of Fredin's failure to comply with the deadlines and terms of the Pretrial Scheduling Order, and his failure to show good cause for not complying.  (Oct. 29, 2019 Orders at 2–7.)  Certainly, the period of time when Fredin was incarcerated between October 2018 and June 2019 may have impacted his ability to conduct discovery, as the magistrate judge acknowledged.  (*Id.* at 7.)  However, the day after his release, the Court held a status conference with the parties, at which both parties informed the Court that they anticipated promptly serving written discovery.  (*Id.* at 3.)  Indeed, afterward, Defendants timely served discovery on Fredin.  (*Id.*)  At a subsequent status conference, Fredin again announced his intention to serve written discovery on Defendants and to eventually notice depositions, although Defendants noted that any effort to do so would be untimely under the Pretrial Scheduling Order.  (*Id.* at 4–5.)  Fredin then served voluminous discovery requests on Defendants, which he later sought to withdraw or "correct."  (*Id.*)  Defendants refused to respond, after which Fredin moved

3

for a 60-day extension, which the magistrate judge denied, on multiple grounds.  (*Id.*)

Magistrate Judge Bowbeer further denied a subsequent request from Fredin for more

limited discovery, finding that he had "cavalierly disregarded" the Pretrial Scheduling

Order, repeatedly.  (*Id.* at 9.)  Fredin did not appeal the October 29, 2019 Orders.[2]

In light of this rather limited record, the Court takes judicial notice of court rulings

in the parties' state court litigation, as well as rulings in other litigation involving the parties

in this Court.  Some of the state court rulings and records have been filed as exhibits in

support of the instant summary judgment motions, (*see, e.g.*, Breyer Decl. [Doc. No. 181],[3]

Exs. 1 & 2 (Ramsey Cty. Dist. Ct. HROs); 18-cv-466, Breyer Decl. [Doc. No. 173], Exs.

1 & 2 (Ramsey Cty. Dist. Ct. Order & Schaefer Aff. in *Schaefer v. Fredin*)), and others are

public records from the Ramsey County District Court, Minnesota appellate courts, or this

Court.  *See Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) ("[W]e may take

judicial notice of judicial opinions and public records."); *United States v. Jackson*, 640

---

[2]    The Court notes that in opposition to Defendants' summary judgment motions,
Fredin submits evidence that he obtained through requests from governmental entities
pursuant to the Minnesota Data Practices Act ("Data Practices Act") or the Freedom of
Information Act.  In addition, he submits two declarations in opposition to each motion, in
which he identifies his exhibits and also makes numerous factual assertions.  (*See* Fredin
Decl. [Doc. No. 189]; Second Fredin Decl. [Doc. No. 190]; 18-cv-466, Fredin Decl. [Doc.
No. 181]; 18-cv-466, Second Fredin Decl. [Doc. No. 182].)  A plaintiff "must substantiate
allegations with sufficient probative evidence that would permit a finding in the plaintiff's
favor." *Frevert v. Ford Motor Co.*, 614 F.3d 466, 473–74 (8th Cir. 2010).  Accordingly,
the Court will only consider statements in Fredin's declarations that are substantiated by
sufficient probative evidence.

[3]    For ease of reference, the Court's citations to the record are in the 17-3058 matter,
and are not prefaced by the case number, while the citations to the record in the 18-cv-466
matter are prefaced by the case number.

F.2d 614, 617 (8th Cir. 1981) (citations omitted) (stating that district court may take judicial notice, whether or not requested, of its own records and files and facts that are part of its public records).

In connection with these cases, the Court also notes that it received a letter from a non-party named Gordon Roy Parker [Doc. No. 191].  Parker asserts that the information in his letter relates to these matters, and in particular, to Middlecamp.  (Parker Letter at 1.) Because the letter contains allegations and identifying information concerning other non-parties, the letter was filed under seal.  Fredin moves to unseal it, arguing that it is a public record.  (Pl.'s Mem. Supp. Mot. to Unseal [Doc. No. 225] at 3–5.)

By Parker's own admission, the information in his letter is "neither a declaration nor an affidavit," and "is not given under penalty of perjury."  (Parker Letter at 1.)  Not only is this letter unreliable, as it contains no sworn statements, it concerns matters well outside the scope of these proceedings and is irrelevant.[4]  Accordingly, the Court will not consider Parker's letter in connection with these motions.  Because of the nature of the contents of the letter, it shall remain under seal, and Plaintiff's Motion to Unseal is therefore denied.

### 1.  Fredin's Interactions with Schaefer

Catherine Schaefer met Fredin through an online dating website in 2014.  *Schaefer*, 2020 WL 1921101, at *1.  Although they had agreed to meet in person, after receiving

---

[4]    In opposition to Miller and Schaefer's summary judgment motion, Fredin refers to Parker as "the lunatic who emailed the [c]ourt's chambers."  (18-cv-466, Pl.'s Opp'n to Summ. J. [Doc. No. 180] at 20 n.11.)

some "very odd texts" from Fredin, Schaefer requested no further contact. *Id.* They did not meet in person until after Schaefer commenced legal proceedings in Minnesota to obtain an HRO against Fredin. *Id.*

In the months following their initial contact, Fredin continued to text message Schaefer through various social media platforms, and posted comments about her on several websites. *Id.* In response, Schaefer petitioned for an HRO against Fredin in Ramsey County, Minnesota, which the district court granted in 2016, following an evidentiary hearing. *Id.* The district court found that although Schaefer had informed Fredin that she wanted no contact, he proceeded to contact her, despite his knowledge of her wishes. *Id.* In the 2016 HRO, the district court found that "[t]he contact . . . was repeated, unwanted, and had the effect of having a substantial adverse effect on [Schaefer's] security and privacy." *Id.* Consequently, the district court granted the HRO and ordered that Fredin have no "direct or indirect contact" with Schaefer for two years. *Id.* "No contact" included not contacting Schaefer "via electronic means such as email or social networking sites." *Id.*

Despite the two-year HRO, Fredin continued to contact Schaefer. *Id.* On the same day that the two-year HRO was issued, Fredin contacted the St. Paul Police Department and met with an officer, alleging that Schaefer was harassing and stalking him. *Id.* In addition, he "authored and posted a website" that discussed the law firm representing Schaefer and included a link to Schaefer's graduate student profile. *Id.* Fredin also filed a formal complaint with the Title IX office of Schaefer's graduate school, Pennsylvania State University ("Penn State"), alleging, among other things, that Schaefer had stalked,

harassed, and sexually exploited him. *Id.* In addition, Fredin emailed the head of Schaefer's graduate department, asserting claims against Schaefer like those in his Title IX complaint. *Id.* Finally, Fredin made comments about Schaefer on social media websites. *Id.*

In April 2017, Schaefer submitted an affidavit to the district court, describing Fredin's conduct following the issuance of the HRO, and seeking an order to show cause for contempt of court. *Id.* The district court initially denied Schaefer's motion without prejudice, pending ongoing investigations by the police and Penn State. *Id.* After Schaefer renewed her motion in January 2018, the district court held an evidentiary hearing, at which both Schaefer and Fredin testified. *Id.*

In its May 2018 ruling following the evidentiary hearing, the district court found that Fredin had violated the 2016 HRO in each of the ways described and that he continued to violate the HRO by posting comments on websites that remained accessible to the public at that time. *Id.* at *2. The district court ordered Fredin to file an affidavit, describing his efforts to remove his posts about Schaefer. *Id.* Although Fredin appealed the May 2018 ruling, his appeal was dismissed. *Id.*

On the day that Fredin's affidavit was due, his attorney wrote to the district court, advising that Fredin had removed the comments about Schaefer, except for those on one website. *Id.* Fredin's attorney also informed the court that counsel had advised Fredin not to submit an affidavit, invoking his Fifth Amendment right against self-incrimination. *Id.*

At a June 2018 hearing, the parties agreed that the violations addressed in the May 2018 order had been resolved. *Id.* However, Schaefer alleged a new violation, and argued

in a 2018 HRO petition that she was entitled to a 50-year HRO because Fredin had

"violated a prior or existing restraining order between us on two or more occasions." *Id.*;

*see* Minn. Stat. § 609.748, subd. 5(b)(3) (2018) ("If the court finds that the petitioner has

had two or more previous restraining orders in effect against the same respondent or the

respondent has violated a prior or existing restraining order on two or more occasions,

relief granted by the restraining order may be for a period of up to 50 years.").

In connection with the 2018 HRO proceedings, Fredin appeared pro se. *Schaefer*,

2020 WL 1921101, at *2. On the day of the hearing on the 2018 HRO petition, Fredin

filed a notice to remove the presiding judicial officer. *Id.* The district court nonetheless

entertained the parties' arguments and received testimony from Fredin and Schaefer

regarding her allegations on the new violations of the 2016 HRO. *Id.* Shortly thereafter,

the district court denied Fredin's notice to remove the judicial officer and scheduled an

evidentiary hearing on the 2018 HRO petition. *Id.*

Separately, the Ramsey Count District Court found Fredin in contempt of court for

a new violation of the 2016 HRO based on his actions in a district court proceeding in

Wisconsin. *Id.* Fredin had filed a temporary restraining order ("TRO") against Schaefer

in Wisconsin, where, the Ramsey County District Court judge subsequently found, he had

"affirmatively and intentionally" given "false and misleading" information to the

Wisconsin court by failing to disclose the 2016 HRO against him. *Id.* The Ramsey County

District Court determined that Fredin had omitted this information "in an effort to ensure

that he would at least get one (1) hearing whereby [Schaefer] would be forced to appear

with [him] in Court." *Id.* The district court therefore found that Fredin's request for a TRO in Wisconsin was "designed to thwart the very purpose of the 2016 HRO." *Id.*

Following a two-day evidentiary hearing on the 2018 HRO petition in Ramsey County District Court, at which Schaefer, Fredin, and Fredin's brother testified, the court determined that Fredin had committed two or more violations of the 2016 HRO. *Id.* at *3. Finding that Fredin had engaged in "an extensive course of conduct in violation of the prohibitions of the 2016 HRO," the district court granted Schaefer the requested 50-year HRO in February 2019. *Id.*

Fredin appealed the ruling. The Minnesota Court of Appeals denied his appeal on April 20, 2020, and the Minnesota Supreme Court denied review on July 23, 2020. *Id.*

## 2. Fredin's Interactions with Miller

Fredin and Grace Miller met on a dating website and began dating in September 2015. *Miller*, 2019 WL 3293766, at *1. Miller subsequently "broke things off" with Fredin, stating they could "still be friends" and share an "occasional date" but not be in a committed relationship. *Id.* Miller continued to see and communicate with Fredin until early December 2015 when "she unequivocally expressed that she no longer wanted to see or hear from Fredin." *Miller v. Fredin*, No. A16-0613, 2017 WL 280974, at *1 (Minn. Ct. App. Jan. 23, 2017) (documenting a Facebook exchange that ended in a message from Miller stating "No. Do not contact me again. Enough is enough. This is out of hand. Trying to block this number. Stop."). After Miller stated that she wanted no further contact, Fredin's messages became—as described by the Minnesota Court of Appeals— "unsettling":

9

Miller:  how [a]bout we be friends . . . .

Fredin:  Nope.  We are dating. Yes, you're taking me to see your family.

***

Miller:  I'm done talking to you tonight . . . .

Fredin:  Be a good girl for me.  Here's a hot photo of what you can't have. [webcam photo of Fredin]

***

Fredin:  Too bad you aren't in this tonight on your knees thinking of me. ;) [photo of woman in lingerie].  You should have nightly tasks.

Miller:  Stop it.

Fredin:  You really should meditate nightly, get on your knees, and think of me.  It's good for your mental health.  Also you're not going on any more first dates.

(*Id.*)

Miller told Fredin that she would seek police intervention if he did not stop contacting her.  *Miller*, 2019 WL 3293766, at *1.   Despite this, Fredin continued to send Miller texts from new phone numbers and electronic messages, including an unsolicited $50 PayPal message on January 24, 2016 reading, "Thank you for everything."  *Id.*

Miller then petitioned for an HRO against Fredin in January 2016, which the court granted on a temporary basis. *Id.*  On March 21, 2016, the district court granted the HRO for a two-year period, finding that the facts were sufficient to find that Fredin had engaged in harassment "by making 'repeated, unwanted contact with [Miller] by continuing to communicate with [Miller] despite being asked to stop all contact, having the Facebook account blocked and two separate telephone numbers blocked.'" *Id.*  The HRO restricted

Fredin from both direct or indirect contact, including in-person visits, phone calls, or electronic contact via email or social networking websites. *Id.* Fredin appealed, but the Minnesota Court of Appeals affirmed the district court's decision, finding sufficient evidence to support the finding that "Fredin's persistent, unwanted communication in the face of Miller's attempts to prevent the communication substantially affected Miller's safety and privacy." *Miller*, 2017 WL 280974, at *3–4.

Six months later, in September 2016, Miller moved for civil contempt against Fredin after discovering posts about her on the online sites DatingPsychos.com and Facebook. *Miller*, 2019 WL 3293766, at *1. After Fredin removed the posts, Miller withdrew the motion. *Id.*

In addition to Miller's HRO proceedings, in April 2017, police executed a search warrant at Fredin's home in connection with an investigation into possible criminal charges against him. *See Fredin v. Clysdale*, No. 18-cv-510 (SRN/HB), 2018 WL 7020186, at *5 (D. Minn. Dec. 20, 2018), *adopted*, 2019 WL 802048 (D. Minn. Feb. 21, 2019), *aff'd*, 794 Fed. App'x 555 (8th Cir. 2020) (per curiam). Fredin's computers, phones, and storage devices were seized. *Id.* On May 2, 2017, Fredin was criminally charged in Ramsey County District Court with "criminal gross misdemeanor stalking and an HRO violation" of Miller's HRO. *Id.*

In the HRO proceedings, in December 2017, Miller filed a motion to modify the HRO to require Fredin to remove a website called "www.majorgracemiller.com." *Miller*, 2019 WL 3293766, at *1. The district court granted Miller's request for temporary relief, but before a hearing could take place, Miller again moved for civil contempt for Fredin's

11

failure to comply with the court's orders.  *Id.*  She filed subsequent requests to modify the HRO, and ultimately requested a 50-year HRO based on the conduct underlying the contempt motions.  *Id.*  The district court granted Miller's motion for a 50-year HRO on a temporary basis, and scheduled a hearing on Miller's request to make the HRO permanent. *Id.* at *2.  After the hearing, the district court found, in a July 2018 ruling, that Fredin had violated Miller's HRO at least three times by creating and placing content about Miller on the internet.  *Id.*  The court also found Fredin in contempt for the HRO violations, granted Miller's 50-year HRO, and directed that the court's order be "delivered to the St. Paul City Attorney's Office for appropriate review."  *Id.*  Fredin appealed, and the Court of Appeals affirmed the district court's rulings.  *Id.* at *5.

In 2018, a Ramsey County District Court jury convicted Fredin on the two criminal charges related to his contact with Miller:  (1) stalking by mail in violation of Minn. Stat. § 609.749, subd. 2(6); and (2) violating an HRO under Minn. Stat. § 609/748, subd. 6(b). *See Fredin v. Miller*, No. 19-CV-3051 (SRN/HB), 2020 WL 3077708, at *2 (D. Minn. June 10, 2020) (discussing the criminal proceedings against Fredin), *appeal filed*, (8th Cir. July 14, 2020).   The district court sentenced Fredin to 365 days in the Ramsey County Correctional Facility. *Id.*

In July 2018, Fredin sought postconviction relief from the Ramsey County District Court on his stalking-by-mail conviction, noting that the Minnesota Supreme Court had recently struck down the stalking-by-mail statute as unconstitutional in an unrelated matter, *In re Welfare of A.J.B.*, 929 N.W.2d 840 (Minn. 2019).  *Id.*  The district court vacated Fredin's stalking-by-mail conviction in light of the Minnesota Supreme Court's ruling, and

adjudicated his conviction on the second count of conviction for violating the HRO. *Id.* The district court imposed a 90-day sentence on the HRO violation, with credit of 90 days for time served. *Id.* Before Fredin's stalking-by-mail conviction was vacated, he had served jail time on that sentence from October 2018 to June 2019. *Id.*

In response to Fredin's direct appeal of his criminal conviction for violating the HRO, the Minnesota Court of Appeals found that there was sufficient evidence to uphold that conviction, beyond a reasonable doubt. *State v. Fredin*, No. A19-0085, 2020 WL 1983050, at *5 (Minn. Ct. App. Apr. 27, 2020), *review denied* (Minn. July 23, 2020).

### 3.  Fredin's Interactions with Middlecamp

Lindsey Middlecamp was previously employed as an Assistant City Attorney for the City of Minneapolis and is now a Special Assistant United States Attorney in the District of Minnesota's United States Attorney's Office. *Clysdale*, 2018 WL 7020186, at *3.

At the times relevant to this action, Middlecamp anonymously maintained a Twitter account on women's issues and gender violence called "@CardsAgstHarassment." (*See* Def.'s Mem. in Supp. Mot. for Summ. J. [Doc. No. 225] at 6; *see also* Second Fredin Decl. [Doc. No. 190], Ex. G at 45.)  Middlecamp had not met Fredin prior to this litigation. (Second Fredin Decl., Ex. G at 45.)  In January 2017, she saw the Minnesota Court of Appeals decision in *Miller*, 2017 WL 280974, affirming the issuance of Miller's two-year HRO against Fredin. (*Id.*) On January 24, 2017, Middlecamp re-posted on the @CardsAgstHarassment Twitter account three photographs of Fredin taken from online dating websites, along with the following statement: "Women of MN: this is Brock Fredin,

aka Dan/Will.  He has at least two restraining orders against him.  Please RT [retweet] to help keep women safe."  (Fredin Decl. [Doc. No. 189], Ex. E (Jan. 24, 2017 tweet).)  At the time Middlecamp made this statement in January 2017, Miller and Schaefer both had active HROs issued against Fredin.  *See Schaefer*, 2020 WL 1921101, at *1–3; *Miller*, 2019 WL 3293766, at *1.

Shortly thereafter, Fredin contacted a writer for the Huffington Post, who had previously written an article about the @CardsAgstHarassment Twitter account.  (Second Fredin Decl., Ex. G at 45; *see also* Breyer Decl., Ex. 1 (*Middlecamp v. Fredin*, No. 62-HR-CV-17-233 (Ramsey Cty. Dist. Ct. Oct. 2, 2017) at 3.)  Fredin asked the Huffington Post writer for Middlecamp's last name, stating that he wanted to report her and Schaefer for "revenge porn and harassment."  (Breyer Decl., Ex. 1 (*Middlecamp v. Fredin*, No. 62-HR-CV-17-233 (Ramsey Cty. Dist. Ct. Oct. 2, 2017) at 3.)  The Huffington Post writer forwarded Fredin's email to Middlecamp, who emailed Fredin, asking that he not contact her or use third parties in order to contact her.  (*Id.*)  Middlecamp communicated her concerns about these attempted contacts to Sergeant David McCabe, an investigator in the St. Paul Police Department.  (Second Fredin Decl., Ex. G at 45.)

In Middlecamp's communications with Sergeant McCabe, she stated that although she recognized that removing the Twitter statement, or "tweet," might be a way to deter further contacts from Fredin, strangers who had seen her tweet and Fredin's photographs were contacting her, alleging similar harassment experiences with Fredin.  (*Id.*)  Middlecamp stated that she encouraged these women to contact Sergeant McCabe, if they wanted to do so.  (*Id.*)  Further, Middlecamp stated that the contacts from these women

confirmed her reason for posting the initial photos and tweet in an effort to "warn other women," as Fredin appeared to be using a false name on dating sites. (*Id.*)

On February 22, 2017, Middlecamp tweeted on the @CardsAgstHarassment account, "The power of sharing. Within hours of the stalking post going up, a rape survivor comes forward. He remains free. (Shared w/her permission)." (Pl.'s Opp'n to Summ. J. [Doc. No. 188] at 10; Am. Compl. [Doc. No. 5] ¶ 20.) Her tweet attached a public Facebook post, with the speaker's identity redacted, in which a woman alleged that Fredin had raped her seven years earlier, but law enforcement authorities did not prosecute him. (Am. Compl. ¶ 20.) In addition, the February 22, 2017 tweet included a link to an article published that same day in the Twin Cities weekly news magazine City Pages, entitled "Accused stalker Brock Fredin is writing a horror story, and he's the main character."[5] (*Id.*)

Despite Middlecamp's request that Fredin cease contact with her directly or via third parties, Fredin registered and authored numerous tweets that included a tweet to Middlecamp's law school describing her as a "likely criminal," as well as tweets directed to other law schools and legal professional organizations sharing identifying information about Middlecamp and accusing her of criminal conduct and professional misconduct. (Breyer Decl., Ex. 1 (*Middlecamp v. Fredin*, No. 62-HR-CV-17-233 (Ramsey Cty. Dist. Ct. Oct. 2, 2017) at 3.) Fredin also registered the domain name "lindseymiddlecamp.com" and published identifying content there about Middlecamp and her employer, accusing her

---

[5]     The Court addresses the information in this article in the following section.

of criminal conduct, and soliciting others to file complaints against her.  (*Id.*)  In addition, Fredin sent numerous emails or other electronic communications to persons associated with Middlecamp's online activities or employment, each time sharing identifying information about her, her employer, and her anonymous Twitter account, accusing her of criminal conduct, and soliciting others to make complaints about her.  (*Id.* at 4.)

After Middlecamp obtained an HRO against Fredin in April 2017, he contacted an attorney who he believed to be adverse to Middlecamp in an active matter of litigation. (*Id.*)  In response to a subsequent HRO motion and evidentiary hearing, the Ramsey County District Court found that Fredin's conduct in contacting the adverse attorney was calculated to reach Middlecamp, and did reach her.  (*Id.*)  The district court also found that Fredin's conduct in sending numerous electronic messages to people associated with Middlecamp's professional employment constituted harassment.  (*Id.*)  The district court thus issued a two-year HRO against Fredin on October 2, 2017.  (*Id.* at 6.)

Subsequently, Middlecamp moved for contempt, and, in February 2018, the district court found, after an evidentiary hearing, that Fredin had violated the October 2, 2017 HRO.  (Breyer Decl., Ex. 2 (*Middlecamp v. Fredin*, No. 62-HR-CV-19621 (Ramsey Cty. Dist. Ct. Mem. Mar. 6, 2020) ¶ 5.)  Specifically, the court found that Fredin had created five separate websites as a way to "air his grievances" against the persons listed in the names of the websites and to specifically highlight Middlecamp.  (*Id.*)  Each of the websites included a hyperlink to Fredin's federal lawsuit against Middlecamp, along with her home address.  (*Id.*)  In light of the five separate websites, the district court found five separate violations of the October 2, 2017 HRO.  (*Id.*)

16

In March 2019, a jury found Fredin guilty on criminal charges of violating the HRO against Middlecamp.  (*Id.* ¶ 7.)

In a subsequent HRO motion against Fredin in Ramsey County District Court, Middlecamp sought a 50-year HRO, arguing that Fredin had continued to violate the HROs in place.  (*See id.*)  In its memorandum and order granting Middlecamp's request, the court noted that in October 2017, after the issuance of the October 2, 2017 HRO, Fredin had filed a complaint against Middlecamp with the Minnesota Office of Lawyers Professional Responsibility.  (*Id.* ¶ 8.)  The Office of Lawyers Professional Responsibility found that neither an investigation nor discipline was warranted.  (*Id.* ¶ 9.)  In December 2017, Fredin appealed the decision, and also argued that Middlecamp had retaliated against him by filing the motion for contempt which resulted in the February 2018 decision against him. (*Id.* ¶¶ 9–10.)  In January 2018, the Office of Lawyers Professional Responsibility affirmed its prior decision and found that no discipline against Middlecamp was warranted.  (*Id.* ¶ 11.)

In addition, in the ruling granting Middlecamp the 50-year HRO, the Ramsey County District court also noted Fredin's actions in filing the instant federal lawsuit against Middlecamp, as well as the instant lawsuit against Miller and Schaefer, and a state civil lawsuit against Middlecamp which was later administratively closed.  (*Id.* ¶¶ 12–14.)  The court also noted Fredin's numerous filings in the 2019 HRO proceedings, and granted the requested 50-year HRO, which included restrictions on Fredin's ability to sue Middlecamp.  (*Id.* ¶ 21.)

17

### 4.  City Pages Article

As noted earlier, on February 22, 2017, the City Pages weekly news magazine published an article about Fredin.  The article, written by a journalist named Mike Mullen, discussed the efforts of two women to obtain HROs against Fredin:  Schaefer, who was mentioned by name, and an unnamed woman, who, based on the dates and information in the article, was Grace Miller.  (18-cv-466, Breyer Decl., Ex. 3 (City Pages Article) at 1–4.)  The article introduced several communications between Schaefer and Fredin by stating, "[a]s Schaefer would later state in court records and an affidavit, . . ."  (*Id.* at 1.)  Mullen went on to discuss communications from Fredin that Schaefer had described as "very odd," such that she believed it was "not in her best interests to meet him."  (*Id.*)  Mullen stated, "She canceled and told Fredin to stop contacting her."  (*Id.*)  Further, Mullen described messages that Schaefer suspected were from Fredin due to his "unique" writing style and his use of a specific nickname for her, "Cat."  (*Id.* at 1–2.)

Mullen also stated that Schaefer, "exasperated," posted about her experience with Fredin on Facebook, which eventually led to another woman reaching out to her.  (*Id.* at 2.)  Stating, "Schaefer wasn't Fredin's only victim," Mullen described Miller's experience, although she was unnamed, "[i]n a story that, like Schaefer's, would one day be told in court records."  (*Id.*)  Mullen stated that after Miller broke off a relationship with Fredin, "Fredin wasn't having it.  'Nope,' he wrote her, in an exchange later quoted in an appeals court ruling."  (*Id.*)  Further, Mullen stated, "The messages, some sexually suggestive, continued for weeks.  'Get on your knees and think of me,' he wrote, according to the

ruling." (*Id.* at 3.)   Near the end of the article, Mullen again quoted the Minnesota Court of Appeals 2017 ruling, noting its denial of Fredin's appeal of Miller's HRO.  (*Id.* at 4.)

## II.   DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). In considering whether to grant summary judgment, a court must not "weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Thomas v. Corwin*, 483 F.3d 516, 526 (8th Cir. 2007).  While "pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law." *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984).  Therefore, "in order to defeat a properly supported motion for summary judgment," Fredin, like any party opposing summary judgment, "must set forth specific facts showing that there is a genuine issue for trial," *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016), and must not rely on "mere" "speculation" or "conjecture."  *Holaway v. Stratasys, Inc*., 771 F.3d 1057, 1059 (8th Cir. 2014).

Here, Middlecamp moves for summary judgment on Fredin's claims of defamation and intentional infliction of emotional distress ("IIED").[6]  Miller and Schaefer similarly seek summary judgment on all of Fredin's claims, including defamation and IIED, as well

---

[6]     The Court previously dismissed Fredin's claim of abuse of process against Middlecamp.  (Sept. 26, 2018 Order [Doc. No. 39], *adopting* Apr. 13, 2018 R&R [Doc. No. 30].)

as abuse of process, nonconsensual sexual solicitation, negligence, invasion of privacy, and civil conspiracy.[7]

In response, Fredin argues that he has submitted evidence sufficient for his claims to survive summary judgment.[8]  (*See, e.g.*, Pl.'s Opp'n to Summ. J. at 10–25.)  The Court addresses these claims in turn.

## A. Defamation

Under Minnesota common law, to prevail on a defamation claim, a plaintiff must establish that the defendant made "(a) a false and defamatory statement about the plaintiff; (b) in [an] unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community."  *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 873

---

[7]     The Court previously dismissed portions of Fredin's invasion of privacy claims against Miller and Schaefer, denied leave to amend to include a copyright infringement claim, and permitted the deletion of claims of false arrest/imprisonment, malicious prosecution, and "prima facie tort."  (18-cv-466, Oct. 17, 2018 R&R [Doc. No. 38], *adopted*, 18-cv-466, Feb. 21, 2019 Order [Doc. No. 49].)  The remaining claims are defamation, IIED, abuse of process, nonconsensual sexual solicitation, negligence, invasion of privacy, and civil conspiracy.

[8]     In his responses to Defendants' summary judgment motions in both of these actions, Fredin also accuses the parties, their counsel, third parties, and the Court of a variety of misconduct.  (*See, e.g.,* Pl.'s Opp'n to Summ. J. at 1–10.)  Among other things, he lodges accusations at defense counsel regarding counsel's legal name, and, in an apparent reference to the period of Fredin's incarceration on state court stalking-by-mail and HRO violation charges, states that he was "tortured and kidnapped," while the magistrate judge and the undersigned judge on his federal cases "watched and did nothing."  (*Id.* at 2, 4.)  He further contends that if the Court had "stepped in sooner, they could have prevented Minneapolis tactics that killed George Floyd," and that the Court's actions in "failing to address Minneapolis violence" "created the global George Floyd protests."  (*Id.*)  The Court disregards all such statements that are non-responsive to Defendants' motions.

(Minn. 2019) (citing *Weinberger v. Maplewood Review*, 668 N.W.2d 667, 673 (Minn. 2003)).

As to the second element, both absolute and qualified privileges may defeat a defamation claim; however a privilege may be overcome if the plaintiff shows that the statement was made with malice. *Id.* (citing *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 920 (Minn. 2009)). Malice under the common law means that the defendant made the statement "'from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff.'" *Id.* (quoting *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 257 (Minn. 1980)).

As to the third element, in cases of defamation per se, damages are presumed. *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 25 (Minn. 1996). The types of statements that courts have considered to be defamatory per se include "false accusations of committing a crime and false statements about a person's business, trade, or professional conduct." *Maethner*, 929 N.W.2d at 875 (citing *Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn. 1987)). However, in light of the constitutional protections of the First Amendment, "courts cannot offer recourse for injury to reputation at the cost of chilling speech on matters of public concern, which 'occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'" *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)). To strike a legal balance between reputational rights and free speech protections on matters of public concern, *id.* at 875–76, the Minnesota Supreme Court has held that a private plaintiff may not recover presumed damages for defamatory statements involving a matter of public concern, absent a showing

of actual malice.  *Id.* at 878–79.  Proof of actual malice is subject to a stricter standard than common law malice, requiring a showing that the statement was "made with the 'knowledge that it was false or with reckless disregard of whether it was false or not.'"  *Id.* (citing *Weinberger*, 668 N.W.2d at 673 ) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 279–80 (1964)).

### 1.  Statements Attributed to Middlecamp

In the Amended Complaint, Fredin alleges that between January and February 2017, Middlecamp published "over 40 posts on the @CardsAgstHarassment Twitter account about Plaintiff."  (Am. Compl. ¶ 19.)  Although Fredin contends that the "overwhelming majority of these posts contained patently false and defamatory statements" concerning him, the sole statement that he specifically identifies in his defamation claim is a February 22, 2017 statement made in a tweet on the @CardsAgstHarassment Twitter account.  (*Id.* ¶¶ 19–21.)

Middlecamp does not dispute that she made the February 22, 2017 statement, or that she maintained the @CardsAgstHarassment Twitter account.  (*See* Def.'s Mem. Supp. Mot. for Summ. J. at 6.)  The general subject matter of the @CardsAgstHarassment account addressed "subjects of online and real life misogyny, harassment, [and] rape culture."  (*See* Third Breyer Decl. [Doc. No. 204], Ex. 3 [Doc. No. 204-3] (*Middlecamp v. Fredin*, No. 62-HR-CV-17-233 (Pl.'s Req. for Admission) at 13.)  Although Middlecamp was employed by a governmental entity at the time she made February 22 statement, there is no dispute that she made it as a private, non-public person, and without attributing her

22

name or position to the statement.  In his opposition memorandum, Fredin acknowledges that Middlecamp is a non-public figure.  (Pl.'s Opp'n to Summ. J. at 7 n.10.)

To provide context for the February 22, 2017 tweet, the Court first notes Middlecamp's January 24, 2017 tweet, in which she posted three photographs of Fredin taken from online dating websites.  (Fredin Decl., Ex. E (Jan. 24, 2017 tweet).)  Along with the photos, Middlecamp identified Fredin, noted that he had at least two restraining orders against him, and stated, "Please RT [retweet] to help keep women safe."  (*Id.*)  At the time, Miller and Schaefer both had active HROs issued against Fredin.[9]  *See Schaefer*, 2020 WL 1921101, at *1–3; *Miller*, 2019 WL 3293766, at *1.

On February 22, 2017, Middlecamp tweeted on the @CardsAgstHarassment account, "The power of sharing.  Within hours of the stalking post going up, a rape survivor comes forward.  He remains free.  (Shared w/her permission)."  (Pl.'s Opp'n to Summ. J. at 10; Am. Compl. ¶ 20.)  She attached the public Facebook post of a woman (whose name Middlecamp redacted), who alleged that Fredin had raped her seven years earlier, but law enforcement authorities did not prosecute him.  (Am. Compl. ¶ 20.)  In addition, the

---

[9]     In her Motion for Summary Judgment, Middlecamp states that Fredin fails to identify which posts form the basis for his defamation claim.  (Def.'s Mem. Supp. Mot. for Summ. J. at 6.)  She surmises that the January 24, 2017 tweet, quoted above, may form the basis for his claim, along with the February 22, 2017 tweet.  (*Id.*)  However, Fredin did not identify the January 24, 2017 statement in the Amended Complaint, nor does he address it in opposition to Middlecamp's summary judgment motion.  Accordingly, the Court finds that the January 24, 2017 tweet does not form the basis for his defamation claim.  Even if it did, the statement that Fredin was the subject of "at least two HROs" is not a false statement.  *See Maethner*, 929 N.W.2d at 873.  The related comment refers to the true information in the prior sentence, and offers the speaker's opinion that sharing the information will help keep women safe.  The First Amendment protects statements of opinion from defamation claims.  *McKee v. Laurion*, 825 N.W.2d 725, 733 (Minn. 2013).

23

February 22, 2017 tweet included a link to the City Pages story, published that same day, about the HROs that Miller and Schaefer had obtained against Fredin.  (*Id.*)

Fredin contends that the rape allegations are false and defamatory per se.  (*Id.*)  He asserts that Middlecamp "solicited this unnamed woman to make these false allegations against him or, much more likely, Defendant fabricated the existence of this unnamed woman altogether to sensationalize and drum-up attention to her defamatory and harassing series of posts about Plaintiff."  (*Id.*)  And Fredin alleges that to the extent Middlecamp did not fabricate the woman's existence, Middlecamp adopted the woman's allegedly defamatory statements by referring to the woman as a "rape survivor," and referring to Fredin as a man who "remains free."  (*Id.* ¶ 21.)

### a.  Claim of Fabricated Victim

The Court first addresses Fredin's claims that Middlecamp "conjured up" the existence of the rape survivor.  (Pl.'s Opp'n to Summ. J. at 10–11.)  He appears to argue that Middlecamp's possible fabrication of the existence of the rape survivor, and her statement referring to the rape survivor, creates a genuine dispute of material fact as to the falsity of the rape allegation.

### i.  Fredin's Evidence of Fabrication

In support of his claim that Middlecamp "was providing 'unique false information' in an effort to 'fabricate,'" Fredin points to an April 25, 2018 email chain from Middlecamp to attorneys in the St. Paul City Attorney's Office, and Sergeant McCabe, the police investigator assigned to cases involving Fredin, copying Schaefer, Miller, and Defendants'

legal counsel on the emails. (*Id.* at 10) (citing Second Fredin Decl., Ex. A (Apr. 25, 2018 emails)).

The Court first observes that the two emails contain no references to rape, a rape victim, or Middlecamp's February 22, 2017 tweet. In the initial email, sent at 11:38 a.m. on April 25, 2018, Middlecamp sought the guidance of St. Paul Assistant City Attorneys and Sergeant McCabe regarding where to report suspected conduct in violation of Schaefer's HRO against Fredin.[10] (Second Fredin Decl., Ex. A (Apr. 25, 2018 emails).) She informed the attorneys and investigator of an October 2, 2017 text message that Schaefer had received from an unknown person named "Kelli," who addressed Schaefer as "Cat"—a nickname that only Fredin had used in prior text messages. (*Id.*) Middlecamp and Schaefer suspected that Fredin was "Kelli," or had used a third party to send the "Kelli texts," in violation of the HRO. (*Id.*) Middlecamp indicated that previously, someone had contacted Schaefer, explaining that they had been paid $40 to relay a message. (*Id.*)

Middlecamp stated that she and Schaefer discussed strategies to determine whether "Kelli" was, in fact, Fredin. (*Id.*)

> [They] agreed that if Catherine [Schaefer] provided Brock with unique false information he might later include it in a court filing and they would be able to track it to this message exchange. They brainstormed and decided the most believable false information to provide that Brock would be most likely to raise in a legal proceeding would be to fabricate that Lindsey Middlecamp and Referee Elizabeth Clysdale were friendly acquaintances and had been hanging out socially for years. (In reality, Lindsey has never heard of or met

---

[10]    Middlecamp sought guidance regarding the proper jurisdiction in which to report the suspected conduct, noting that Schaefer resided in Hennepin County, Fredin was in Wisconsin, and St. Paul had an existing criminal file on Fredin pertaining to his prior conduct. (Second Fredin Decl., Ex. A (Apr. 25, 2018 emails).)

Referee Clysdale outside of her court appearances in her matter involving Brock Fredin.) Catherine sent a message to that effect on October 3, 2017.

(*Id.*)  In response to the message, Middlecamp stated that "Kelli" feigned ignorance about the names and eventually ceased contact with Schaefer.  (*Id.*)

Middlecamp stated that on April 25, 2018—the same day that Middlecamp sent the email in question—Fredin posted messages on his Twitter account about Referee Clysdale being a "corrupt referee," who is friends with "corrupt litigants."  (*Id.*)  Attached to Fredin's tweet was a screen shot of the same message that Schaefer had sent "Kelli."  (*Id.*)  Based on Middlecamp's belief that the text had never been previously disclosed or posted, she believed that Fredin's tweet of the text screenshot demonstrated that he was, in fact, behind the October 2017 "Kelli texts."  (*Id.*)  She therefore believed that Fredin had violated the HRO that prohibited him from contacting Schaefer.  (*Id.*)

In Middlecamp's subsequent email, sent at 12:47 p.m. that same day, she apologized for her prior email and asked the recipients to disregard it.  (*Id.*)  After having spoken with Schaefer, Middlecamp determined that the screenshot, which Schaefer had provided to the St. Paul Police in the fall of 2017, had also been included in a police report that Fredin had later obtained.  (*Id.*)  Middlecamp explained, "I was operating under the false impression that the only way he could have gotten the message was if he'd had a role in the communications but it sounds like that is not the only possible manner he obtained them and it is not the smoking gun evidence I had believed when I saw it this morning."  (*Id.*)

26

> ii.    **Middlecamp's Evidence Rebutting Claim of Fabrication, Plaintiff's Motion to Strike, and Plaintiff's October 13, 2020 Motion for Rule 11 Sanctions**

In connection with Middlecamp's reply memorandum, and in response to Fredin's claim of a fabricated rape victim, Middlecamp submits three declarations. One declaration is a standard declaration submitted by counsel, attaching copies of two exhibits. (Second Breyer Decl. [Doc. No. 193].) The other two declarations are substantive declarations submitted by Middlecamp [Doc. No. 195] and J.K. [Doc. No. 196], who states that she is the rape victim whose redacted post was included in Middlecamp's February 22, 2017 tweet.[11]

In a separate motion, pursuant to Federal Rule of Civil Procedure 12(f), Fredin moves to strike the Middlecamp Declaration and J.K. Declaration, arguing that they represent "a last-ditch effort" to "attempt to sandbag Plaintiff" with "with[e]ld evidence." (Pl.'s Mot. to Strike [Doc. No. 200] at 1.) Citing Local Rule 7.1(c)(3)(b), Fredin asserts that through these declarations, Middlecamp improperly attempts to raise new issues and evidence in her reply materials. (*Id.* at 3.) He argues that J.K.'s identity was never disclosed at any previous stage, nor was she ever deposed, and she did not physically sign or notarize her declaration. (*Id.* at 6.) Characterizing the documents as "sham declarations," Fredin states that they are inherently prejudicial, and the Court must either strike them or grant Fredin leave to file a surreply to Defendant's summary judgment motion.

---

[11]    The Court refers to the alleged rape victim by her initials.

In a related motion, Fredin moves for Rule 11 sanctions against Middlecamp and her counsel for their alleged "knowingly false statements" and "sandbagging attempts to introduce . . . new issues and evidence in two (2) sham declarations to defeat depositions or cross examination."  (Pl.'s Oct. 13, 2020 Mot. for R. 11 Sanctions [Doc. No. 216] at 1.)

While Federal Rule of Civil Procedure 12(f) provides that a party may move to strike a pleading within 21 days after service, several judges in this District have noted that memoranda and affidavits are not "pleadings," and neither the Federal Rules of Civil Procedure nor this District's Local Rules authorize a party to bring a motion to strike memoranda or affidavits.  *See Carlson Mktg. Grp., Inc. v. Royal Indem. Co.*, Civ. No. 04–CV–3368 (PJS), 2006 WL 2917173, at *2 (D. Minn. Oct. 11, 2006) (citing *Smith v. United HealthCare Servs., Inc.*, No. Civ. 00–1163 (ADM/AJB), 2003 WL 22047861, at *3 n.7 (D. Minn. Aug. 28, 2003); *VanDanacker v. Main Motor Sales Co.*, 109 F. Supp. 2d 1045, 1047 (D. Minn. 2000)).

But more to the point here, the declarations are responsive to Fredin's allegations of fabrication raised in his opposition memoranda.  The Local Rules only prohibit a party from filing a reply memorandum that raises new grounds for relief or presents matters "*that do not relate to the opposing party's response*."  D. Minn. L.R. 7(c)(3)(B) (emphasis added).  In Fredin's opposition memorandum, he asserts that his defamation claim survives summary judgment because Middlecamp "conjured up" and fabricated the rape survivor. (Pl.'s Opp'n to Summ. J. at 10–12.)  The Court finds that the declarations relate to Fredin's response and were not improperly filed in connection with Middlecamp's reply memorandum.

As to Fredin's claim that he will be prejudiced if the Court considers the declarations, the issue regarding the alleged rape is not new.  In his Amended Complaint, Fredin alleges that "Defendant posted on her Twitter account in January 2017 that Plaintiff 'raped' an unnamed woman—a woman that likely does not even exist and was wholly contrived by Defendant."  (Am. Compl. ℙ 2.)   Fredin certainly had the opportunity to timely conduct discovery in this case, including the cross examination of deposition witnesses, but did not do so.  (*See* Oct. 29, 2019 Order at 2–6.)  Moreover, as Middlecamp notes, Fredin identified J.K. in discovery in Middlecamp's HRO case in Ramsey County District Court, and he possesses the online postings in question.  (Third Breyer Decl. [Doc. No. 204], Ex. 1 at Interrog. No. 11, Ex. 2 at Req. No. 5, Ex. 3 at Req. No. 12.)  And, in response to Fredin's arguments about a fabricated rape survivor, Middlecamp notes that in 2017, Fredin appeared to speculate about the identity of the woman on his own Twitter account, referring to "false rape accusations," coming from "women cheating on their fiance's [sic] in consensual intimacy."  (Second Breyer Decl., Ex. 1 (Fredin Facebook Post).)  In his deposition, however, Fredin denied that that comment referred to anyone in particular.  (*Id.*, Ex. 2 (Fredin Dep.) at 170–71.)  Particularly given Fredin's own failure to conduct discovery on this question, there is no basis for a finding of prejudice.

Relatedly, the Court finds no basis for the imposition of Rule 11 sanctions against defense counsel based on the filing of the declarations.  Under Rule 11, a party submitting a pleading, motion, or other written submission "certifies that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances," the submission satisfies the following requirements:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the costs of litigation;
(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).  The Court finds that the declarations here do not violate these requirements, as they were submitted in response to the arguments raised in Fredin's response memorandum.  Accordingly, the Court denies Fredin's October 13, 2020 Motion for Rule 11 sanctions.

As noted, however, Fredin also argues that the Court should not consider the information in J.K.'s Declaration on summary judgment because it was not notarized and not hand-signed.  (Pl.'s Mot. to Strike at 6.)  Both the Middlecamp Declaration and the J.K. Declaration were electronically signed, consistent with the electronic filing rules of this Court, and the Court will not disregard them on that basis.  As to the lack of notarization, this Court has observed that unsworn declarations or affidavits may be considered on summary judgment if they recite some form of the "under penalty of perjury language." *Perez v. Harris*, No. 12-cv-3136 (SRN/FLN), 2015 WL 12990189, at \*1–2 (D. Minn. Jan. 15, 2015) (citing 28 U.S.C. § 1746) (permitting consideration of proof of a matter to be supported by a written, "unsworn declaration" "of such person which is subscribed by him, as true under penalty of perjury and dated," stating, substantially, "'I declare under penalty

of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on (date).'").

In the Middlecamp Declaration, she states, "I declare under the penalty of perjury that the foregoing is true and correct.  Executed this 3rd day of September, 2020 at Duluth, Minnesota," and she electronically signed the document.  (Middlecamp Decl. at 2.)  This declaration meets the requirements of the law and the Court will consider it in support of Middlecamp's summary judgment motion.  However, J.K.'s Declaration contains no such "under penalty of perjury" statement and the Court will not consider it on summary judgment, as it is an unsworn, un-notarized statement.  *See* 28 U.S.C. § 1746; *Perez*, 2015 WL 12990189, at *1–2.

Again, because the Court finds that a motion to strike is not the appropriate means to preclude consideration of these declarations, Fredin's motion is denied in part with respect to the Middlecamp Declaration, and denied as moot in part, with respect to the J.K. Declaration, which the Court declines to consider.

### iii. Analysis of Allegation of Fabrication

Based on the evidence in the record, the Court finds that there is no disputed issue of material fact as to whether the person to whom Middlecamp referred as "a rape survivor" in her February 22, 2017 tweet was a real person, as opposed to a fabrication.  Middlecamp states that on February 22, she saw a public Facebook post made by a person unknown to her, who accused Fredin of rape.  (Middlecamp Decl. ⁋ 1.)  She contacted the person via Facebook and offered to connect her with a rape survivor support group.  (*Id.*)  In addition, the person who posted the Facebook post asked Middlecamp to share her story with others.

31

(*Id.*)  Middlecamp then redacted identifying information from the Facebook post, which she shared in the February 22, 2017 tweet, because she "believe[ed] in the veracity of the allegation and believe[ed] it was important to share as a matter of public concern."  (*Id.*)

Middlecamp's April 25, 2018 emails do not support Fredin's claim that Middlecamp "fabricated" the existence of a rape survivor in February 2017.  Middlecamp contacted authorities for guidance on where to report conduct that she reasonably believed had violated the HRO, but she retracted her email within little more than an hour, once she learned that Fredin's April 25, 2018 tweet did not conclusively support her suspicions of violative conduct.  (Second Fredin Decl., Ex. A (Apr. 25, 2018 emails).)  The two emails have nothing to do with rape allegations.  Fredin makes much of the fact that Middlecamp states that she and Schaefer supplied "Kelli" with false information, but the emails make clear that they did so in order to determine whether Fredin was behind the "Kelli texts," in violation of Schaefer's HRO.  (*Id.*)  The April 25, 2018 emails have no bearing on the question of whether, in February 2017, Middlecamp fabricated the existence of a rape victim.

Again, in order to survive a motion for summary judgment, a plaintiff must not rely on "mere" "speculation" or "conjecture," *Holaway*, 771 F.3d at 1059, but must submit "specific facts showing that there is a genuine issue for trial."  *Ingrassia*, 825 F.3d at 896. Setting aside the April 25, 2018 emails, which are not relevant to the question of a fabricated rape allegation and which Fredin obtained through a Data Practices Act request, Fredin conducted no discovery regarding the February 22, 2017 rape allegation or Middlecamp's republication of the posting.  The Court finds that there is no disputed issue

32

of material fact as to whether Middlecamp fabricated the existence of the rape victim. Accordingly, the Court turns to the question of whether the February 22, 2017 statement is defamatory.

### b. February 22, 2017 Statement

Again, Middlecamp's February 22, 2017 tweet stated, "The power of sharing. Within hours of the stalking post going up, a rape survivor comes forward. He remains free. (Shared w/her permission)." (Pl.'s Opp'n to Summ. J. at 10; Am. Compl. ¶ 20.) Middlecamp attached to her tweet a February 22, 2017 Facebook post from J.K., who was not identified, in which J.K. posted a link to the City Pages article, which included Fredin's photo, and stated, "This man raped me 7 years ago. The St. Louis Park police didn't take me seriously then, but I hope they will see now that he is a predator. . . . I resent the fact that the police let my case drop. It would have spared his future victims from the heartache and trauma they are most certainly enduring now." (Am. Compl. ¶ 20.) The City Pages article came out on February 22, 2017. (18-cv-466, Breyer Decl., Ex. 3 (City Pages article).)

Fredin claims that Middlecamp's February 22, 2017 tweet was defamatory per se. Although Fredin argues that he suffered harm in the form of lost employment, financial opportunities, and emotional harm, (*see* Am. Compl. ¶¶ 9, 22), he presents no evidence of damages, including reputational harm, in opposition to Middlecamp's summary judgment motion. Because emotional harm damages alone are insufficient to sustain a defamation claim, absent harm to reputation, *Richie*, 544 N.W.2d at 28, Fredin's defamation claim fails

as a matter of law unless he can recover presumed damages.[13] *Maethner*, 929 N.W.2d at 875 (noting that where the plaintiff testified that he did not know whether the statements had impacted his reputation, nor could he name anyone who thought ill or less of him because of the statements, his defamation claim could only survive if he established presumed damages).

The Court first considers Middlecamp's statement that "a rape survivor comes forward," while "he remains free." (Pl.'s Opp'n to Summ. J. at 10; Am. Compl. ⁋ 20.) Again, courts have recognized that a false accusation of criminal conduct may be considered defamatory per se. *Maethner*, 929 N.W.2d at 875 (citing *Becker*, 401 N.W.2d at 661). Given that Middlecamp was commenting on J.K.'s allegation ("a rape survivor comes forward") and knew that Fredin was not incarcerated at that time ("he remains free"), her statement was not false. Accordingly, that statement, strictly construed, was not defamatory.

### i.      Matter of Public or Private Concern

Construing Middlecamp's statement and the republished allegation from J.K.'s Facebook post to state that Fredin committed rape, there is no evidence that J.K.'s

---

[13]      In opposing summary judgment on his defamation claims in both cases, Fredin relies on four cases in which courts denied summary judgment on defamation claims. (Pl.'s Opp'n to Summ. J. at 9 (citing *Moritz v. Town of Warwick*, No. 15-cv-5424 (NSR), 2017 WL 4785462 (S.D.N.Y. Oct. 19, 2017); *Daly v. N.Y. Life Ins. Co.*, No. 1:12cv125, 2017 WL 4349032 (S.D. Ohio Sept. 30, 2017); *Wenz v. Becker*, 948 F. Supp. 319 (S.D.N.Y. 1996); *Metcalf v. KFOR-TV, Inc.*, 828 F. Supp. 1515 (W.D. Okla. 1992); 18-cv-466, Pl.'s Opp'n to Summ. J. at 15 (citing same authority)). None of these cases arise under Minnesota law, none are controlling legal authority, and Fredin fails to discuss how they apply to the facts of his case.

statement was false. While Fredin was not charged with rape, as J.K. acknowledges, that does not necessarily render the allegation false.

But assuming the statement is considered defamatory per se, as Fredin argues, that does not end the analysis. As noted earlier, "a private plaintiff may not recover presumed damages for defamatory statements involving a matter of public concern unless the plaintiff can establish actual malice." *Maethner*, 929 N.W.2d at 878–79. In *Maethner*, the Minnesota Supreme Court ruled that the question of whether the subject of the speech was one of public concern should be remanded to the district court to determine "in the first instance." *Id.* at 881 (citing *Capistrant v. Lifetouch Nat'l Sch. Studios, Inc.*, 916 N.W.2d 23, 31 (Minn. 2018) (remanding to the district court, which had not made any findings on materiality, to decide whether the occurrence of a condition precedent was material to the disputed agreement)). Therefore, even assuming that the statement was defamatory per se, the Court must determine whether the subject of the statement was one of public or private concern. *Id.*

The determination of whether speech involves a matter of public or private concern depends upon the totality of the circumstances. *Id.* Courts must examine the content, form, and context of the speech, "'as revealed by the whole record.'" *Id.* at 880 (quoting *Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)). Specifically, courts are to evaluate "'what was said, where it was said, and how it was said.'" *Id.* (quoting *Snyder*, 562 U.S. at 454).

As to content, the Supreme Court has stated that speech addresses matters of public concern "when it can be fairly considered as relating to any matter of political, social, or

other concern to the community" or when the subject is "of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453.

For instance, if the speech concerns "a subject of legitimate news interest," it may indicate that it is a subject of public concern. *Id.* (citation omitted); *see also Bowman v. Pulaski Cty. Special Sch. Dist.*, 723 F.2d 640, 644 (8th Cir. 1983) (observing that "media coverage" is a good gauge of public interest). In contrast, where speech is "solely in the individual interest of the speaker and its specific business audience," it does not involve an issue of public concern. *Dun & Bradstreet*, 472 U.S. at 761–62 (finding that a credit report about a construction contractor that was only made available to five subscribers did not involve a public issue). In *Maethner*, the Minnesota Supreme Court noted that in prior defamation cases brought by private citizens, it had found the following speech content— which occurred in a "news" related context—to address matters of public concern: (1) a radio news report about a felony arson trial and the out-of-court activities of the defendant, 929 N.W.2d at 880 (citing *Jacobson v. Rochester Commc'ns Corp.*, 410 N.W.2d 830, 836 n.7 (Minn. 1987)); and (2) a discussion on a nationally syndicated television show about the sexual abuse of children by their parents and the available legal remedies to the child. *Id.* (citing *Richie*, 544 N.W.2d at 26).

The content of the speech here addressed harassment and rape, and more specifically, the subject of women coming forward to share their experiences in this regard. (Pl.'s Opp'n to Summ. J. at 10; Am. Compl. ⁋ 20.) The form of the speech, on a public Twitter account, was not confined to a limited audience. While the @CardsAgstHarassment Twitter account is not a traditional news entity, it is publicly

available, unlike the credit reports in *Dun & Bradstreet*, and more like a traditional news source, such as the radio news report in *Rochester Communications*. Moreover, the tweet was responsive, at least in part, to the news article published in City Pages that same day about Fredin's harassment of Miller and Schaefer.

Viewing all of these factors in totality, the Court finds that the February 22, 2017 statement addressed a matter of public concern. The overall subject of the statement—sexual harassment and rape—is a topic of public interest to society at large, rather than simply a matter of private concern. In addition, the statement was posted on the @CardsAgstHarassment Twitter account, a publicly available platform that regularly addressed issues of harassment and violence against women. The statement also coincided with the City Pages news article, published that same day, discussing Fredin's harassment of Miller and Schaefer.

### ii.    Actual Malice

Again, where a statement addresses a matter of public concern, a private plaintiff may not recover presumed damages unless he can establish actual malice. *Maethner*, 929 N.W.2d at 878–79. Proof of actual malice is subject to a stricter standard than common law malice, requiring a showing that the statement was "made with the 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (citing *Weinberger*, 668 N.W.2d at 673) (quoting *Sullivan*, 376 U.S. at 279–80).

Here, after reading J.K.'s Facebook post, Middlecamp contacted J.K. (Middlecamp Decl. ¶ 1.) She offered J.K. contact information for a rape survivor support group, to which J.K. was receptive. (*Id.*) After contacting J.K., and prior to sharing the Facebook post on

the @CardsAgstHarassment Twitter account, for which she had received J.K.'s permission, Middlecamp states that she believed both in the veracity of J.K.'s allegation, and that it was important to share the information as a matter of public concern.  (*Id.*)

Moreover, Middlecamp's contemporaneous statement to Sergeant McCabe about her motivation in posting the earlier January 2017 tweet was that she did it to warn other women, given her knowledge of the two HROs against Fredin at that time, and that he was "continuing to use a fake name on dating applications."  (Second Fredin Decl., Ex. G (Feb. 6, 2017 email) at 33.)

Against Middlecamp's evidence that she reached out to J.K. and believed in J.K.'s truthfulness prior to making the February 22 tweet, and that her earlier post was made in order to protect women, the Court finds that Fredin's purported evidence of actual malice fails to create a disputed question of material fact.  In addition to his argument that the rape allegation involved a fabricated victim—which is belied by the record—Fredin seeks to establish actual malice through Middlecamp's communications with attorneys in the Minneapolis City Attorney's Office, the St. Paul Attorney's office, and with Sergeant McCabe.  (Pl.'s Opp'n to Summ. J. at 11) ("Defendant used her false rape allegation maliciously to vindictively prosecute Plaintiff by self-dealing within her own office.") (citing Fredin Decl., Ex. A (Jan. 24, 2017 email); Second Fredin Decl., Ex. A (Apr. 25, 2018 emails)).  The communications to which Fredin refers are: (1) a January 24, 2017 email from Middlecamp to an attorney in the Minneapolis City Attorney's Office, (Fredin Decl., Ex. A (Jan. 24, 2017 email)); and (2) the April 25, 2018 emails from Middlecamp primarily to Sergeant McCabe and an attorney in the St. Paul City Attorney's Office,

copying Schaefer, Miller, and their attorneys. (Second Fredin Decl., Ex. A (Apr. 25, 2018 emails).)

In the January 24, 2017 email, Middlecamp asked an attorney in the Minneapolis City Attorney's Office for a referral to the attorney's counterpart in the St. Paul City Attorney's Office. (Fredin Decl., Ex. A (Jan. 24, 2017 email).) She stated that she had "a friend" (Schaefer) who had received an HRO against Fredin, after which Fredin registered and launched a website that portrayed the woman as a stalker and sexual predator. (*Id.*) Middlecamp also referred to the recently-issued Minnesota Court of Appeals opinion, *Miller*, 2017 WL 280974, in which the court upheld the issuance of Miller's HRO against Fredin. (*Id.*) Middlecamp expressed concern that Fredin might escalate his behavior against Schaefer or other women. (*Id.*) She further noted that journalists from City Pages and Minnesota Public Radio had contacted Schaefer about her experiences with Fredin. (*Id.*) Middlecamp believed that the reported narrative would be that "St. Paul is doing nothing to protect [the women]." (*Id.*) Also, Middlecamp forwarded the Minnesota Court of Appeals decision, so that prosecutors in St. Paul might "have more confidence in the need to pursue [Fredin]." (*Id.*)

This email does not relate to the rape allegation. It makes no reference to rape whatsoever, but merely forwards a legal opinion to a colleague and investigator already assigned to cases involving Fredin, and suggests that the St. Paul Attorney's Office might want to take a another look at their investigations into Fredin in light of similar behavior discussed in the Minnesota Court of Appeals opinion. (*Id.*) Nothing about this document supports a finding that Middlecamp knew about the rape allegation at that time, knew that

her February 22, 2017 statement was false, or that she made that statement with reckless disregard for its truth or falsity. As such, the January 24, 2017 email fails to create a disputed issue of material fact as to actual malice.

The April 28, 2018 emails, discussed earlier regarding Fredin's claim of a fabricated rape survivor, also fail to raise a disputed issue of material fact concerning malice. These emails about the "Kelli texts," and Middlecamp's suspicion that Fredin was violating one of the HROs, have nothing to do with the rape allegation, or rape allegations in general. (Second Fredin Decl., Ex. A (Apr. 28, 2018 emails).) Again, to the extent that Middlecamp and Schaefer provided "Kelli" with false information to determine whether Fredin was behind the texts, they did not falsely accuse him of a crime, much less the crime of rape. (*Id.*) Rather, their actions were aimed at obtaining proof that Fredin had violated the HRO that Schaefer had obtained. (*Id.*) And, when Middlecamp determined that Fredin could have obtained the information elsewhere, she quickly retracted her earlier email. (*Id.*) The Court thus finds that the April 28, 2018 emails do not create a disputed question of material fact that Middlecamp either knew that her February 22, 2017 statement was false or that she made the statement with reckless disregard for whether it was true or false. Accordingly, the Court finds that there is no disputed issue of material fact regarding malice.

In sum, the Court finds that the statements in question attributed to Middlecamp were not false, Fredin presents no evidence of damages, and emotional harm is insufficient, on its own, to sustain a defamation claim. *Richie*, 544 N.W.2d at 27. Moreover, to the extent that Fredin alleges defamation per se, there is no disputed issue of material fact

regarding actual malice.  *See Maethner*, 929 N.W.2d at 878–79.  Accordingly, his claim against Middlecamp for defamation per se likewise fails as a matter of law.

### 2.   Statements Attributed to Miller and Schaefer

In Fredin's defamation claims against Miller and Schaefer, he alleges that they provided "false and legally untenable" statements to the City Pages reporter who authored the February 22, 2017 article about Fredin.  (18-cv-466, Am. Compl. ⁋ 38 [Doc. No. 53].)  He asserts that none of the statements were verified and were "patently false and defamatory per se," as they accused him of committing the crime of stalking.  (*Id.* ⁋⁋ 38, 44.)  Fredin also alleges that Miller and Schaefer "published and continue[] to publish these false statements to numerous individuals on an analogous Twitter account and the City Pages tabloid."  (*Id.* ⁋ 45.)

### a.   Statements Allegedly Made to City Pages Reporter

Fredin identifies the following statements from the City Pages article in support of his claim of "defamation per se":

(1) "Before they met in person, Fredin sent a series of 'very odd' and intense texts.  Schaefer decided a meeting was 'not in her best interests.'"

(2) "[Defendant Schaefer] canceled and told Fredin to stop contacting her."

(3) "Over the next two years, she was contacted dozens of times by unfamiliar cell phone numbers and online dating profiles.  In longer communiques, Schaefer recognized Fredin's 'unique' writing style, she wrote in the affidavit.  Other messages just said, 'Hi Cat.'  No one else called her that."

(4) "Exasperated, Schaefer took to Facebook, detailing how a guy she'd never met was haunting her.  A friend shared her post.  Another Twin Cities woman soon reached out.  Schaefer wasn't Fredin's only victim."

(5) "The messages, some sexually suggestive, continued for weeks."

(6) "Schaefer's evidence of unwanted contact through the years was overwhelming."

(*Id.* ¶ 38.)

Miller and Schaefer move for summary judgment, arguing that they did not make the statements in question directly to the City Pages reporter.  (18-cv-466, Defs.' Mem. Supp. Mot. for Summ. J. [Doc. No. 172] at 11.)  Rather, they contend, the statements were taken verbatim, or nearly verbatim, from an HRO affidavit that Schaefer had filed in state court, and from other HRO-related court records and rulings.  (*Id.*)  Relatedly, Miller and Schaefer contend that because the statements were taken from court documents, they are protected by an absolute litigation privilege that extends to publications that bear some relation to a judicial proceeding.  (*Id.* at 11–12) (citing *Mahoney & Hagberg v. Newgard*, 729 N.W.2d 302, 306 (Minn. 2007)).  In addition, they argue that the statements in question are statements of opinion that are protected under the First Amendment, are true statements, which are not subject to defamation liability, or are supportable interpretations of ambiguous circumstances that are not provably false.  (*Id.* at 11–13) (citing *Hunt v. Univ. of Minn.*, 465 N.W.2d 88, 93 (Minn. Ct. App. 1991); *Stuempges,* 297 N.W.2d at 255; *Hunter v. Hartman*, 545 N.W.2d 699, 707 (Minn. Ct. App. 1996)).

### i.    Analysis of the Statements

First, it is undisputed that Miller and Schaefer were not the authors of the City Pages article—it was written by journalist Mike Mullen.  (*See* 18-cv-466, Breyer Decl., Ex. 3 (City Pages Article) at 1 (listing Mullen in the byline); 18-cv-466, Am. Comp. ¶ 40

(containing an excerpt from an email allegedly sent by Mullen to Fredin, seeking Fredin's input on the forthcoming article, and stating that Mullen was the writer of the article).) Defendants assert that they did not directly make the statements in question to the City Pages reporter.  (18-cv-466, Defs.' Mem. Supp. Mot. for Summ. J. at 11–13; 18-cv-466, Defs.' Reply [Doc. No. 184] at 3–4.)   The Court examines the statements in question.

As to the statement about "very odd" texts, and Schaefer's determination that meeting Fredin would "not be in her best interest," the Court has already ruled that this statement is not defamatory, as it expresses a mere opinion that cannot be proven true or false, describing the nature of the texts and offering an opinion about what was in Schaefer's best interest.  (18-cv-466, Oct. 17, 2018 R&R [Doc. No. 38] at 11, *adopted*, 18-cv-466, Feb. 21, 2019 Order [Doc. No. 49].)   Moreover, the preceding sentence in the City Pages article expressly referenced Schaefer's HRO affidavit.  (18-cv-466, Breyer Decl., Ex. 3 (City Pages Article) at 1) ("As Schaefer would later state in court records and an affidavit . . .").   Schaefer's HRO application and affidavit contain the very same language.  (18-cv-466, Breyer Decl., Ex. 2 (Schaefer HRO Aff.) at 22[14]) ("After that, several very odd texts came in from Brock—I don't specifically recall their content, but they were enough to make me decide that meeting this person was not in my best interest.").

And while the Court finds that this statement is not susceptible to be proven true or false, as it expresses an opinion, *see Hunter*, 545 N.W.2d at 706–07, in the Ramsey County

---

[14]    The Court's page citations to the Schaefer HRO Affidavit, 18-cv-466 Breyer Declaration, Ex. 2 [Doc. No. 173-2]), are to the page numbers that appear at the top of the ECF banner, as opposed to the internal page numbers.

District Court's May 22, 2018 Order granting Schaefer's motion to show cause for contempt, the court made a factual finding that Schaefer had received several "'very odd texts'" and "decided [that] meeting [Fredin] would not be in her best interest." (18-cv-466, Breyer Decl., Ex. 1 (*Schaefer v. Fredin*, No. 62-HR-CV-16-411 (Ramsey Cty. Dist. Ct. May 22, 2019) Order ⁋ 2.)  In sum, the statement is not "false."

Fredin next points to the following statement in the City Pages article, which he attributes to Schaefer:  "'[Defendant Schaefer] canceled [plans to meet] and told Fredin to stop contacting her.'"  (18-cv-466, Am. Compl. ⁋ 38) (quoting City Pages article).  Indeed, Schaefer's HRO affidavit submitted in Ramsey County District Court states that after meeting Fredin online in 2014, they had planned to meet in person, but she decided that she did not want to meet him, and told him not to contact her.   (18-cv-466, Breyer Decl., Ex. 2 (Schaefer HRO Aff.) at 22.)

As to whether the statement is false, the Ramsey County District Court found that Schaefer had messaged Fredin, telling him that she was no longer interested, and that he should not contact her again.  (18-cv-466, Breyer Decl., Ex. 1 (*Schaefer v. Fredin*, No. 62-HR-CV-16-411 (Ramsey Cty. Dist. Ct. May 22, 2019) Order ¶ 2.)  Statements to this effect are also found in the Minnesota Court of Appeals' ruling affirming Schaefer's 50-year HRO against Fredin.  *Schaefer*, 2020 WL 1921101, at *1 ("Schaefer sent him a message not to contact her again.  Fredin and Schaefer did not meet in person until after Schaefer started legal proceedings in Minnesota to obtain an HRO.").  At the very least, the content of Schaefer's statement is "substantially true," as a "supportable interpretation" of an

ambiguous underlying situation, and as such, is protected by the First Amendment. *Hunter*, 545 N.W.2d at 707 (citations omitted).

Another allegedly defamatory statement from the City Pages article that Fredin attributes to Schaefer is the following: "'Over the next two years, [Schaefer] was contacted dozens of times by unfamiliar cell phone numbers and online dating profiles. In longer communiques, Schaefer recognized Fredin's 'unique' writing style, *she wrote in the affidavit*. Other messages just said, 'Hi Cat.' No one else called her that.'" (18-cv-466, Am. Compl. ⁋ 38) (quoting City Pages article) (emphasis added). Not only does the quoted language from the article refer *directly to Schaefer's affidavit*, the affidavit, in fact, states that in the months following their initial contact, Schaefer received texts and messages from other dating sites that appeared to be from Fredin, based on Fredin's "unique way of writing that would alert me that it was him, or he would call me Cat or Catherine, when I went by a different nickname in social and professional spheres." (18-cv-466, Breyer Decl., Ex. 2 (Schaefer HRO Aff.) at 22–23.) Schaefer provided examples of the dates and greetings on the texts, including several that stated, "Hi Cat." (*Id.* at 23.) The Court finds that here too, the information supporting the statement in the City Pages article that Fredin attributes to Schaefer is also found in her HRO affidavit in state court.

Moreover, as to whether the statement is false, the Ramsey County District Court made factual findings that "[Schaefer] continued to receive unwanted texts and messages from other profiles on other sites 'that seemed to be from Brock'" and that she suspected the messages were from Fredin because he would call her Cat or Catherine, when she used a different nickname with others. (18-cv-466, Breyer Decl., Ex. 1 (*Schaefer v. Fredin*, No.

45

62-HR-CV-16-411 (Ramsey Cty. Dist. Ct. May 22, 2019) Order ¶¶ 4, 6.)  Again, not only has the content of the statement been accepted as true in the state court's factual findings, but it is also a supportable interpretation of an ambiguous underlying situation, i.e., the identity of the sender of texts and other messages.  *Hunter*, 545 N.W.2d at 707.

Fredin also alleges that the following statement from the City Pages article, which he apparently attributes to Miller, is defamatory: "'The messages, some sexually suggestive, continued for weeks.'"  (18-cv-466, Am. Compl. ¶ 38) (quoting City Pages article).  The portion of the City Pages article that describes "sexually suggestive" texts refers to the text messages that were quoted in the Minnesota Court of Appeals' 2017 decision, in which Fredin texted Miller that she needed to "get down on her knees."  *Miller*, 2017 WL 280974, at *1.  The language in those texts is certainly subject to an interpretation as "sexually suggestive."  *Hunter*, 545 N.W.2d at 707.   Moreover, describing something as "sexually suggestive" is an opinion, not a defamatory statement.  *Hunt*, 465 N.W.2d  at 93.  In addition, in reciting the language from those texts in support of the HRO and in affirming the HRO, *Miller*, 2017 WL 280974, at *1, the state courts did not dispute the content, frequency, or origin of those text messages.

Fredin also contends that the following statement from the article is likewise defamatory: "'Schaefer's evidence of unwanted contact through the years was overwhelming.'"  (18-cv-466, Am. Compl. ¶ 38) (quoting City Pages article).  In her HRO affidavit Schaefer describes Fredin's "two and a half year history of harassing and defaming me," (18-cv-466, Breyer Decl., Ex. 2 (Schaefer HRO Aff.) at 13), and provides details regarding numerous actual or suspected unsolicited contacts by Fredin.  (*Id.* at 9,

46

13–17, 21–22.)  The Ramsey County District Court made a finding of fact in support of

Schaefer's motion for contempt, that for two and a half years, Fredin had made "repeated

and unwanted contacts, internet, and social media posts by [Fredin]."  (18-cv-466, Breyer

Decl., Ex. 1 (*Schaefer v. Fredin*, No. 62-HR-CV-16-411 (Ramsey Cty. Dist. Ct. May 22,

2019) Order ⁋ 2.)  Schaefer's affidavit and the district court's findings support Mullen's

characterization of "unwanted contact" in the City Pages article as a supportable

interpretation of the underlying circumstances.  *Hunter*, 545 N.W.2d at 707.  Moreover,

the word "overwhelming" is a statement of opinion, which is not capable of being proved

true or false, and does not imply a defamatory factual assertion.  *Hunt*, 465 N.W.2d at 93.

Fredin also asserts that the following statement from the City Pages article, which

he attributes to Schaefer, is defamatory: "'Exasperated, Schaefer took to Facebook,

detailing how a guy she'd never met was haunting her.  A friend shared her post.  Another

Twin Cities woman soon reached out.  Schaefer wasn't Fredin's only victim.'"  (18-cv-

466, Am. Compl. ⁋ 38 ) (quoting City Pages article).  The Court has already determined

that the characterization of Fredin and/or his actions as "haunting" is a protected statement

of opinion, not fact.  (18-cv-466, Oct. 17, 2018 R&R at 11) (citing *Hunt*, 465 N.W.2d at

93), *adopted*, 18-cv-466, Feb. 21, 2019 Order [Doc. No. 49]).)

As to the statement that Schaefer had turned to Facebook and found others who had

similar experiences with Fredin, this is a description of Schaefer's actions.  In her HRO

application and affidavit, Schaefer stated, "I had seen other women post his picture in a

group on Facebook, so I wanted to find out by word of mouth if there was anyone else he

was bothering in hopes of getting help.  I wanted to see if they had any solutions in

Minneapolis, or if a case had already been established, since Pennsylvania police were telling me that the fact that we never met meant I could not take advantage of any protection laws in this state." (18-cv-466, Breyer Decl., Ex. 2 (Schaefer HRO Aff.) at 16.) She further stated, "I knew that Brock had filed false claims against another woman who suffered his harassment after she rejected him." (*Id.* at 22.) The information in the state court HRO affidavit thus supports the City Pages statement that Fredin attributes to Schaefer. Moreover, the alleged statement about "other victims" is not a false statement, because in addition to Schaefer, at the time of the publication of the City Pages article, Miller had obtained an HRO against Fredin. *Miller*, 2019 WL 3293766, at *1. As such, all of the components of this statement are substantially true, supportable interpretations of the underlying circumstances. *Hunter*, 545 N.W.2d at 707.

In sum, the Court finds that these statements can be traced to Schaefer's HRO affidavit or to the 2017 Minnesota Court of Appeals decision in *Miller*, 2017 WL 280974. In addition to the need to raise a genuine issue of material fact as to defamatory content—which Fredin has not done—in order to survive summary judgment, he must offer some evidence, sufficient to at least create a disputed issue of material fact, that Defendants made the allegedly defamatory statements to the City Pages reporter. *See Maethner*, 929 N.W.2d at 873 (noting that, as elements of a defamation claim, the plaintiff must establish that the defendant made the false and defamatory statement about the plaintiff in an unprivileged communication to a third party). It is insufficient, on summary judgment, for a plaintiff to rely on mere allegations and speculation. *Holaway* 771 F.3d at 1059.

### ii.    Fredin's Evidence in Opposition

Fredin states that he "discovered new evidence that negates and undermines" Defendants' position that the statements in question were taken from public court records. (18-cv-466, Pl.'s Opp'n to Summ. J. [Doc. No. 188] at 11.)  He contends that Miller and Schaefer "solicited reporter contact," pointing to an email from Miller to Sergeant McCabe that included the reporter's email address.  (*Id.* at 11–12)  Also, Fredin asserts that Miller and Schaefer made "direct contact to the reporter flowing through Lindsey Middlecamp who was Facebook friends with the reporter."  (*Id.* at 12.)  Further, Fredin contends that Miller and Schaefer demonstrated this direct contact to reporters "flowing through" Middlecamp "when they stated they were being 'contacted' by 'journalists' with '*MPR*' and '*City Pages*.'"  (*Id.*) (citing 18-cv-466, Fredin Decl. [Doc. No. 181], Ex. A (Jan. 24, 2017 email)).  Fredin also relies on the April 25, 2018 emails from Middlecamp, discussed earlier, in which she noted that she and Schaefer had discussed how to provide "unique false information" to Fredin in order to gather evidence showing that he was violating Schaefer's HRO.  (*Id.*) (citing Second Fredin Decl., Ex. A (Apr. 25, 2018 emails)). Finally, Fredin suggests that Schaefer "tacitly suggested" the use of the word "stalker" in the City Pages headline, pointing to Middlecamp's January 24, 2017 email to her colleague at the Minneapolis City Attorney's Office in which she described Fredin's conduct that led to Schaefer's HRO as "stalking."  (*Id.* at 13.)

### iii.    Analysis of Fredin's Evidence

None of Fredin's "new evidence" addresses the relevant question of whether Miller and Schaefer themselves made the allegedly defamatory statements that Fredin has

identified.  The email in which Miller purportedly "demonstrated her direct contact with Mike Mullen" is an April 21, 2017 email chain between Miller and Sergeant McCabe.  (18-cv-466, Second Fredin Decl. [Doc. No. 182], Ex. E (Apr. 21, 2018 emails).)  This email chain began with Miller reporting to Sergeant McCabe that Fredin had posted several online "comments" in response to the City Pages article in which he addressed Miller by name and military rank, and accused both Miller and Schaefer of criminal activity.  (*Id.*)  In response, Sergeant McCabe asked Miller whether she knew if City Pages had been editing the online comments for the article.  (*Id.*)  Miller replied, stating that she had emailed Mullen the previous night, asking him to remove the comments.  (*Id.*)  Sergeant McCabe then asked Miller for the writer's email address, stating that he would ask for the comments feature to be closed.  (*Id.*)  Miller then provided Mullen's email address to Sergeant McCabe.  (*Id.*)

Nothing about these email communications shows a disputed question of material fact that Miller and Schaefer made the statements in question to Mullen for publication in the City Pages article.  This evidence merely shows that Miller possessed Mullen's email address and had communicated with him about Fredin's comments to the article, after it was published.  (*See id.*)  Under Fredin's logic, Fredin himself could have provided the statements in the City Pages article, since he also possessed Mullen's email address.  (18-cv-466, Am. Compl. ¶ 40) (alleging in the Amended Complaint that Mullen reached out to Fredin via email, seeking his input prior to publication of the article).  Merely because Miller had Mullen's email address in April 2017 does not demonstrate a disputed issue of

material fact as to whether she made the statements in question to Mullen for publication in the February 2017 article.

Nor does Fredin's evidence of so-called "direct contact" to Mullen "flowing through Middlecamp" demonstrate a disputed issue of material fact.  The notion of "contact" "flowing through" another person is hardly "direct contact," but in any event, in Middlecamp's January 24, 2017 email to her colleague at the Minneapolis City Attorney's Office, she stated, "I'm also aware my friend is being contacted by journalists with MPR and City Pages about her experiences with this man and other women's restraining orders and issues with him."  (18-cv-466, Fredin Decl., Ex. A (Jan. 24, 2017 email).)  This statement merely indicates that Middlecamp's unnamed "friend" had been contacted by a City Pages journalist.  Again, Fredin himself was contacted by a City Pages journalist. (18-cv-466, Am. Compl. ¶ 40.)  Middlecamp's reference to her unnamed friend being contacted by a City Pages reporter does not create a disputed issue of material fact that Miller or Schaefer themselves made the statements in question to the journalist.

Also, Fredin's speculation that Schaefer "tacitly solicited" the use of the word "stalker" in the City Pages headline is not supported by any evidence sufficient to create a disputed question of material fact that she directly conveyed that phrase to Muller—nor is it alleged in Fredin's Amended Complaint as one of the statements supporting his defamation per se claim.  (*See* 18-cv-466, Pl.'s Opp'n to Summ. J. at 1318-cv-466; *see also* Am. Compl. ¶ 38.)  Fredin again points to Middlecamp's January 24, 2017 email to her colleague, discussed directly above, in which she stated that following a hearing in Schaefer's HRO proceedings, Fredin "launched a website referring to her by full name as

51

a stalker and sexual predator[.]"  (18-cv-466, Fredin Decl., Ex. A (Jan. 24, 2017 email).)
But Middlecamp authored the email, not Miller or Schaefer.  This evidence is far too
attenuated to create a disputed question of material fact for the jury regarding whether
Miller or Schaefer directly made the statements in question to Mullen.  Given the language
in the article, which expressly references and quotes Schaefer's HRO affidavit as well as
the Minnesota Court of Appeals ruling, Fredin presents no evidence in opposition that is
relevant to this issue.  Again, Fredin conducted no discovery from Defendants on any of
his defamation claims, and his speculation fails to defeat summary judgment.  *Holaway*,
771 F.3d at 1059.

### b. Statements Made on Twitter

Finally, regarding Fredin's allegation in the Amended Complaint that Defendants
have also published "these false statements to numerous individuals on an analogous
Twitter account," (18-cv-466, Am. Compl. ¶ 45), he fails to identify the Twitter posts in
question.  For all of the foregoing reasons, Miller and Schaefer are entitled to summary
judgment on Fredin's defamation claims.[16]

---

[16]     While Miller and Schaefer also argue, on summary judgment, that an absolute
litigation privilege applies to the statements that originate in Schaefer's state court HRO
affidavit and the January 2017 Minnesota Court of Appeals decision in *Miller v. Fredin*,
(18-cv-466, Defs.' Mem. Supp. Mot. for Summ. J. at 10–13), the Court declines to rule on
the basis of privilege, as it is unnecessary.  Certainly, if Fredin had sued Miller and Schaefer
on the basis of statements made in state court proceedings, without the issue of subsequent
republication to the press, the absolute litigation privilege could very well apply.  *See
Mahoney & Hagberg*, 729 N.W.2d at 306.  The facts here are slightly different, however.
Fredin sues Miller and Schaefer on the theory that although the statements may be found
in court documents, Miller and Schaefer also made the statements directly to Mullen, and
Mullen published the statements in City Pages.  As Fredin observes, (18-cv-466, Pl.'s
Opp'n to Summ. J. at 10–11), the Eighth Circuit has stated that "[i]n determining whether

### B. Intentional Infliction of Emotional Distress

As noted, Fredin asserts claims against Middlecamp, Miller, and Schaefer for IIED. Under Minnesota law, a person asserting a claim for IIED must establish the following four elements with respect to the defendant:  (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) the conduct must cause emotional distress; and (4) the distress must be severe.  *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (citing *Hubbard v. United Press Intern., Inc.*, 330 N.W.2d 428, 438–39 (Minn. 1983)).  A claim for IIED is limited to the most egregious facts, in situations in which the defendant's conduct is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community."  *Hubbard*, 330 N.W.2d at 439 (citation omitted).  Thus, "[l]iability for intentional infliction of emotional distress does not extend to insults, indignities, threats, annoyances, petty oppressions, or trivialities."  *Langeslag*, 664 N.W.2d at 865 (citations omitted).  The scope of a claim for IIED is therefore constrained by "the extreme nature of the conduct necessary to invoke this tort, and the

---

an occasion is absolutely privileged, the pivotal factor is frequently to whom the matter is published.  Publication to the news media is not ordinarily sufficiently related to a judicial proceeding to constitute a privileged occasion."  *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 697 (8th Cir. 1979) (finding, under Iowa law, that absolute litigation privilege did not extend to dissemination of a complaint to news services); *see also POET, LLC v. Nelson Eng'g, Inc.*, No. CIV 17-4029, 2018 WL 791254, at *5 (D.S.D. Feb. 7, 2018) (citing *Asay* and predicting that South Dakota Supreme Court would not extend the absolute litigation privilege to a statement that formed the basis for a defamation counterclaim that the plaintiff posted to the public on the internet regarding its own pending litigation). While the Court is unaware of similar authority under Minnesota law, it need not reach the question. Rather, as set forth above, the Court finds that Fredin has failed to submit evidence sufficient to show a disputed question of material fact that Miller and Schaefer made these statements directly to Mullen and that the statements are false and defamatory.

necessary degree of severity of the consequent mental distress." *Hubbard*, 330 N.W.2d at

439.   Such limitations "reflect[] a strong policy to prevent fictitious and speculative

claims." *Id.* (citing Restatement (Second) of Torts § 46 comment j (1965)).

In his IIED claim against Middlecamp, Fredin alleges that the same conduct in

support of his defamation claim provides the basis for his IIED claim, namely,

Middlecamp's actions in reposting the Facebook allegation of rape.[19]  (Am. Compl. ¶¶ 42–

43.)   With respect to Miller and Schaefer, Fredin alleges that in order to cause him

emotional distress, they engaged in "the publication and dissemination of sexual

advertisements and coaching of false legal actions and/or broadcasting false claims through

their revenge porn media platforms @CardsAgstHrsmt and a City Pages tabloid to cover

up their misconduct."  (*Id.* ¶ 85.)  Fredin alleges that as a result of the conduct of Miller

and Schaefer, he lost his employment and professional livelihood and endured a "terrifying

no-knock swat raid and loss of all his assets following a terrifying forensic analysis of his

phones and computers later revealing no evidence and dismissed in Plaintiff's favor."  (*Id.*

¶¶ 85–86.)

---

[19]     To the extent that Fredin argues that Middlecamp has demonstrated extreme and outrageous conduct toward non-parties, (Pl.'s Opp'n to Summ. J. at 16), such allegations do not form the basis for Fredin's IIED claim, in which he alleges that Plaintiff directed her conduct toward him.  (Am.  Compl. ¶ 42) ("Defendant has engaged, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard for causing, emotional distress to Plaintiff, namely the publication and dissemination of patently false and sensational statements about him on her public Twitter account.").   Accordingly, the Court does not consider Fredin's arguments regarding non-parties.

### 1.   IIED Claim Against Middlecamp

Middlecamp argues that she is entitled to summary judgment on Fredin's IIED claim because he has failed to provide sufficient evidence to support his allegation that her February 22, 2017 tweet was "extreme and outrageous."  (Def.'s Mem. Supp. Mot. for Summ. J. at 11.)  She contends that because the statement addressed a matter of public importance, aimed at protecting the safety of women, it does not rise to the level of extreme and outrageous conduct required under the law.  (*Id.* at 11–12.)  Further, she argues that Fredin has produced no evidence that the underlying statement was false or that she was reckless when she shared it on Twitter.  (*Id.* at 12.)

Earlier in the case, when Middlecamp moved to dismiss Fredin's claims under Federal Rule of Civil Procedure 12(b)(6), Magistrate Judge Franklin Noel, who was then assigned to the case, applied the deferential standard of review applicable to plaintiffs at the pleading stage.  (Apr. 13, 2018 R&R at 6 [Doc. No. 30], *adopted*, Sept. 26, 2018 Order [Doc. No. 39].)   While he noted that Minnesota courts had not addressed the question of whether a false rape allegation is extreme and outrageous conduct, the magistrate judge found, under the liberal review standard, that if Fredin's claim of a false accusation were taken as true, such facts sufficiently alleged "extreme and outrageous" conduct.  *Id.*  (citing *Mangan v. Rumo*, 226 F. Supp. 2d 250, 254 (D. Me. 2002); *Iglesias v.* O'Neal, No. 16-6291 (RBK/AMD), 2017 WL 1170835, at *3 (D.N.J. Mar. 29, 2017)).  Also, reading the complaint as a whole, and in the light most favorable to Plaintiff, Magistrate Judge Noel found that Fredin had sufficiently pleaded that he suffered severe distress as a result of Plaintiff's statements.  (*Id.* at *4.)

As noted, at the summary judgment stage, however, a plaintiff opposing a motion may not rest on mere allegations, but must offer some evidence to at least establish a disputed issue of material fact. *Holaway*, 771 F.3d at 1059.

### a. Extreme and Outrageous Conduct

Fredin states that "intentionally false allegations of rape could amount to outrageous behavior intolerable in a civilized society." (Pl.'s Opp'n to Summ. J. at 13) (quoting *Mangan*, 226 F. Supp. 2d at 253–54). Again, Minnesota courts do not appear to have addressed this issue, but even under Fredin's legal authority, the evidence here fails to create a disputed question of material fact that Middlecamp's conduct was extreme and outrageous. As noted earlier, prior to republishing the rape allegation, Middlecamp avers that she contacted the alleged rape survivor, believed in her veracity, and received her permission to share the allegation. (Middlecamp Decl. ¶ 2.) This evidence rebuts Fredin's assertion that the allegation was intentionally false or that Middlecamp's conduct was reckless.

Fredin's evidence in opposition to summary judgment is insufficient to create a disputed question of material fact in this regard. He again points to Middlecamp's April 25, 2018 emails in which she states that she and Schaefer provided "Kelli," who they believed to be Fredin, with "unique false information" in order to demonstrate that Fredin was violating Schaefer's HRO. (Pl.'s Opp'n to Summ. J. at 13) (referring to Second Fredin Decl., Ex. A (Apr. 25, 2018 emails).) First, the "unique false information" was about Middlecamp herself, involving a supposed friendship with HRO Referee Elizabeth Clydesdale, to see if Fredin would essentially take the bait by using the false information

in one of his legal actions.  (Second Fredin Decl., Ex. A (Apr. 25, 2018 emails).)  The false information was not about Fredin.  (*Id.*)  Second, these emails have nothing to do with the rape allegation, let alone whether Middlecamp had knowledge of the truth or falsity of the rape allegation.

Relatedly, Fredin points to a text message that is apparently described in a December 7, 2017 St. Paul Police report, obtained through his Data Practices Act requests, which he believes originated from Schaefer.  (Pl.'s Opp'n to Summ. J. at 13–14.)  He claims that this text message "confirms the ongoing scheme of Defendant Middlecamp to harass Plaintiff, but also demonstrates the fact that they are acting with malicious intentions." (*Id.*)  The text message, which Fredin reproduces in his opposition memorandum, states:  "Listen Brock, I have a hilarious secret for you.  Lindsey and Clydesdale [sic] have a mutual bestie and have been hanging out for years.  You are going down way further than you imagined.  You messed with the wrong women."  (*Id.* at 14.)

Based on the content of this text message, it appears to be the communication that Schaefer made to "Kelli," in order to determine whether Fredin was violating Schaefer's HRO by communicating with her as "Kelli." (*See* Second Fredin Decl., Ex. A (Apr. 25, 2018 emails).)  This evidence fails to show a disputed question of material fact regarding Middlecamp's knowledge of the truth or falsity of the rape allegation, nor does it demonstrate that her conduct in republishing the rape allegation was reckless.  The text, by its very language, does not purport to originate from Middlecamp, and it has nothing to do with the subject of rape.

Fredin also claims that Middlecamp "sent her false rape allegation to Saint Paul Officer David McCabe who was known to be in the sexual assault group." (Pl.'s Opp'n to Summ. J. at 14) (citing Fredin Decl., Ex. C (Jan. 24, 2017 McCabe email)). But the email that Fredin identifies in support of this contention contains no allegation of rape. The two-sentence, January 24, 2017 email message from Sergeant McCabe appears to refer to Middlecamp's earlier email which she sent to her colleague in the Minneapolis City Attorney's Office, asking whether a counterpart in the St. Paul City Attorney's Office might take another look at Fredin's conduct, particularly in light of the Minnesota Court of Appeals ruling issued the previous day in *Miller*, 2017 WL 280974. (*See* Fredin Decl., Ex. C (Jan. 24, 2017 McCabe email).) In McCabe's January 24, 2017 email message, he stated that had seen the earlier email, and noted, "I have been working on this case for several years now and so far everything I have submitted has been declined." (*Id.*) This January 24, 2017 email contains no rape allegations, and predates the February 22, 2017 reposting of the rape allegation by nearly a month.

In light of the record here, even assuming that Minnesota courts would find that a false accusation of rape rises to the level of extreme and outrageous conduct, Fredin's evidence in opposition fails to show a disputed question of material fact sufficient to present the claim to a jury.

### b. Causation

Even if a question of material fact remained in dispute as to extreme and outrageous conduct, a plaintiff asserting an IIED claim also "must meet a high threshold of proof" to show that the defendant's extreme and outrageous conduct caused the plaintiff's severe

emotional distress. *Langeslag*, 664 N.W.2d at 868–69. Fredin's IIED claim fails to survive summary judgment because he presents no such evidence sufficient to show a disputed question of material fact on causation and the severity of his alleged distress. *See Peterson v. HealthEast Woodwinds Hosp.*, No. A14-1409, 2015 WL 4523558, at \*6, (Minn. Ct. App. June 29, 2015) (affirming district court's finding of a lack of causation on IIED claim where plaintiff testified that she had suffered from depression for 15 years, but did not provide any medical records in support of her claim), *review denied* (Minn. Sept. 29, 2015). Generally, a plaintiff's own testimony does not sufficiently establish the necessary causal connection between the defendant's conduct and the plaintiff's emotional distress "because a person's emotional distress may have multiple and complex causes." *Id.* (citing *Langeslag*, 664 N.W.2d at 869). Thus, "[t]he appropriate method of proving the . . . causation of emotional distress is through medical testimony." *Id.* (citing *Langeslag*, 664 N.W.2d at 870). Fredin concedes that he lacks documentation of his emotional distress, stating that a lack of health insurance resulted in his inability to document his injuries. (Pl.'s Opp'n to Summ. J. at 15.) The Court finds that here, the source of Fredin's alleged distress could have arisen from a variety of sources. Because of the lack of medical documentation and testimony, there is no disputed question of material fact on the issue of causation. *Langeslag*, 664 N.W.2d at 869; *Peterson*, 2015 WL 4523558, at \*6.

Accordingly, for all of these reasons, Middlecamp's summary judgment motion is granted with respect to Fredin's IIED claim.

### 2.   IIED Claims Against Miller and Schaefer

In Fredin's IIED claims against Miller and Schaefer, he alleges that they engaged in "the publication and dissemination of sexual advertisements and coaching of false legal actions and/or broadcasting false claims through their revenge porn media platforms @CardsAgstHrsmt and a City Pages tabloid to cover up their misconduct."  (18-cv-466, Am. Compl. ¶ 85.)  As a result of this conduct, Fredin contends, he lost his employment and professional livelihood and endured a "terrifying no-knock swat raid," from which he lost items of property.  (*Id.* ¶¶ 85–86.)  Defendants move for summary judgment, arguing that none of the alleged conduct finds any support in the record sufficient to create a disputed question of material fact about extreme and outrageous conduct.  (Defs.' Mem. Supp. Mot. for Summ. J. at 25–26.)  In addition, they argue that Fredin's IIED claims fail because he presents no medical or expert testimony sufficient to demonstrate the existence of a material fact question on the element of causation.  (*Id.* at 26.)

### a.   Causation

As to causation, the Court agrees with Miller and Schaefer, for the reasons set forth in the Court's discussion of the IIED claim against Middlecamp, that Fredin fails to offer medical evidence sufficient to show disputed issues of material fact as to causation. *Langeslag*, 664 N.W.2d at 869; *Peterson*, 2015 WL 4523558, at *6.

Here too, Fredin argues that he "did not have medical insurance and was unable to seek proper care which negates Defendants['] assertion of medical records and testimony." (18-cv-466, Pl.'s Opp'n to Summ. J. at 23.)  He then states, without citing any evidence in the record, "Moreover, Plaintiff did provide sufficient medical records." (*Id.*)  Regardless

60

of Fredin's lack of insurance, he initiated this litigation and pleaded this cause of action. Although Fredin is proceeding pro se, he must still present sufficient evidence to meet the elements of his claims in order to survive summary judgment. S*ee Farnsworth v. City of Kansas City, Mo.*, 863 F.2d 33, 34 (8th Cir. 1988) ("Pro se litigants are not excused from complying with court orders or substantive and procedural law.") (citing *Burgs*, 745 F.2d at 528). Fredin's failure to do so forecloses his IIED claims on summary judgment. *Langeslag*, 664 N.W.2d at 869; *Peterson*, 2015 WL 4523558, at *6.

To the extent that he believes he provided such records, he fails to identify them in opposition to summary judgment. "A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Brown v. City of Jacksonville*, 711 F.3d 883, 888 n.5 (8th Cir. 2013) (quoting *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 915 (8th Cir. 2007)). Accordingly, because Fredin fails to offer medical evidence sufficient to show a disputed issue of material fact on causation, Miller and Schaefer are entitled to summary judgment on this basis. *Langeslag*, 664 N.W.2d at 869; *Peterson*, 2015 WL 4523558, at *6.

### b. Extreme and Outrageous Conduct

The Court also finds that Miller and Schaefer are entitled to summary judgment because the evidence in the record fails to demonstrate a disputed question of material fact as to whether Miller and Schaefer performed the alleged conduct, let alone whether that conduct could be considered extreme and outrageous, as discussed below.

###### i.       Publishing and Disseminating Information

The Court first considers Fredin's claim that Miller and Schaefer published and disseminated sexual advertisements in his name without his consent—the same conduct that he alleges in support of his claims for nonconsensual sexual solicitation. (*Compare* 18-cv-466, Am. Compl. ¶ 61 (nonconsensual sexual solicitation claims), *with id*. ¶ 85 (IIED claims).)   Miller and Schaefer argue that they are entitled to summary judgment because Fredin offers no evidence of who created the profiles.   (18-cv-466, Defs.' Mem. Supp. Mot. for Summ. J. at 22) (addressing evidence with respect to nonconsensual sexual solicitation claims).   Fredin cites no legal authority showing that Minnesota courts have found such conduct to be "extreme and outrageous," but even assuming that Minnesota courts would reach that conclusion, Fredin does not submit evidence showing a material factual dispute regarding whether Miller and Schaefer engaged in this conduct.

In general, Fredin contends that Miller and Schaefer impersonated him by using his email address to create false profiles and publishing online sexual advertisements, which caused him to receive unsolicited sexual invitations from persons who accessed the allegedly fake profiles.[20]   (18-cv-466, Am. Compl. ¶¶ 61, 85.)   He alleges that through this conduct, Defendants intended to cause him emotional distress.   (*Id.* ¶ 69.)

In opposition to summary judgment, Fredin argues that "Defendants make conclusory allegations that they are not liable for the profiles they created." (18-cv-466,

---

[20]       The Court presumes that Fredin's evidence in support of his IIED claims based on the publication and dissemination of sexual advertisements is the same that he offers in support of his nonconsensual sexual solicitation claims, given the similar factual allegations underlying these two causes of action.

Pl.'s Opp'n to Summ. J. at 19.)  But it is Plaintiff who must offer some proof, on summary judgment, of the alleged conduct, as he must identify record evidence to at least show the existence of a triable issue of material fact on the elements of his IIED claims. *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 258 (8th Cir. 1996) ("The moving party will be entitled to judgment as a matter of law when the nonmoving party has failed to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In fact, Fredin acknowledges the paucity of his evidence, stating, "The court denied discovery[,] complicating this issue." (18-cv-466, Pl.'s Opp'n to Summ. J. at 19.)

Fredin alleges that Miller and Schaefer created two false accounts or profiles, and impersonated him on the website "www.collarspace.com," using the names "EpicViewf12," "EpicViewfu," and "blackoutx2." (18-cv-466, Am. Compl. ¶¶ 17–18; 18-cv-466, Breyer Decl., Ex. 4 (Fredin Dep.) at 128.)  At his deposition, when asked to identify the basis for his allegations, Fredin testified,

> Schaefer had emailed me, directly taunting me, related to the [HRO] proceeding and the smear campaign online against me, and then suddenly these profiles popped up within hours.  The user name blackoutx2 references a, quote, unquote, blackout campaign, and the x2 is pretty easily identifiable as times two, which is two people, Catherine Schaefer and Grace Miller.

(18-cv-466, Breyer Decl., Ex. 4 (Fredin Dep.) at 66.)  Fredin further believed that Schaefer and Miller were behind the profiles because Schaefer had Fredin's email address, and, in a Facebook post, referenced Miller.  (*Id.* at 68; *see also* 18-cv-466, Am. Compl. ¶ 22.)

Fredin also testified to his belief that Schaefer sent him a message using the name "Blackoutx2," stating, "We know about you.  We will be coming soon."  (18-cv-466,

Breyer Decl., Ex. 4 (Fredin Dep.) at 72; *see also* 18-cv-466, Am. Compl. ¶ 20.) He thought that Schaefer had sent the message, based on his belief that the phrase "We will be coming soon" referred to the subsequent Ramsey County HRO action that Schaefer filed against him, as well as "the subsequent smear campaign against me as well as their efforts to contact any and all people that they knew I had dated." (18-cv-466, Breyer Decl., Ex. 4 (Fredin Dep.) at 73–74.)

But Fredin's testimony consists of conjecture based on the fact that one or both women had Fredin's email address at some point, and the temporal proximity of various communications to other events. Without actual evidence raising at least a material factual dispute about the origins of the online profiles, Fredin's unsupported speculation cannot defeat summary judgment. *Bloom v. Metro Heart Group of St. Louis, Inc*., 440 F.3d 1025, 1028 (8th Cir. 2006) ("[Plaintiff's] speculation and conjecture are insufficient to defeat summary judgment."). Fredin testified that he had requested IP addresses from www.collarspace.com in order to uncover the source of these profiles, but never subpoenaed www.collarspace.com or received a log of IP addresses associated with the usernames because he "didn't have the bandwidth to pursue fighting through a subpoena to get IP records." (18-cv-466, Breyer Decl., Ex. 4 (Fredin Dep.) at 133.) Nevertheless, Fredin asserted that Schaefer created the false profiles, based on his belief that they were associated with her IP address. (*Id.* at 133–41.) He testified, "So I didn't subpoena this website, but this content could only have been created by Catherine Schaefer," explaining that the profile in question contained a picture of a black couple and, at approximately the same time, Schaefer had been posting about Black Lives Matter on Facebook. (*Id.* at 135–

64

36.)   Having failed to conduct discovery on the relevant question of where the advertisements originated, the Court rejects Fredin's speculative and attenuated testimony as insufficient to show a disputed issue of material fact.

Fredin also testified that "by way of a friend" who he refused to name, he used Google Analytics to "show[] that HTTP requests made to retrieve data were made, in reference to this whole smear campaign" from Schaefer's IP address. (*Id.* at 136–38.)  But Fredin produced no such evidence in discovery and nothing in opposition to Defendants' summary judgment motion.

The Court finds that Fredin has failed to make a showing on an essential element of his case for which he bears the burden of proof, *Barge*, 87 F.3d at 258, namely, whether Miller and Schaefer engaged in the conduct in question by publishing or disseminating the online advertisements.  *Langeslag*, 664 N.W.2d at 864 (reciting elements of IIED claim, which include showing that the defendant's conduct was extreme and outrageous). Accordingly, the Court grants summary judgment to Miller and Schaefer in this regard.

### ii.   "Coaching of False Legal Actions"

As noted, Fredin also bases his IIED claims against Miller and Schaefer on their alleged conduct in "coaching false legal actions."  (18-cv-466, Am. Compl. ¶ 85.)  In opposition to summary judgment on this aspect of his IIED claims, Fredin fails to specifically identify the "false legal actions" in question.  (*See* 18-cv-466, Pl.'s Opp'n to Summ. J. at 22–23.)  Presumably, he refers to the legal actions that support his separate allegations of abuse of process. (*Compare* 18-cv-466, Am. Compl. ¶ 85 (alleging the "coaching [of] false legal actions" in IIED claims), *with id.* ¶¶ 48–59 (referring to

"fraudulent HRO petition[s]" and "baseless and fraudulent criminal charges" in abuse-of-process claims).)

Fredin cites no authority for the proposition that filing a false legal action constitutes "extreme and outrageous" conduct for an IIED claim under Minnesota law, but even assuming that is true, he fails to substantiate his allegations with relevant evidence sufficient to create a question of material fact that either the HRO proceedings or the criminal proceedings were false or fraudulent.  To the contrary, Minnesota's appellate courts have affirmed the issuance of the 50-year HROs granted to Miller and Schaefer, *Schaefer*, 2020 WL 1921101, *review denied*, (Minn. July 23, 2020); *Miller*,  2019 WL 3293766, *review denied*, (Minn. Oct. 15, 2019); and have affirmed Fredin's criminal conviction for violating Miller's HRO.[21]  *Fredin*, 2020 WL 1983050, at *5, *review denied* (Minn. July 23, 2020).  Moreover, in connection with one of Fredin's other federal lawsuits, this Court previously dismissed an abuse-of-process claim that he brought against Miller, Schaefer, Middlecamp, and McCabe based on the filing of criminal charges against him.[22] *Clysdale*, 2018 WL 7020186, at *11.

---

[21]    The fact that Fredin's criminal conviction for stalking by mail was later vacated because the Minnesota Supreme Court found the statute unconstitutional in *In re Welfare of A.J.B.*, 929 N.W.2d at 856, does not support his claim of "false charges" or "false proceedings."  In addition to the stalking-by-mail count, the jury also found Fredin guilty of violating Miller's HRO—a conviction that stands.  *Fredin*, 2020 WL 1983050, at *5, *review denied* (Minn. July 23, 2020).  And, at the time of his conviction in July 2018, the Minnesota Supreme Court had not yet found the stalking-by-mail statute unconstitutional, which did not occur until June 2019.  *See In re Welfare of A.J.B.*, 929 N.W.2d at 856.

[22]    To the extent that Fredin's allegations of "false legal actions" include the "terrifying no-knock swat raid," (18-cv-466, Am. Compl. ¶¶ 33, 87), the execution of the search warrant was conducted as part of a criminal investigation.  As private citizens, Miller and

Accordingly, the Court finds that there is no disputed issue of material fact regarding whether Defendants "coach[ed] false legal actions" against him. To the extent that Fredin's allegations in the Amended Complaint refer to other conduct, his failure to identify the conduct and provide support for it in the record warrants the entry of summary judgment on this portion of his IIED claims. Thus, Defendants are entitled to summary judgment on this aspect of Plaintiff's IIED claims.

### iii.   "Broadcasting False Claims"

Finally, as part of Fredin's IIED claims against Miller and Schaefer, he alleges that they "broadcast[] false claims through their revenge porn media platforms @CardsAgstHrsmt and a City Pages tabloid to cover up their misconduct." (18-cv-466, Am. Compl. ¶ 85.)

As to the City Pages article, Fredin does not identify within his IIED claims the "false claims" that Miller and Schaefer allegedly made. Assuming that he refers to the statements that form the basis for his defamation claims, the Court has already found that there is no disputed question of material fact that neither Miller nor Schaefer wrote the City Pages article. Nor has Fredin demonstrated that the statements he identified were made by Miller and Schaefer to the City Pages reporter, or that they were "false." Accordingly, the Court grants summary judgment to Defendants on this portion of the IIED claims against them.

_____

Schaefer did not execute the search warrant. Moreover, the Eighth Circuit has affirmed the dismissal of Fredin's claims for abuse of process, retaliation, and Fourth Amendment violations based on the same search. *Clysdale*, 794 Fed. App'x at 556.

Fredin also does not specify the "false claims" on "revenge porn media platforms" that Miller and Schaefer allegedly made.  The Court has already ruled that as to Fredin's defamation claims against Miller and Schaefer, he has failed to submit evidence sufficient to create a disputed question of material fact that they were behind the profiles posted on "porn media platforms."  As to the alleged "false claims" on the @CardsAgstHrsmt site, Fredin does not identify these claims in opposition to summary judgment, explain how they were false, or substantiate his allegations with relevant evidence showing that Miller and Schaefer made them.  (*See* Pl.'s Opp'n to Summ. J. at 22–23.)  As noted, on summary judgment, the nonmoving party may not rest upon mere allegations, but must "set forth specific facts sufficient to raise a genuine issue for trial."  *Rohr v. Reliance Bank*, 826 F.3d 1046, 1052 (8th Cir. 2016) (citation omitted).   The Court finds that there is no disputed issue of material fact regarding this portion of Fredin's IIED claims against Miller and Fredin, and Defendants are entitled to summary judgment in this regard.

### C. Nonconsensual Sexual Solicitation and Invasion of Privacy Claims Against Miller & Schaefer

Miller and Schaefer move for summary judgment on all of Fredin's claims, (18-cv-466, Defs.' Mem. Supp. Mot. for Summ. J. at 2), which include the related claims for nonconsensual sexual solicitation and invasion of privacy based on the publication of private facts.

### 1.  Nonconsensual Sexual Solicitation

Fredin alleges that Defendants engaged in "the publication and dissemination, confidential email addresses [sic], and publishing of sexual advertisements on the [i]nternet

68

impersonating his identity in an effort to bring actions and/or broadcasting false claims through adult websites thereby sending him countless unsolicited sexual invitations and images to his personal phone and email from people both visiting and making direct contact to the adult profile." (18-cv-466, Am. Compl. ¶ 61.)

Under Minnesota law, "[a] person who uses the personal information of another to invite, encourage, or solicit sexual acts without the individual's consent and knows or has reason to know it will cause the person whose personal information is used to feel harassed, frightened, threatened, oppressed, persecuted, or intimidated, is liable for damages to the individual whose personal information was published or disseminated publicly." Minn. Stat. § 604.31, subd. 2 (2016).

For the reasons previously stated, the Court finds that Fredin fails to make a sufficient showing on an essential element of his claim for which he has the burden of proof, *Barge*, 87 F.3d at 258, as to his allegation that Defendants impersonated him by creating false online profiles and posting his name and email addresses on adult websites.[23] Specifically, he fails to substantiate his allegations with relevant evidence that Defendants used his personal information to solicit sexual acts. Minn. Stat. § 604.31, subd. 2 (2016).

Accordingly, the Court grants Defendants' summary judgment motion on Fredin's nonconsensual sexual solicitation claims.

---

[23] Moreover, as to the unsolicited text messages that Fredin contends he received, he testified that he deleted them from his phone, which he later sold online. (18-cv-466, Breyer Decl., Ex. 4 (Fredin Dep.) at 94.) Of the email messages that Fredin received from the www.collarspace.com platform, he testified that he "opened one or two of them" but otherwise did not read them. (Id. at 77–79.)

### 2. Invasion of Privacy

Fredin alleges that Miller and Schaefer invaded his privacy in the form of intrusion upon seclusion by publishing and disseminating his confidential email addresses, name, and private facts in sexual advertisements on the internet, and impersonating his identity in the course of publishing the advertisements, causing him to receive unsolicited sexual invitations. (18-cv-466, Am. Compl. ¶ 64.)

Intrusion upon seclusion is one of the three types of invasion of privacy claims that Minnesota courts recognize. *Lake v. Wal-Mart Stores, Inc*., 582 N.W.2d 231, 236 (Minn. 1998). While Fredin originally pleaded several theories of liability for invasion of privacy, this Court previously ruled that only his intrusion upon seclusion claim could proceed. (18-cv-466, Oct. 17, 2018 Order at 19–23.) The tort of intrusion upon seclusion requires a plaintiff to show that the defendant (1) intentionally intruded (2) into "the solitude or seclusion of another or his private affairs or concerns" (3) in such a way as to "be highly offensive to a reasonable person." *Lake*, 582 N.W.2d at 233) (quoting Restatement (Second) of Torts, § 652B (1977)).

Fredin contends that his invasion of privacy claims survive summary judgment "based on numerous FOIA productions evidencing Defendants['] misconduct." (18-cv-466, Pl.'s Opp'n to Summ. J. at 23.) However, he fails to identify the particular exhibits in the record to which he refers. Again, the Court is not required to comb through the entire record and speculate about the portion of the record on which he relies. *Brown*, 711 F.3d at 888 n.5 (citation omitted). In any event, the Court has reviewed Plaintiff's exhibits. None of them address the salient question, sufficient to show a disputed issue of material

fact for trial, that Defendants published and disseminated Fredin's information in sexual advertisements.  As the Court has previously discussed in connection with Fredin's IIED claims based on such allegations, it is insufficient at summary judgment for a plaintiff to rely upon speculation and conjecture.  *Holaway*, 771 F.3d at 1059.  Accordingly, for the reasons discussed earlier, the Court finds that Plaintiff has failed to substantiate his allegations with evidence in the record sufficient to create a material factual dispute as to whether Defendants published and disseminated the sexual advertisements.   Thus, Defendants are entitled to summary judgment on Fredin's invasion of privacy claims against them.

### D. Abuse-of-Process Claims Against Miller & Schaefer

In the Amended Complaint, Fredin alleges that Miller and Schaefer, acting in concert, fraudulently used civil legal proceedings and collateral criminal proceedings against him in order to "deprive Plaintiff of legitimate First Amendment rights, create tabloid fodder, bring baseless and fraudulent criminal charges, and impose irreparable harm to his person and professional livelihood."  (18-cv-466, Am. Compl. ¶ 53.)  Specifically, he alleges that they (1) filed false police reports; (2) used fabricated police reports to initiate civil contempt motions in September 2016, May 2017, and February 2018; and (3) used Middlecamp's position as a City of Minneapolis Assistant Attorney "for the collateral purpose of intimidating and/or encouraging an illegal search warrant on Plaintiff's home to remove lawful and peaceful criticisms on his Facebook [account]."  (*Id.* ¶¶ 49–55.) Further, Fredin claims that Miller and Schaefer filed the allegedly false legal actions "for

the collateral purpose of instigating greater attention to their associated media campaign(s) and in order to interfere with Plaintiff Fredin's professional standing." (*Id.* ¶ 58.)

"Process" is defined as "'[t]he proceedings in any action or prosecution; a summons or writ, esp. to appear or respond in court.'" *Eclipse Architectural Grp., Inc. v. Lam*, 814 N.W.2d 692, 697 (Minn. 2012) (quoting Black's Law Dictionary 1574 (9th ed. 2009)). There are two elements for a claim of abuse of process: "(1) the existence of an ulterior purpose; and (2) the act of using the process to accomplish a result not within the scope of the proceeding in which it was issued, whether such result might otherwise be lawfully obtained or not." *Pow-Bel Constr. Corp. v. Gondek*, 192 N.W.2d 812, 814 (Minn. 1971) (citation omitted). The test is "whether the process was used to accomplish an unlawful end for which it was not designed or intended." *Kittler & Hedelson v. Sheehan Props., Inc.*, 203 N.W.2d 835, 840 (1973).

The Court previously dismissed a similar claim for abuse of process that Fredin brought against Miller and Schaefer in a related case. *Fredin*, 2020 WL 3077708, at *10 (finding abuse-of-process claim failed as a matter of law where Defendants had no authority to bring criminal charges against Fredin, and to the extent Miller and Schaefer used the civil legal process to obtain an HRO, or reported suspected criminal behavior, "their conduct was not outside the bounds of the civil proceedings."). Here, Fredin has failed to offer evidence sufficient to show a material fact question as to whether Miller and Schaefer filed false police reports or used fabricated information to obtain contempt rulings or to bring "greater attention to their associated media campaign(s) and in order to interfere with Plaintiff Fredin's professional standing." (18-cv-466, Am. Compl. ¶ 58.) Rather,

there is no evidence that Miller and Schaefer used legal processes "to accomplish a result not within the scope of the proceedings." *Pow-Bel Const. Corp.*, 192 N.W.2d at 814.   On the contrary, they successfully obtained HROs against Fredin.   In addition, any police reports that supported those HRO proceedings accomplished results that were within the scope of the proceedings.

Regarding Fredin's allegation that Miller and Schaefer filed their allegedly false legal actions in order to effectuate the search of Fredin's residence and to have him criminally prosecuted, (18-cv-466, Am. Compl. ¶ 55), Miller and Schaefer had no authority or control over the criminal investigation and prosecution of Fredin.[24]

For all of these reasons, the Court finds that Fredin fails to make a sufficient showing of an essential element of his abuse-of-process claim—that Defendants used legal processes to accomplish a result not within the scope of the proceedings in question. *Pow-Bel Const. Corp.*, 192 N.W.2d at 814.   Moreover, while Fredin speculates about Defendants' ulterior motives in using the legal processes—the other element of an abuse-of-process claim, *id.*,—he fails to substantiate his allegations with sufficient evidence.   The Court therefore grants summary judgment to Defendants on Plaintiff's abuse-of-process claims. *Barge*, 87 F.3d at 258.

---

[24]   Moreover, in a related action in which Fredin sued Sergeant McCabe for abuse of process based on the execution of the search warrant, the Court dismissed the claim, finding that the warrant was lawfully executed on a showing of probable cause. *Fredin*, 2018 WL 7020186, at *11.

### E.  Negligence Claims Against Miller & Schaefer

In the Amended Complaint, Fredin asserts that Miller and Schaefer were negligent, alleging that they owed him a duty of care and breached that duty of care, to his detriment, in the following ways:  filing false legal proceedings and false police reports and causing him to experience "a no-knock swat raid directly to gain investigative details surrounding these false reports."  (18-cv-466, Am. Compl. ¶¶ 71–83.)  Defendants move for summary judgment, arguing that they owed Fredin no duty of care, and even if they did, nothing in the underlying state court proceedings suggests that they ever filed a false police report or that there was insufficient evidence of Fredin's misconduct.  (18-cv-466, Defs.' Mem. Supp. Mot. for Summ. J. at 23.)

"Negligence is the failure to exercise the level of care that a person of ordinary prudence would exercise under the same or similar circumstances." *Doe 169 v. Brandon*, 845 N.W.2d 174, 177 (Minn. 2014) (citation omitted). To state a claim for negligence, a plaintiff must establish "(1) the existence of a duty of care; (2) breach of that duty; (3) proximate causation; and (4) injury."  *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn. 2007). "Duty is a threshold question '[b]ecause a defendant cannot breach a nonexistent duty.'" *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 582 (Minn. 2012) (quoting *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011)). The existence of a duty is a legal question for the court to resolve.  *Id.* (citing *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986)).

Fredin alleges that Miller and Schaefer owed him the "duty of care not to unreasonably harm Plaintiff."  (18-cv-466, Pl.'s Opp'n to Summ. J. at 21.)   As to the

breach of the duty, he suggests that a disputed issue of material fact exists, arguing that all of his exhibits demonstrate that Miller and Schaefer (1) "admitted to possessing knowledge that their actions were intentionally designed to deceive" by providing "unique false information" and taking actions to "fabricate"; and (2) "withheld knowledge that they were pressuring officials by obstructive use of their state and federal law enforcement officials to rig proceedings." (*Id.* at 21–22.)

Fredin appears to argue that Defendants breached a general duty of reasonable care. (*Id.* at 21.)   "A legal duty of care is imposed either by the common law rule requiring exercise of ordinary care not to injure another, or by a statute designed for the protection of others." *Wendinger v. Forst Farms, Inc.*, 662 N.W.2d 546, 554 (Minn. Ct. App. 2003). Fredin identifies no statutory duty of care.   Under Minnesota common law, there is generally "no duty to act for the protection of another," absent a special relationship that gives rise to a duty to protect, (e.g., common carriers, innkeepers, and public landholders), or a foreseeable risk of injury to the plaintiff. *Heilman v. Courtney for Minn. Dep't of Corr.*, No. A17-0863, 2019 WL 4008097, at *4 (Minn. Ct. App. Aug. 26, 2019) (quoting *Gilbertson v. Leininger*, 599 N.W.2d 127, 130 (Minn. 1999)); *see also Domagala*, 805 N.W.2d at 23 (citations omitted).   Because Plaintiff and Defendants do not stand in a special relationship, the Court addresses only whether Defendants' conduct created a foreseeable risk of injury to Plaintiff. *Heilman*, 2019 WL 4008097, at *4.

The Court finds nothing in the record showing that Defendants' conduct created a foreseeable risk of harm to Fredin, such that they owed him a duty of care. The 50-year HROs and Fredin's criminal conviction for violating Miller's HRO were based on *Fredin's*

conduct, not Defendants' conduct.   And as to the criminal proceedings, Miller and Schaefer, as private citizens, were not authorized to bring criminal charges against Fredin. Therefore, their "conduct" in reporting Fredin's suspected criminal violations was not the proximate cause of any injury resulting from Fredin's prosecution.   *Bjerke*, 742 N.W.2d at 664 (reciting elements of negligence claim).   Rather, "Fredin's jail sentence resulted from his own conduct, as well as the independent decisions of prosecutors, a jury, and a presiding judge."   *Fredin*, 2020 WL 3077708 at *11.   Moreover, as to the duty of care, the Court has previously addressed a negligence claim brought by Fredin against Miller in another case, stating, "It would be antithetical to the goals of the civil justice system to impose a duty of care on Ms. Miller, in particular, as she was found to be the victim of Fredin's HRO violation."   *Id.*

Again, Fredin relies on the April 28, 2018 emails in which Middlecamp recounted how she and Schaefer sought to determine whether Fredin was the source of the "Kelli texts."   (18-cv-466, Second Fredin Decl., Ex. A (Apr. 25, 2018 emails).)   Middlecamp and Schaefer decided to respond to the "Kelli texts" with "unique false information," i.e., that Middlecamp and Referee Clysdale were friendly acquaintances, to see if Fredin would use the information in one of the court proceedings.   (*Id.*)   By so doing, they hoped to "track it to [the Kelli] message exchange."   (*Id.*)   The fact that Middlecamp and Schaefer attempted to glean whether Fredin was violating Schaefer's HRO by providing "Kelli" with false information, fails to show that Miller and Schaefer initiated false legal proceedings or filed false police reports, thereby creating a foreseeable risk of harm to Plaintiff.

To the extent that Miller and Schaefer contacted legal authorities about Fredin's conduct, and that conduct did not result in legal charges, Fredin again provides no evidence showing the existence of a material fact question as to whether they knowingly provided false information.   For example, in June 2019, Miller contacted the St. Paul Police Department after finding "two new memes about her" on the internet.   (18-cv-466, Fredin Decl., Ex. T (SPPD Rpt. 19132719) at 109–15.)   Miller found the information online shortly after Fredin's release from jail, whereas during his period of confinement, "she stopped finding stuff about her on [the] internet."   (*Id.* at 109.)   The police report reflects that the Ramsey County Attorney's Office ultimately declined criminal charges based on this conduct, and that later, Miller reported to the investigating officer that she had discovered the memes were approximately two years old.   (*Id.* at 115.)   This evidence does not support a finding that Miller "falsely" reported a suspected violation of her HRO—it simply shows that she later learned that she had been mistaken about the timing of the appearance of the memes.   Moreover, simply because Fredin was not charged does not make the underlying police report intentionally false.   *See Fredin*, 2020 WL 3077708 at *11.   ("[T]he fact that authorities declined to arrest or charge Plaintiff based on these reports does not render the reports knowingly 'false.'").   Nor can Fredin show that he sustained any injury as a result of a police report that resulted in no charges.   *Id.*

Fredin's claim that Defendants were "with[holding] knowledge that they were pressuring officials by obstructive use of their state and federal law enforcement officials to rig proceedings" finds no support in the record.   (18-cv-466, Pl.'s Opp'n to Summ. J. at 21–22.) While Fredin submits evidence showing that Miller and Schaefer communicated

77

with law enforcement officers, as the Court discusses below, evidence in the record also shows that Fredin communicated with law enforcement officers.  (18-cv-466, Second Fredin Decl., Ex. G (Mar. 24, 2017 & Mar. 27, 2017 emails between Fredin & McCabe).)

Fredin offers evidence of Miller's and Schaefer's communications, including:  (1) two St. Paul Police Department reports that originated from Miller involving Fredin's suspected HRO violations, (18-cv-466, Fredin Decl., Ex. T (SPPD Report Nos. 18101907 & 19132719)); (2) an email chain between Miller and Sergeant McCabe regarding Fredin's responses in the comments to the City Pages article, (18-cv-466, Second Fredin Decl., Ex. E (April 20–21, 2017 email chain)); (3) an email from Miller to Sergeant McCabe attaching a link to a website regarding Middlecamp that Miller suspected Fredin had created, (*id.*, Ex. G (Apr. 20, 2017 email)); (4) emails between Miller and McCabe attaching the 2017 Minnesota Court of Appeals decision, (*id.*, Ex. G (Jan. 24, 2017 emails)); and (5) emails between Schaefer and St. Paul Police officers regarding suspected violations of her HRO (*id.*, Ex. G (Dec. 2017–Oct. 2018 emails).)  This evidence fails to provide support for Fredin's claim that Miller and Schaefer were "pressuring officials" to "rig proceedings." (18-cv-466, Pl.'s Opp'n to Summ. J. at 21–22.)  It shows that they contacted law enforcement officers to report Fredin's suspicious conduct.  This evidence fails to support a finding of a general duty of care due to a foreseeable risk of harm to Fredin.

For all of the foregoing reasons, the Court finds that Plaintiff fails to demonstrate essential elements of his negligence claims—the existence of a legal duty and the breach of that duty by Defendants.  *Doe 169*, 845 N.W.2d at 177.  Because he has not identified record evidence meeting these prima facie elements, there is no genuine dispute of material

fact sufficient to submit Fredin's negligence claims to a jury.  *Barge*, 87 F.3d at 258.  The Court therefore grants Defendants summary judgment on Plaintiff's negligence claims.

### F.  Conspiracy Claims Against Miller & Schaefer

As noted, Fredin alleges that Miller and Schaefer "acted in concert" in carrying out the unlawful conduct alleged throughout his Amended Complaint.  (18-cv-466, Am. Compl. ¶ 91.)  He alleges that the objective of their conspiracy was to "smear Plaintiff with false statements constituting defamation per se" and "commit false arrest/imprison Plaintiff to cover up revenge pornography," which they accomplished by committing the following torts:  defamation, invasion of privacy, negligence, and intentional infliction of emotional distress."  (*Id.* ¶¶ 92–94.)

To state a claim for civil conspiracy, a plaintiff must establish "that two or more people worked together to accomplish (1) an unlawful purpose or (2) a lawful act by unlawful means." *Robert Allen Taylor Co. v. United Credit Recovery, LLC*, No. A15-1902, 2016 WL 5640670, at *11 (Minn. Ct. App. Oct. 3, 2016) (citing *Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (1950)).  A civil claim for conspiracy must be supported by an underlying tort.  *Id.* (citing *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997)).  Because the Court finds that all of Plaintiff's underlying tort claims fail, his conspiracy claims likewise fail.  *Id.*  Accordingly, Defendants are entitled to summary judgment.

## III.   CONCLUSION

Accordingly, for all of the forgoing reasons, the Court finds that no material fact issues remain in dispute and that Defendants are entitled to summary judgment.

**THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    The Motion for Summary Judgment filed by Defendant Lindsey Middlecamp (17-cv-3058 [Doc. No. 179]) is **GRANTED**;

2.    The Motion for Summary Judgment filed by Defendants Grace Miller and Catherine Schaeffer (18-cv-466 [Doc. No. 171]) is **GRANTED**;

3.    Plaintiff's Motion to Strike (17-cv-3058 [Doc. No. 199]) is **DENIED in part and DENIED AS MOOT in part**;

4.    Plaintiff's October 13, 2020 Motion for Rule 11 Sanctions (17-cv-3058 [Doc. No. 216]) is **DENIED**;

5.    Plaintiff's Motion to Unseal Document (17-cv-3058 [Doc. No. 223]) is **DENIED**;

6.    Plaintiff's Motion to Unseal Document (18-cv-466 [Doc. No. 193]) is **DENIED**; and

7.    Plaintiff's claims in the above actions (17-cv-3058 and 18-cv-466) are **DISMISSED WITH PREJUDICE**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  November 13, 2020                    s/Susan Richard Nelson
                                             Susan Richard Nelson
                                             United States District Judge